Case 1:04-cv-00348-MBC    Document 25-5    Filed 12/06/2006    Page 1 of 30

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
- - - - -
WALTER BECK CORPORATION )
d/b/a THE RAINBOW INN, )
　　　　　　　　　　　　　　)
　　Plaintiff, )
　　　　　　　　　　　　　　)
　　vs. 　　　) Civil Action
　　　　　　　　　) No. 04-348-ERIE
SAFECO CORPORATION, 　)
AMERICAN ECONOMY 　)
INSURANCE COMPANY and )
AMERICAN STATES 　)
INSURANCE COMPANY, 　)
　　　　　　　　　　　　　　)
　　Defendants. )

- - - - -

DEPOSITION OF PAUL G. SMITH
- - - - -
REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
WITHOUT AUTHORIZATION FROM THE CERTIFYING
AGENCY
- - - - -

## Page 2

1
2　　　　DEPOSITION OF PAUL G. SMITH
3　a witness herein, called by the Plaintiff for
4　examination, taken pursuant to the Federal
5　Rules of Civil Procedure, by and before
6　Christine M. Vitrano, a Professional Court
7　Reporter and Notary Public in and for the
8　Commonwealth of Pennsylvania, at the law
9　offices of Meyer, Unkovic & Scott, LLP, 1300
10　Oliver Building, Pittsburgh, Pennsylvania, on
11　Tuesday, November 7, 2006, at 9:59 a.m.
12　　　　　- - - - -
13
14　COUNSEL PRESENT:
15　For the Plaintiff: Meyer, Unkovic & Scott, LLP
　　　　　　　　by Richard T. Victoria, Esq.
16
　　For the Defendant: Anstandig, McDyer & Yurcon, P.C.
17　　　　　　　by Dan McDyer, Esq.
18　　　　　　　And
19　　　　　　　by Ben Mayer, Esq.
20
21
22
23
24
25

## Page 3

1
2　　　　　I N D E X
3　　　　　- - - - -
4　　WITNESS: PAUL G. SMITH
5
6　E X A M I N A T I O N:　　　PAGE
7
8　BY MR. VICTORIA　　　　　4
9
10　E X H I B I T S:
11
12　SMITH DEPOSITION NO. 1　　　7
13　SMITH DEPOSITION NO. 2　　　11
14　SMITH DEPOSITION NO. 3　　　11
15　SMITH DEPOSITION NO. 4　　　11
16　SMITH DEPOSITION NO. 5　　　13
17　SMITH DEPOSITION NO. 6　　　34
18　SMITH DEPOSITION NO. 7　　　38
19　SMITH DEPOSITION NO. 8　　　40
20　SMITH DEPOSITION NO. 9　　　41
21　SMITH DEPOSITION NO. 10　　47
22　SMITH DEPOSITION NO. 11　　71
23　SMITH DEPOSITION NO. 12　　93
24　SMITH DEPOSITION NO. 13　　107
25　SMITH DEPOSITION NO. 14　　109

## Page 4

1
2　　　　P R O C E E D I N G S
3　　　　　- - - - -
4　　　　PAUL G. SMITH
5　a witness herein, having been first duly sworn,
6　was examined and testified as follows:
7　　　　EXAMINATION
8　BY MR. VICTORIA:
9　　Q.　Good morning.
10　　A.　Good morning.
11　　Q.　Just for the record, I'm Richard
12　Victoria, and I represent the plaintiffs in the
13　case that you're here being deposed in, Walter
14　Beck Corporation, doing business as the Rainbow
15　Inn. Could you state your full name for the
16　record, please.
17　　A.　Paul G. Smith.
18　　Q.　Mr. Smith, have you been deposed
19　before?
20　　A.　Yes.
21　　Q.　So you understand that she's taking
22　things down, and the head nods or head shakes
23　won't be easy to transcribe, so if you could
24　give verbal answers, that would be great.
25　Also, if you need a break for any reason, just

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 5

P. Smith - by Mr. Victoria
1    P. Smith - by Mr. Victoria
2  say so. The one thing I would ask is that if
3  there's a question on the table, unless it's
4  something that requires you to consult about
5  attorney/client privilege or things like that,
6  you should answer the question before we take a
7  break, but at any time just say so. Mr. McDyer
8  and Mr. Mayer are representing you here today.
9    A.  Yes.
10   Q.  Mayer, I'm sorry.
11       MR. MAYER:  That's okay.
12   Q.  How many times have you been deposed
13 before?
14   A.  I believe three.
15   Q.  All this relates to your work as an
16 insurance adjustor?
17   A.  Yes.
18   Q.  Have you ever been deposed in a case
19 involving property damage before?
20   A.  Yes.
21   Q.  Were those all property damage
22 cases?
23   A.  Yes.
24   Q.  How long ago was the last one?
25   A.  I would say about a year.

Page 6

1    P. Smith - by Mr. Victoria
2    Q.  Before that, when was the one before
3  roughly? I mean, if they go back too far for
4  you to remember, just say so.
5    A.  It was several years before that.
6    Q.  What was the last case you were
7  deposed in about?
8    A.  It was an arson fire in
9  Philadelphia, Pennsylvania.
10   Q.  It involved a claim made under
11 Safeco or one of the related company's
12 policies?
13   A.  Yes.
14   Q.  You were the adjustor on that claim?
15   A.  Yes.
16   Q.  Did you review any documents to
17 prepare for the deposition today?
18   A.  Yes.
19   Q.  What documents did you review?
20   A.  My old claim file, some of the suit
21 papers that came in and some of the evidence
22 that the gentlemen presented me to review in a
23 nice big fat box.
24   Q.  To your knowledge, was there
25 anything that you reviewed that hasn't been

Page 7

1    P. Smith - by Mr. Victoria
2  produced in discovery in this case?
3    A.  Not to my knowledge.
4    Q.  Let's take a look at the deposition
5  notices just to get them part of the record
6  here. I'll give you the easy one first which
7  is the Paul Smith deposition notice. I have
8  copies enough I think for everybody.
9        (Smith Deposition Exhibit No. 1
10       was marked for identification.)
11   Q.  That's our Notice of Deposition of
12 Paul Smith, you. Have you seen that document
13 before?
14   A.  Yes.
15   Q.  You're here today to testify, at
16 least in part, in response to this Notice of
17 Deposition?
18   A.  Yes.
19   Q.  Did you bring any of the documents,
20 any documents with you as requested on the
21 second page?
22       MR. McDYER:  Actually, no.
23 They were all produced. In addition, you would
24 have -- I suppose we could also designate the
25 Sundahl and Company agency file which you

Page 8

1    P. Smith - by Mr. Victoria
2  already have, so I didn't bring it, and we did
3  subpoena and obtain a few pages of documents
4  from National City Bank, and we gave you that
5  and the cover letter. We're anticipating a few
6  more things coming in, but they are not in yet.
7        MR. VICTORIA:  You have a
8  subpoena out to the accountant?
9        MR. McDYER:  I have a subpoena
10 out to Ms. Perigo, the accountant, and a
11 subpoena out to Princeton Insurance. We asked
12 Princeton if they had any surveys if they could
13 send them, and we asked the accountant if they
14 had any financials if they could send them.
15       MR. VICTORIA:  We haven't
16 gotten anything back from Princeton?
17       MR. McDYER:  No.
18       MR. VICTORIA:  The accountant
19 has contacted us. So I'll talk to you about
20 that later. It's likely that what she's going
21 to do, she's concerned, since it's her client's
22 documents, she wants to produce them to us
23 first to have us look at them and then forward
24 them to you. We said that was okay, and I was
25 going to talk to you about that.

2  (Pages 5 to 8)

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 9

1         P. Smith - by Mr. Victoria
2              MR. McDYER:  Actually, in New
3    York, they don't have a privilege.
4              MR. VICTORIA:  Well, I think
5    she's trying to be courteous to the client.  I
6    don't think she's trying to withhold anything.
7    She just wants us to review them first, and so
8    that's no problem for us.
9              MR. McDYER:  No problem.
10             MR. VICTORIA:  The last thing
11   on the list of documents requested the claims
12   manual or claims handling guidelines.  I just
13   want to clarify for the record.  Nothing like
14   that has been produced, and there has been an
15   objection to producing that in the discovery
16   requests thus far.  I just want to make sure
17   that we're all on the same page.  You're
18   objecting because you're saying they are not
19   discoverable or they don't exist at all?
20             MR. McDYER:  Well, we don't
21   think they are relevant, and actually the
22   claims manuals don't exist.  They don't use
23   them.
24             MR. VICTORIA:  That's what I
25   wanted to clarify.  I'm not going to fight over

Page 10

1         P. Smith - by Mr. Victoria
2    something that doesn't exist.  That's what I
3    wanted to make sure.
4    Q.   So you're saying that there are no
5    claims manuals or claims handling guidelines?
6    A.   Not as of April 1 of this year when
7    I left Safeco.
8    Q.   Were there any at the time you made
9    your determination regarding the claim that's
10   at issue in this case?
11   A.   No.
12   Q.   That clears up that up.
13             MR. MAYER:  Paul, I'm just
14   going to ask that whenever Mr. Victoria is
15   asking the question, if you could wait until
16   he's done with the entire question before you
17   respond in case we need to make an objection.
18   Just wait until he's completely finished with
19   his question.  You might be able to anticipate
20   what he's going to ask, but just wait until
21   he's completely done.
22   Q.   There are three other deposition
23   notices that are relevant to today's
24   deposition.  This is one of the things we'll
25   try to clear up today.  We've sued American

Page 11

1         P. Smith - by Mr. Victoria
2    States, American Economy and Safeco
3    Corporation.  And we've sent out deposition
4    notices for all three of them as well.  Let me
5    show these to you.  The first one that will be
6    Exhibit 2 is the American States.  Exhibit 3 is
7    American Economy, and Exhibit 4 is the Safeco
8    Corporation.  I have more of those.
9             (Smith Deposition Exhibit Nos.
10   2, 3 and 4 were marked for identification.)
11   Q.   I don't know if this is a better
12   question to ask you or your counsel.  I'll ask
13   it, and then whoever wants to answer it can
14   answer it.  Are you appearing here today in
15   response to these deposition notices as well?
16             MR. McDYER:  Yes.
17   Q.   Is there any of the designated
18   categories that he's not designated to testify
19   for?
20             MR. McDYER:  Well, the net
21   worth we objected to.
22             MR. VICTORIA:  Understood.
23             MR. McDYER:  Underwriting we
24   previously objected to in discovery.  And
25   Paul's not an underwriter.  He didn't work in

Page 12

1         P. Smith - by Mr. Victoria
2    underwriting.  So he'd have a little difficulty
3    addressing that.
4    Q.   If we find we need to ask questions
5    about underwriting, who would be the person
6    that would have the knowledge of the
7    underwriting in this case, if you know?
8    A.   I'm not sure at this point.
9    Q.   Maybe we'll see them in the document
10   if you could identify a name.  But otherwise,
11   you're the man.  You're the one we need to talk
12   to.
13   A.   Okay.
14   Q.   Now, the one thing that's a little
15   confusing for everything in everybody in this
16   case is the fact that there are three named
17   defendants and only one insurance policy,
18   correct?
19   A.   That's correct.
20   Q.   You're familiar with that fact,
21   correct?
22   A.   Yes.
23   Q.   So we're going to try to clarify
24   that and have marked here the copy of the
25   insurance policy that was produced to us in

3 (Pages 9 to 12)

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 13

1        P. Smith - by Mr. Victoria
2    discovery in this case.  It's an exhibit we
3    might refer back to off and on throughout the
4    deposition today, so you might want to keep it
5    handy, and that will be Exhibit 5.
6            (Smith Deposition Exhibit No. 5
7    was marked for identification.)
8        Q.   I'll just ask you some simple
9    ministerial questions.  In front page there's
10   an affidavit signed by somebody named Angie
11   Gilbreath.  Do you know who Angie Gilbreath is?
12       A.   No.
13       Q.   You never met her?
14       A.   No.
15       Q.   Let's take a look first at the --
16   there are numbered pages in the bottom
17   right-hand corner.  Those are the numbers that
18   were put on by you or your counsel in producing
19   these documents.  Let's go to 137.  You see at
20   the top there it's partly cut off, but it says
21   American Economy Insurance Company.
22       A.   Yes.
23       Q.   Then if we go to page 139, there's a
24   reference there to Safeco has an unparalleled
25   history, et cetera, et cetera.  At the bottom

Page 14

1        P. Smith - by Mr. Victoria
2    it says Safeco with a logo there, correct?
3        A.   Yes.
4        Q.   And on the next page and on numerous
5    subsequent pages, the Safeco name and logo is
6    at the top left-hand corner of the page,
7    correct?
8        A.   Yes.
9        Q.   Now, if you can flip back to page
10   199, that's a pretty good ways in there.  It
11   states at the bottom there is a name and
12   address, correct?
13       A.   Yes.
14       Q.   That states American States
15   Insurance Company, correct?
16       A.   Yes.
17       Q.   Could you tell me why the three
18   separate entities are referenced at different
19   points in the policy?
20       A.   Well, I believe Safeco is the
21   holding company for a number of insurance
22   companies.  In this particular case, this
23   policy was written under the American Economy.
24       Q.   So your testimony is American
25   Economy has issued this insurance policy,

Page 15

1        P. Smith - by Mr. Victoria
2    correct?
3        A.   Yes, sir.
4        Q.   What explains the American States
5    Insurance Company's address on page 199?
6        A.   I can't answer that, but I have an
7    opinion.
8        Q.   What is that?
9        A.   Safeco did purchase American States.
10   This is the American States original home
11   office on Meridian.  When I left Safeco, it was
12   the regional office for all of Safeco.  But
13   American Economy was part of the American
14   States, and Safeco purchased all of those
15   companies.
16       Q.   So the structure is Safeco at the
17   top, and then American States Insurance
18   Companies which I guess is what's referenced
19   here is another entity beneath Safeco, and then
20   American Economy is part of American States
21   Insurance Companies?
22       A.   That's what I am saying.  I can't
23   say that for certain.  I know Safeco is the
24   holding company for a number, many insurance
25   companies.  American Economy was the one in

Page 16

1        P. Smith - by Mr. Victoria
2    this case.  Why this appears here, I gave you
3    my opinion.
4        Q.   There is no dispute between the
5    several companies that are named as defendants
6    here that American Economy Insurance Company is
7    the company that issued the policy that's at
8    issue in this case?
9        A.   That's correct.
10       Q.   You're testifying on behalf of all
11   three, so you can answer that question, I
12   think.
13       A.   Yes.
14       Q.   If there was a claim to be paid
15   under this policy, it would be paid by American
16   Economy Insurance Company?
17       A.   American Economy Insurance Company,
18   yes.
19       Q.   Let's just hold onto that policy.
20   You can set it aside for now.  We'll obviously
21   need to come back to that.  We won't need to
22   come back to the deposition notices.  Hopefully
23   we won't.
24           I just want to get some background
25   information on you.  What's your current

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

---

Page 17

1          P. Smith - by Mr. Victoria
2    business address if you have one?
3          A.    It's 15 Bedford Road, Lowellville,
4    Ohio.
5          Q.    You've mentioned before we went on
6    the record today that you're no longer employed
7    by Safeco, correct?
8          A.    That's correct.
9          Q.    What is your current employment?
10         A.    I am the business administrator of
11   Victory Christian Center.
12         Q.    What's that?
13         A.    I am the business administrator of a
14   church.  Victory Christian Center, Assembly of
15   God Church in Lowellville.
16         Q.    So you are retired from the
17   insurance business?
18         A.    Retired from insurance business.
19         Q.    What's your home address?
20         A.    427 South Main Street, Poland, Ohio.
21         Q.    Are you being compensated to come
22   here on behalf of Safeco?
23         A.    I certainly believe so, yes.  I plan
24   on submitting a bill for my expenses, yes.
25         Q.    At what rate are you going to be

---

Page 18

1          P. Smith - by Mr. Victoria
2    compensated at or are you going to submit a
3    bill for?
4          A.    Yes.  I would assume my annual
5    salary at Victory divided on an hourly basis is
6    what I was going to do.
7          Q.    In your prior depositions, you've
8    mentioned you had been deposed three times
9    before.  Did any of the cases involve the
10   question of whether an insured had a fire
11   suppression system or a sprinkler system?
12         A.    No, not to my knowledge.
13         Q.    You said you had been deposed three
14   times before.  Have you ever testified in court
15   during a trial or a hearing where a judge was
16   present?
17         A.    Yes.  It would have been
18   approximately 1980.
19         Q.    So not in relation to your recent
20   deposition?
21         A.    No.
22         Q.    Do you recall what that case was
23   about?
24         A.    That was an arson fire and our
25   insured was arrested.

---

Page 19

1          P. Smith - by Mr. Victoria
2          Q.    Let's go through just a brief
3    educational background.  Let's just talk about
4    college education.  Start there.  Any graduate
5    or college education?
6          A.    I graduated Baldwin Wallace College
7    in 1972 and have taken a number of
8    insurance-related courses since that time.
9    Actually too numerous to mention.  I do have an
10   Associates in Claims degree.
11         Q.    What was your degree from Baldwin
12   Wallace?
13         A.    History and Political Science.
14         Q.    So you took some insurance related
15   additional education?
16         A.    (Witness nods head.)
17         Q.    Do you have certifications in
18   various -- do you have any specific
19   certifications related to your insurance
20   training or insurance background?  I always see
21   these letters after people's names.
22         A.    I am an Associates in Claims.  But
23   way back in the day we did some auto training
24   when I wrote automobile estimates, but that's
25   been many years ago.

---

Page 20

1          P. Smith - by Mr. Victoria
2          Q.    When you say you're an associate in
3    claims, what does that mean?
4          A.    I have an Associate degree.
5          Q.    You have an Associate degree in
6    Claims?
7          A.    In claims.
8          Q.    In claims adjusting?  Is that what
9    you mean?
10         A.    Yes.
11         Q.    What is claims adjusting?  It's not
12   a trick question.  Just to be clear for the
13   record.
14         A.    I understand.  I am employed by or
15   was employed by Safeco Insurance Company to be
16   the intermediary, the claims adjustor, to meet
17   an insured and resolve their claim both in
18   coverage and damages.
19         Q.    So your last position with Safeco,
20   for the record, can I use Safeco to represent
21   the name of the defendant today, or should I
22   use American Economy?  Whatever you guys prefer
23   I'll use.  We all know what it means, or maybe
24   let me ask this first.  Were you employed --
25         A.    I have no objection to Safeco.

---

Powers, Garrison & Hughes

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 21

1        P. Smith - by Mr. Victoria
2    Q.    Were you employed by Safeco or by
3  American Economy or by American States?
4    A.    My paycheck said Safeco.
5    Q.    Let's use Safeco then.  What was
6  your last position with Safeco?
7    A.    I was large loss specialist.
8    Q.    How long were you a large loss
9  specialist?
10    A.    Approximately five years.
11    Q.    What does a large loss specialist
12  do?
13    A.    I did larger claims over
14  approximately 18 states.
15    Q.    By larger claims, is there a dollar
16  cutoff?
17    A.    There was generally a threshold of
18  over $100,000, but that could vary based on
19  location of the loss and perhaps the complexity
20  of the loss.  Could be less.  But generally
21  $100,000 and up.
22    Q.    And you worked from your address in
23  Poland, Ohio?
24    A.    Yes.
25    Q.    Who was your immediate supervisor?

Page 22

1        P. Smith - by Mr. Victoria
2  Who do you immediately report to?
3    A.    Gene Oberjohann.
4    Q.    Is a Gene a male or a female?
5    A.    It's a male.
6    Q.    What was his title?
7    A.    That's a good question.  When I had
8  a problem, I just called Gene.  He was the unit
9  manager for the large loss unit.
10    Q.    So there were large loss managers
11  throughout the United States that he --
12    A.    I believe there were either three or
13  four.
14    Q.    You said that -- we're going to call
15  it a rough threshold of $100,000, if that's
16  fair.
17    A.    Yes.
18    Q.    Did it only relate to property
19  damage claims, or did you work on all sorts of
20  insurance claims?
21    A.    In the past, I worked on all types
22  of insurance claims, but this large loss unit
23  was strictly property.
24    Q.    Just fire claims or various property
25  claims?

Page 23

1        P. Smith - by Mr. Victoria
2    A.    It would be various.
3    Q.    So hurricane, storm, flood, whatever
4  might come up?
5    A.    Yes.
6    Q.    In your job as large loss adjustor,
7  you assessed and made determinations regarding
8  whether a claim was allowed or not?
9    A.    That would be part of my job
10  description.
11    Q.    Part of your job?
12    A.    Yes.
13    Q.    Did those determinations have to be
14  approved by Gene Oberjohann?
15    A.    Yes.
16    Q.    Did he have the authority to
17  overturn your position, your decision?
18    A.    Yes.
19    Q.    Was there a category of claims that
20  was so large that it went up to a different
21  person?  In other words, was large loss limited
22  at a number, and then there was a different
23  kind of adjustor for, say, a multi-million
24  dollar claim?
25    A.    Actually, I handled claims in the

Page 24

1        P. Smith - by Mr. Victoria
2  multi-million dollar area.
3    Q.    So you were at the top of the dollar
4  value loss adjustor food chain?
5    A.    Yes.  There were two individuals who
6  had a higher title.  They are general
7  adjustors, and they too would handle, and they
8  were also in my unit.  If they had a choice of
9  one or the other, they would give it to one
10  with the more expertise.  That general
11  adjustor, but there wasn't always a choice.
12    Q.    Were you assigned a specific region
13  as large loss adjustor?
14    A.    We tried.  We had the northeast
15  region, so it was 18 states.  We had four other
16  adjustors, sometimes five.  Usually four.  So
17  they tried to keep us close to home.  We had an
18  adjustor in Chicago, two in Cincinnati, myself
19  in the Youngstown area, and then we had an
20  adjustor in Hartford, Connecticut.
21    Q.    They generally tried to assign you
22  based upon where the claim was located?
23    A.    Tried to keep us fairly as close to
24  home as we could.
25    Q.    Before you were large loss adjustor,

6  (Pages 21 to 24)

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

---

Page 25

1          P. Smith - by Mr. Victoria
2    you said that was about five years, correct?
3        A.    Yes.
4        Q.    What was your position before that?
5        A.    I was a senior adjustor, and that
6    would -- I was doing primarily property under
7    $100,000 and had only done that for a short
8    while.  Before that, I was still a senior
9    adjustor, what we called multi-line which means
10   I would do auto, liability, property as well.
11       Q.    And that was for smaller claims
12   under 100 roughly?
13       A.    Yes.
14       Q.    How long were you in those roles?
15       A.    Oh, gosh.  About --
16       Q.    From the time you started?
17       A.    About 26 years.
18       Q.    So you were at Safeco for --
19       A.    I started my career with GAB
20   Business Services which is an independent
21   adjusting firm.  I came to American States in
22   1986.  And trying to remember when Safeco
23   purchased American States.  It was the late
24   '90s.
25       Q.    So you originally began as an

---

Page 26

1          P. Smith - by Mr. Victoria
2    American States employee and became a Safeco
3    employee by acquisition?
4        A.    Yes.
5        Q.    Sometime in the '90s.  Your position
6    was basically the same until you became a large
7    loss adjustor?
8        A.    Yes.
9        Q.    At any time during your time with
10   Safeco, were you involved in a case in which a
11   coverage decision turned on whether or not an
12   insured had a fire suppression system?
13           MR. MAYER:  I'm going to
14   object to the form of the question.  You can
15   answer it if you can.
16       A.    I can't recall where a denial was in
17   order, but on any restaurant fire with this
18   coverage, that would be part of the
19   investigation.
20       Q.    You answered the question that I
21   meant to ask which was whether you recall
22   denying claims or being involved in a case that
23   was denied based upon the lack of or an
24   improper system, and your answer to that is you
25   don't recall that?

---

Page 27

1          P. Smith - by Mr. Victoria
2        A.    No.
3        Q.    You mentioned that Gene Oberjohann
4    is immediately above you in the hierarchy.  Is
5    there someone above Gene that you're aware of?
6        A.    Yes, but I can't recall the name
7    right now.  It's only been since April.  I
8    can't recall the name right now, but yes,
9    there's someone over Mr. Oberjohann.
10       Q.    You didn't have any reason to report
11   directly to that person?
12       A.    No.
13       Q.    So if you were reporting up the food
14   chain, it would be to Gene, and Gene would
15   report to someone else?
16       A.    That's correct.
17       Q.    There wasn't any situations where
18   you'd skip that step?
19       A.    No.
20       Q.    Was there anybody who reported to
21   you?
22       A.    No.
23       Q.    Did you have an administrative
24   assistant that you could utilize or anything
25   like that?

---

Page 28

1          P. Smith - by Mr. Victoria
2        A.    I had a home office.
3        Q.    You were a one-man show?
4        A.    Yes.  I did do a lot of training of
5    younger adjustors because it was experience,
6    but no one actually reported to me.
7        Q.    You've mentioned a word that is in
8    the next sentence of my note here.  Training.
9    I was going to ask what sort of training did
10   Safeco offer to you in -- well, let's talk
11   about property claims adjusting.
12       A.    Safeco per se, as far as property
13   claims adjusting, very little, virtually none.
14       Q.    Where did you develop most of your
15   knowledge and ability relating to --
16       A.    I started in the business in '74 and
17   received training at GAB.  They have an
18   adjusting school for liability for property,
19   and then I was with GAB for about 11 years and
20   then came with American States.  It was
21   approximately '86.  At that point, there was
22   very little training.  Just whatever I did on
23   my own getting my Associates in Claims degree.
24       Q.    Then after that Safeco didn't offer
25   you updated training or in-house training?

---

7 (Pages 25 to 28)

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 29

P. Smith - by Mr. Victoria

2    A.    There would be some limited damage
3    training.  We have a computer estimating system
4    and upgrades on that computer system, upgrades
5    on our general computer system and training in
6    that and typing.
7    Q.    But not necessarily kind of the nuts
8    and bolts of how to be an adjustor?
9    A.    That's correct.
10   Q.    Did you go for training outside of
11   Safeco?
12   A.    No.
13   Q.    Did they provide you with any
14   written materials regarding any sort of
15   checklists, dos and don'ts of being an
16   adjustor, any written materials regarding what
17   your duties and responsibilities were?
18   A.    Not to my knowledge.  Those type of
19   checklists would be something that I would do
20   for myself when somebody said, you know, it's
21   time to do this in an investigation, and Gene
22   would say, why don't you watch this area, and
23   I'd make a mental note or write it down and
24   make sure that I addressed that.
25   Q.    Did you have a system or a list of

Page 30

P. Smith - by Mr. Victoria

2    things that you followed when you were
3    presented with a new claim?
4    A.    Not a written system that I
5    followed.
6    Q.    Not in writing but anything in your
7    head, a checklist or a -- is there stages of a
8    claim adjustment process that you would follow?
9    A.    There would be just the standard I
10   had used over the years and developed over the
11   years of obviously you get a claim, and it
12   usually came in the form of a phone call to me
13   because on the large loss end we would handle
14   those a little differently than the smaller
15   claims.  And obviously you're on your computer,
16   and you're looking at the claim, you're looking
17   at coverage, you're examining all the details
18   of it, and then you make the contact to the
19   insured and set up the appointment and find out
20   where you're going.  At that point, you're
21   meeting the insured, you're inspecting the
22   damages at the building, you're discussing the
23   loss with the insured.  So you're following
24   those type of routine.
25   Q.    Was part of your responsibilities as

Page 31

P. Smith - by Mr. Victoria

2    an adjustor to investigate claims as well?
3    A.    Yes.
4    Q.    So you'd interview witnesses, if
5    necessary?
6    A.    In some cases, yes.
7    Q.    You'd at least --
8    A.    On those large claims, we would --
9    cause and origin, we would hire experts to
10   conduct the detailed investigation.
11   Q.    I understand it.  In those sorts of
12   cases where you want to know the cause of a
13   fire or whether it was an arson case or what
14   started a fire, you're not an expert on those
15   sorts of things?
16   A.    That's correct.
17   Q.    Is part of being an adjustor
18   interpreting the language of the insurance
19   policy?
20   A.    Yes.
21   Q.    You routinely did that as a large
22   loss adjustor?
23   A.    Yes.
24   Q.    If you had a question about what a
25   provision meant in a policy, who would you ask?

Page 32

P. Smith - by Mr. Victoria

2    A.    I would ask my supervisor.
3    Q.    Did he answer those directly, or did
4    he go to another source for the answers to
5    those questions?
6    A.    Usually answered those directly.
7    But there were times he would say, I'll get
8    back with you on that, so I presume he either
9    did additional research on his own or went to
10   someone else.
11   Q.    Did Safeco offer you or provide you
12   with any training on how to interpret policy
13   provisions?
14   A.    No.  Not to my knowledge.  I can't
15   say there was never a brief seminar somewhere,
16   but not to my knowledge.
17   Q.    Not a routine?
18   A.    No.
19   Q.    Do you have any specific training in
20   investigation skills?
21   A.    Only what I've learned just through
22   doing.
23   Q.    Through doing?
24   A.    Yes.
25   Q.    So you've never been trained in how

8 (Pages 29 to 32)

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 33

1        P. Smith - by Mr. Victoria
2    to question a witness or things like that?
3            MR. MAYER: Objection to the
4    form.
5    Q.    Have you ever been trained in how to
6    question a witness?
7    A.    Not a specific seminar training.
8    But to have in my younger days as an adjustor a
9    supervisor or manager say, you did this, this
10   is what you missed, next time do that.
11   On-the-job-type training.
12   Q.    We've done enough of the background
13   work here. Let's talk about this claim. I'm
14   sure you're eager to get to it and get over
15   with it. So let's move onto more substantive
16   things.
17           In this case, I'll ask you, what's
18   the claim at issue in this case?
19   A.    It's a fire loss of a restaurant
20   bar.
21   Q.    When did you receive notice of that
22   fire loss?
23   A.    You're asking a specific date?
24   Q.    If you know.
25   A.    I'm not sure of the exact date. It

Page 34

1        P. Smith - by Mr. Victoria
2    wasn't part of the file that I was presented to
3    review.
4    Q.    Do you recall it being immediately
5    after the loss?
6    A.    It was immediately after the loss.
7    I can recall this, that I was out on a Friday
8    and a Saturday both.
9    Q.    I'll show you here. I'm not trying
10   to play games with you on dates.
11           (Smith Deposition Exhibit No. 6
12   was marked for identification.)
13   Q.    Have you seen that letter before?
14   A.    Yes.
15   Q.    Is that your signature at the bottom
16   of the page under the sincerely?
17   A.    That's my electronic signature, yes.
18   Q.    You wrote this letter?
19   A.    Yes.
20   Q.    Is this the sort of letter that you
21   would write immediately after you were notified
22   of a loss?
23   A.    Yes.
24   Q.    Basically a form letter?
25   A.    This is a form letter, yes.

Page 35

1        P. Smith - by Mr. Victoria
2    Q.    I asked you these questions in part
3    because this wasn't a document that was
4    produced from Safeco's files. It was produced
5    from my client's files. It was not in the
6    documents produced by Safeco. It references a
7    list of the most frequently asked questions
8    that arise after a loss. Do you see that in
9    the second paragraph there?
10   A.    Yes.
11   Q.    Are you familiar with what that
12   document is?
13   A.    Yes.
14   Q.    Describe it to me. Is it one page?
15   Is it extensive?
16   A.    I believe it's a page or two. I
17   don't have it in front of me, so I can't
18   reference it.
19   Q.    Do you have a copy? Would you have
20   access to a copy of it, or could you direct
21   your counsel to where they might be able to get
22   a copy of it?
23   A.    This should have been part of the
24   claim file.
25   Q.    I'm not accusing anybody of

Page 36

1        P. Smith - by Mr. Victoria
2    anything. It's just, you know, you see a
3    missing document, you want to make sure you're
4    not missing anything else.
5    A.    That's the initial form letter I
6    pull off the computer and send out, sometimes
7    even before I have a conversation, because I'm
8    not always able to get somebody right away on
9    the phone. This letter is supposed to go out
10   every claim.
11   Q.    So the list of frequently asked
12   questions, what sorts of questions are on it,
13   generally speaking?
14   A.    How will my claim be handled, what
15   am I required to do, those just general
16   questions that wouldn't just relate to a large
17   loss fire. Some of those questions actually
18   aren't the best to even send out sometimes
19   because it's a generic letter that goes to all.
20   Where when you have this large a loss, there
21   are -- I'm going to be there in person. This
22   is almost, like I said, it goes out on every
23   claim, and not every insured gets an adjustor
24   at their doorstep.
25           MR. VICTORIA: Sure. If I

9 (Pages 33 to 36)

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

---

Page 37

1          P. Smith - by Mr. Victoria
2   could just make the request for the record. If
3   you could get a copy of that or produce it to
4   us, that would be great.
5          MR. McDYER:  That's fine.
6   We'll look for it.
7          MR. VICTORIA:  Thank you.
8      Q.   You said this would normally be
9   something that you put a copy of in the claim
10  file?
11     A.   Yes.
12     Q.   Did you maintain the claim files
13  with respect to your specific claims that you
14  were adjusting?
15     A.   Yes.  For the most part they were
16  electronic, but because of the nature of these
17  losses, you would have to have a paper file as
18  well.
19     Q.   Then once you were finished with a
20  claim, what would you do with the paper file?
21     A.   That would be sent to either
22  Indianapolis and eventually sent to Seattle, I
23  believe.
24     Q.   So you maintain it, you put the
25  documents in it.  Did anybody else add things

---

Page 38

1          P. Smith - by Mr. Victoria
2   to that file?
3      A.   Yes, they could.  Our files were
4   electronic so --
5      Q.   I'm just talking about the paper
6   file.
7      A.   No.  I worked out of my home.  I
8   would be the one that would put those documents
9   in the file.
10     Q.   As far as you said the files were
11  electronic.  I think those were produced here.
12  We'll get to some of those and how those work.
13     A.   But that's important as far as you
14  may see a document that I may have never seen
15  in a file because somebody has scanned it
16  electronically, put it in a file, and I
17  wouldn't -- that wouldn't be something that I
18  had done perhaps.
19          (Smith Deposition Exhibit No. 7
20  was marked for identification.)
21     Q.   I show you the next exhibit which
22  you can tell me what it is.  It's Bates stamped
23  No. 11 of the documents produced by Safeco.  Do
24  you know what that document is?
25     A.   Yes.  I believe this was an invoice

---

Page 39

1          P. Smith - by Mr. Victoria
2   from an excavator to assist in the cause and
3   origin investigation.  Some of the material
4   there had burned so bad and collapsed that in
5   order for the cause and origin investigation to
6   continue, it had to be moved is my
7   recollection.
8      Q.   Did the excavator take anything off
9   site?
10     A.   No.
11     Q.   He didn't take anything to a dump
12  or --
13     A.   No.  This would have been done with
14  the supervision of Churchwell Fire Consultants.
15  I was just paying the invoice.  I'd agreed to
16  insure that additional cost and pay the
17  gentleman.
18     Q.   Were you present when this was done?
19     A.   It wasn't a one-day process.  I
20  believe I was there while he was there, but I
21  wasn't a part of that procedure.  I was doing
22  something else.
23     Q.   I'm just going to get a random
24  document out of the way here because I don't
25  know what it is.  Let me see if you did.  This

---

Page 40

1          P. Smith - by Mr. Victoria
2   was not something produced.  I guess it is
3   something produced by Safeco, but I can't see
4   the -- it looks like documents numbered 8, 9
5   and 10.  The Bates stamps overlap a line on the
6   bottom.
7          (Smith Deposition Exhibit No. 8
8   was marked for identification.)
9      Q.   Do you know what this is?
10     A.   This would be part of our -- a
11  printout of the computer screen that would come
12  up when we're looking at the basic coverage
13  that was involved.
14     Q.   So on the system there is a way to
15  call up details or summary of a policy of
16  coverage provided under a policy?
17     A.   Yes.  This would be, as I said, this
18  would be part of the -- when I call up a claim,
19  there are a number of different screens.  This
20  is one of those screens that would have
21  coverage on it.
22     Q.   This is something you had access to?
23     A.   Yes.
24     Q.   Now, was this something that you
25  could revise or add to, or was it a document

---

10  (Pages 37 to 40)

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 41

1        P. Smith - by Mr. Victoria
2    that you could see and print out?
3        A.    No.  This is for viewing only.
4        Q.    Do you know who prepares this
5    information, who puts it into the system?
6        A.    I do not.
7        Q.    I'm going to give you another
8    document here.  We're going to flip back and
9    forth to this.  This is the activity log
10    produced by Sundahl and Company who is the
11    agent on this claim or on this policy, I guess.
12            (Smith Deposition Exhibit No. 9
13    was marked for identification.)
14        Q.    Have you seen this document before?
15        A.    I saw it as part of the package that
16    I reviewed.  Prior to that review, I had never
17    seen this.
18        Q.    When did you review it?
19        A.    It would have been Wednesday and
20    yesterday.
21        Q.    So recently?
22        A.    Yes.
23        Q.    Is this something you would normally
24    have access to in adjusting claims?
25        A.    No.

Page 42

1        P. Smith - by Mr. Victoria
2        Q.    This isn't something that would have
3    been part of the claims file or the
4    underwriting file?
5        A.    It's not part of the claims file.  I
6    couldn't speak to the underwriting file.
7        Q.    So you received notice of the claim
8    in this case.  What happened next?
9        A.    I reviewed my computer screens to
10    ascertain coverage obviously to find out where
11    the loss is located.  I would have actually
12    generated this letter electronically and
13    printed it.  I would have contacted the insured
14    to make arrangements to get preliminary
15    information as to what happened, how serious is
16    the fire, make an appointment to stop out and
17    see them as quick as possible.
18        Q.    Do you recall that in this case, you
19    did go out and visit the insured?
20        A.    Yes, I did.
21        Q.    Did you speak with anybody at that
22    time?
23        A.    I spoke with Harold Beck.
24        Q.    Do you have any knowledge relating
25    to that conversation?

Page 43

1        P. Smith - by Mr. Victoria
2        A.    I do not.
3        Q.    Do you recall if you made any at the
4    time?
5        A.    I believe so.
6        Q.    What would you have done with them?
7        A.    They would have been electronic
8    notes.
9        Q.    So if you had any notes, they would
10    have been produced in the claims file in this
11    case?
12        A.    They should have been produced as
13    part of the claims file.  I made electronic
14    notes.  We always make electronic notes in our
15    file.
16        Q.    The only reason I ask is I don't
17    think there's anything like that in the
18    documents that have been produced.  So just to
19    be safe, if you could ask the insurer to
20    double-check because obviously those would be
21    important as I believe one of the issues here
22    is what went on in that conversation between
23    you and Mr. Beck.  Obviously you and Mr. Beck
24    would have discussed a lot of things, correct?
25        A.    Yes.

Page 44

1        P. Smith - by Mr. Victoria
2        Q.    What sorts of questions did you ask
3    him?
4        A.    Just, of course, some basic
5    questions.  One of the primary concerns was his
6    wife who had been -- they feared had a heart
7    attack over this, and we discussed that.  He
8    was pretty distraught over the building being
9    burned and his wife's illness.
10            I discussed just some background
11    information, how long have you had the
12    business, when were you there, as far as when
13    you purchased it, is there a mortgage, a lot of
14    basic preliminary information.  Who was the
15    last person in the building.
16            Of course, as far as the cause and
17    origin, I did have a cause and origin expert I
18    called, so they went ahead and did a statement,
19    you know, a recorded statement, so I did not,
20    to my knowledge.  But then we got down to the
21    basics of where things were located, how he
22    thought this could have happened and also
23    discussed how the claim was going to be
24    adjusted.
25        Q.    At that first discussion with him,

11 (Pages 41 to 44)

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

---

Page 45

1            P. Smith - by Mr. Victoria
2    did you discuss whether or not there was a fire
3    suppression system in the kitchen?
4        A.   I don't recall.
5        Q.   You don't recall if it happened in
6    that first discussion?
7        A.   I don't recall whether it happened
8    in that first discussion.
9        Q.   At some point there was a discussion
10   about that, correct?
11       A.   Yes.
12       Q.   What do you recall about the
13   substance of that conversation?
14       A.   I recall that he advised we were
15   talking about the fire suppression system, and
16   I was asking about the system and actually if
17   there was a system, and if there was, when was
18   it serviced, who did it, so we could get those
19   records.  Because it was required under the
20   policy, and he indicated to me that my
21   recollection is that this was actually removed
22   in '96 or '97.
23       Q.   Would this be a conversation that
24   you would have taken notes of?
25       A.   I believe so, yes.  I believe that

---

Page 46

1            P. Smith - by Mr. Victoria
2    was a phone conversation.
3        Q.   So you believe that you made notes
4    of that conversation right after it happened?
5        A.   I believe so.
6        Q.   Was it your normal practice to take
7    notes either simultaneous or right after the
8    conversation takes place?
9        A.   It's normal practice.  It doesn't
10   happen every single time, but it's normal
11   practice.
12       Q.   If those notes existed, they'd be in
13   the claims file?
14       A.   Yes.  Those would have been again
15   electronic.
16       Q.   What kind of system did Mr. Beck say
17   that was in place that had been removed?
18       A.   I don't recall.  I believe there was
19   some type of a Halon system.
20       Q.   Do you know what a Halon system is?
21       A.   I've seen them.  I don't know all
22   the specs or anything.  I've just seen them in
23   place.
24       Q.   Do you know what an Ansul system is?
25       A.   It's a similar mechanical system.

---

Page 47

1            P. Smith - by Mr. Victoria
2    Again, I've never seen one in operation.  I
3    know of them.  I've seen them in place.
4        Q.   Do you know what the difference is
5    between the two?
6        A.   Actually, I couldn't sit here and
7    tell you what those differences were.
8        Q.   Do you understand that there are
9    differences between the two?
10       A.   Yes.
11       Q.   Let's take a look at --
12            (Smith Deposition Exhibit No. 10
13   was marked for identification.)
14       Q.   I'm giving you a copy of a letter
15   that I wrote dated December 2, 2004.  Have you
16   seen this letter before?
17       A.   I don't recall this letter.  I don't
18   recall having seen this.
19       Q.   Is the address -- you see the two
20   address parties, Safeco, Mike McGavick, and
21   then you as well; is that correct?  Is that an
22   accurate address for you?
23       A.   Yes, it is.
24       Q.   You didn't review this letter in
25   preparation for this deposition today?

---

Page 48

1            P. Smith - by Mr. Victoria
2        A.   I don't believe so.
3        Q.   At the time this letter was -- it's
4    dated December 2, 2004, you were still an
5    adjustor with Safeco?
6        A.   Yes.
7        Q.   And you were still responsible for
8    making the decision with respect to the claim
9    that's at issue in this case?
10       A.   I do not believe so, no.
11       Q.   Who would have been the person
12   responsible for --
13       A.   I believe it was -- I am not sure if
14   the lawsuit had been filed previous to this
15   correspondence.  If that were the case, then I
16   would not have seen this.
17       Q.   I think this letter actually
18   enclosed the initial complaint for the filing
19   of the lawsuit.
20       A.   Which means that --
21       Q.   Which would have been day one.
22       A.   At that point, that file was no
23   longer my file.  I would not have seen this
24   letter.
25       Q.   Well, it was sent to you.

---

Powers, Garrison & Hughes

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 49

1          P. Smith - by Mr. Victoria
2       A.   But all of that would have gone --
3   been packed up and sent directly to whomever
4   was handling.
5       Q.   So you wouldn't have read this
6   letter even if it came to you?
7       A.   What I am saying is I don't recall
8   this letter at all.  It's obviously -- here it
9   is addressed to me.
10      Q.   That's fine.  That's an answer.
11  Let's flip to the first attachment to that
12  letter which is a letter dated January 3, 2004.
13  It's right after the signature page.  Do you
14  recall having seen this letter and the
15  attachment to it?
16      A.   Yes.
17      Q.   You can see really quickly it's a
18  lengthy inventory after it.
19      A.   Yes.
20      Q.   This is something you received from
21  Mr. Beck?
22      A.   Yes.
23      Q.   In the first sentence, it states I
24  am unclear as to why you have not received our
25  e-mails as you requested.  Do you recall what

Page 50

1          P. Smith - by Mr. Victoria
2   went on there regarding that sentence or what
3   was the reason for that sentence?
4       A.   He was going to send me this
5   inventory as an e-mail attachment.
6       Q.   You never got it?
7       A.   Which I never got.
8       Q.   But you did receive it attached to
9   this letter?
10      A.   Yes.
11      Q.   And do you have any reason to
12  believe this letter wasn't sent on or around
13  January 3, 2004?
14      A.   No.
15      Q.   You recall receiving it reasonably
16  early on in the process?
17      A.   Yes.
18      Q.   Before you made the claim
19  determination?
20      A.   Yes.
21      Q.   Did you review it?
22      A.   Yes.
23      Q.   I'm going to ask you to flip to the
24  inventory.  The fifth page of the inventory.
25  Is this a document that you reviewed in

Page 51

1          P. Smith - by Mr. Victoria
2   preparation for coming here today?
3       A.   Briefly, yes.
4       Q.   If you go down about -- I'm going to
5   estimate about ten lines, you see an entry for
6   Halon fire suppression system?
7       A.   Yes.
8       Q.   Did you see this at the time this
9   was transmitted to you when you received it?
10      A.   I believe I did, yes.
11      Q.   What did you think of that?
12      A.   I thought he has placed the Halon
13  fire suppression system in his inventory.
14      Q.   Did you think that it was actually
15  in the inventory, in the restaurant?
16      A.   I don't know.  I mean, what I am
17  saying is I thought -- I don't know whether it
18  was or not.
19      Q.   Did you ask him about it?
20      A.   I asked him repeatedly for
21  documentation as to what was in there in the
22  way of a fire suppression system and who
23  installed it, who maintained it because that
24  was one of the requirements of the policy that,
25  the basis on which the denial was made, that he

Page 52

1          P. Smith - by Mr. Victoria
2   did not comply with the provisions of the
3   policy.
4          So although I noticed it was in
5   here, he had listed it, that does not to me
6   prove that it was actually there.  But even if
7   it was actually there, whether it was serviced
8   per the policy requirements.
9       Q.   You said you had repeatedly asked
10  him for information about the system.
11      A.   Yes.
12      Q.   Did you do that in writing?
13      A.   Well, our denial letter and
14  subsequent letters I had asked him, and I did
15  it in phone conversations.  In fact, my
16  supervisor, I believe, I was on vacation,
17  called me and said he got a call from Mr. Beck,
18  and he said just -- my supervisor told him,
19  Gene Oberjohann, told him, if you could just
20  tell us who serviced your unit, your fire
21  suppression system, then we can get the
22  information as to whether it was serviced semi
23  annually and cleaned quarterly as required.
24      Q.   Did any of that take place before
25  the denial letter?  Any of those requests in

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 53

1          P. Smith - by Mr. Victoria
2    writing or your conversations, his
3    conversations with Gene, any of that take place
4    before the denial letter went out?
5        A.   Some of the verbal conversations did
6    indeed happen.  I can't speak to written -- I'm
7    trying to remember when the actual denial
8    letter went out and that will help me.
9        Q.   It was February 11, 2004.  We'll
10   have that in here as well.  In fact, it's the
11   next document.
12       A.   Yes.
13       Q.   So you believe that you asked him
14   for that information prior to that February 11,
15   denial letter?
16       A.   Yes.
17       Q.   Would that be in the file somewhere?
18       A.   I would presume in the course of
19   electronic notes, it should be there.
20       Q.   Would it surprise you, and we can
21   look at it, if I told you it's in the notes.
22   It's in the documents quite a bit after the
23   denial letter but not before the denial letter?
24       A.   That would surprise me.
25       Q.   But it is your testimony that you

Page 54

1          P. Smith - by Mr. Victoria
2    saw this fire suppression system item listed
3    prior to the denial letter?
4        A.   Yes.
5        Q.   Now, if you take a look at that
6    Sundahl file activity log, and maybe we can
7    look at some of the references in here.  Did
8    you communicate regularly with the folks at
9    Sundahl?
10       A.   On occasion.  Not regularly.
11       Q.   You communicated with them at some
12   point regarding this claim?
13       A.   Yes.
14       Q.   If you go to -- this is tough
15   because it's not numbered.
16       A.   Well, I think they are numbered at
17   the top right.
18       Q.   You're right.  Page 27.  The second
19   entry from the bottom.  It's dated 1/7/2004.
20   It states, Paul Smith, adjustor for Safeco,
21   called on 12/5/03 fire loss, asked if we had
22   anything in the file indicating what service
23   agreement insured had for the Ansul system.
24   And it goes on.  Is that correct?
25       A.   Yes.  That's what it says.

Page 55

1          P. Smith - by Mr. Victoria
2        Q.   You haven't seen this document
3    before, right?
4        A.   No.
5        Q.   You didn't have any involvement in
6    creating it, correct?
7        A.   No, sir.
8        Q.   Do you recall calling Sundahl to ask
9    this question on January 1, 2004?
10            MR. MAYER:  I'm going to
11   object just because the date's off.
12       A.   Yes, January.
13            MR. MAYER:  You're referring
14   to January 1, 2004.  The date next to the entry
15   says the 7th.
16            MR. VICTORIA:  I'm sorry.
17   January 7.  That's just a misstatement.
18       A.   Yes.  I do recall a conversation in
19   early January.  I have no reason to doubt this
20   is that.
21       Q.   In here, it references -- and I'm
22   only asking because I don't know.  They
23   reference that you called to ask about whether
24   they had anything for an Ansul system.  Would
25   that have been a term that you used or that

Page 56

1          P. Smith - by Mr. Victoria
2    they used?
3        A.   It may have been a term that I used.
4        Q.   And there's no dispute in this case
5    that the Becks didn't have an Ansul system in
6    that restaurant, correct?
7        A.   My reference there was the generic
8    fire suppression system is what I should have
9    asked for.  I may well have said Ansul system.
10       Q.   The policy doesn't require
11   specifically an Ansul system, correct?
12       A.   No.
13       Q.   It merely requires a UL listed fire
14   suppression system, correct?
15       A.   Yes.
16       Q.   If you'd flip to the next page, 28,
17   which is also dated -- the first item there is
18   also dated 1/7/2004.  If you go to the middle
19   of that, it's indicating there was a telephone
20   conversation with you, correct?
21       A.   This is the actually the first
22   entry?
23       Q.   Yes.  The first entry on that page.
24       A.   Yes.  Okay.
25       Q.   Is this a reference -- the reference

14  (Pages 53 to 56)

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 57

1          P. Smith - by Mr. Victoria
2    in here, and I'll just read it.  He spoke with
3    Mr. Beck, and he indicated that they had a
4    Halon system but had it taken out in 1997.  Is
5    that a reference to the conversation you and I
6    just discussed a few minutes ago that you had
7    with Mr. Beck?
8        A.   I believe so.
9        Q.   If you go to the next entry in
10   there, there is a reference to something called
11   a restaurant supplemental ap.  Here it says
12   it's a selective form.  Do you know what that
13   is?
14       A.   I have seen it in some of the forms
15   here, I believe.
16       Q.   Do you recall receiving a copy of
17   it?
18       A.   I may have.  I'm not -- I may have,
19   yes.
20       Q.   In the prior entry, it states that
21   that form -- if I'm wrong tell me, it says
22   insured had Ansul system but did not indicate
23   service agreement.  Do you remember seeing that
24   document?
25       A.   You're referencing.

Page 58

1          P. Smith - by Mr. Victoria
2        Q.   Back to the first entry, the second
3    sentence.
4        A.   It's what it says.
5        Q.   I guess my question is, do you
6    recall actually seeing a document that comports
7    with what that says, that there was a form that
8    says the insured had an Ansul system but did
9    not indicate a service agreement?
10       A.   I don't recall.  If it's perhaps
11   part of the file there.  But right at this
12   minute, I can't recall.
13       Q.   If you would have received that,
14   would that have been something that influenced
15   your decision in denying or accepting the
16   claim?
17           MR. MAYER:  I'm going to
18   object because it calls for speculation, but
19   you can answer if you can.
20       A.   The denial was based on not only the
21   having of a system, but the servicing with an
22   independent contractor semi-annually and
23   cleaning quarterly.  So that's, again, the
24   reference of a service agreement.  We were
25   looking for that service agreement, something

Page 59

1          P. Smith - by Mr. Victoria
2    to document what we were told.
3        Q.   In your experience with this
4    specific claim, is there anything in any of the
5    reports that you saw, whether the Churchwell
6    consultants or any other investigation they
7    did, that indicated that the failure to service
8    the system played any role in the fire?
9        A.   No.
10       Q.   Did you see anything that indicated
11   that the absence of a system resulted in or
12   played any role in the fire?
13       A.   No.
14       Q.   Is it Safeco's position that the
15   absence of the fire suppression, the alleged
16   absence of a fire suppression system, resulted
17   in the fire here?
18       A.   No.  No.  It's not the -- but even
19   the question we're not alleging he did or
20   didn't have a system.  You have to have the
21   system and service the system.
22       Q.   That's what -- I guess I'm getting
23   to that point.  Safeco's not contending that
24   the absence of a system was the cause of the
25   fire?

Page 60

1          P. Smith - by Mr. Victoria
2        A.   No.
3        Q.   That the absence of a system
4    contributed to the fire?
5        A.   No.
6        Q.   That the failure to service the
7    system contributed to the fire?
8        A.   No.
9        Q.   Now, the one thing you said, you
10   said Safeco's not saying they did or did not
11   have a system in place.  I'm not sure I
12   understood that.  If I am misstating it,
13   correct me.
14           I understand the separate aspect of
15   a service agreement.  Let's just talk about the
16   existence of a system in place or not.  Is it
17   Safeco's position that there was no system in
18   place?
19       A.   No.  I don't know if there was a
20   system in place.
21       Q.   So Safeco's sole basis for denying
22   the claim is that Safeco wasn't provided with
23   an agreement showing that a system had been
24   serviced in accordance with the agreement?  In
25   accordance with the policy?

15  (Pages 57 to 60)

Case 1:04-cv-00348-MBC    Document 25-5    Filed 12/06/2006    Page 16 of 30

Paul Smith                                                    Walter Beck Corporation vs.
November 7, 2006                              Safeco Corporation American Economy, et al.

Page 61

1           P. Smith - by Mr. Victoria
2       A.   In accordance with the policy, yes.
3    That there was a system, that it was in place,
4    it was UL approved, that it was serviced
5    semi-annually and cleaned quarterly by an
6    independent contractor.  And that was the basis
7    of my denial.
8       Q.   Well, but Safeco has to -- I'm
9    getting back to the question again.  Is it
10   Safeco's contention that no system was there?
11      A.   Not necessarily.
12      Q.   What was the results of your
13   investigation?  Was there a system or wasn't
14   there?
15      A.   I don't know.  I don't know whether
16   there was or wasn't.
17      Q.   What did you do to determine whether
18   there was or wasn't?
19      A.   Inquired of the insured, proof,
20   evidence that they had a system and that it was
21   serviced quarterly.  Because it's a package to
22   me.  If they didn't have a system, they have a
23   problem.  But if they do have a system and it's
24   not serviced according to the policy, there's
25   still an issue that we have to get Safeco and

Page 62

1           P. Smith - by Mr. Victoria
2    Mr. Beck over that hurdle.  We have to get over
3    that hurdle so we can get on with adjusting the
4    claim.
5       Q.   And I understand that there's two
6    separate things at play.  What I am getting at
7    is, we need to know what Safeco's telling us is
8    the flaw in the system on our end and the error
9    on our end that resulted in the denial of the
10   claim.  So is it both the absence of a system
11   and the failure to maintain a system, or is it
12   what you're saying is it is at least the
13   failure to maintain a system, and we don't know
14   on the other thing?
15      A.   It's an either/or.  It's not really
16   either/or.  That's not correct.  But it is a
17   package, and I have a pile of debris.  So I
18   can't walk in the restaurant and say there is a
19   system.  So I have to rely on evidence that all
20   of that has been complied with.  There is a
21   system and that it's been serviced.
22      Q.   Do you know if in any of that debris
23   there is a burned up service agreement?
24      A.   I don't know.
25      Q.   Do you know if in any of that debris

Page 63

1           P. Smith - by Mr. Victoria
2    there are mangled or melted parts of a fire
3    suppression system?
4       A.   I don't know.
5       Q.   Did anybody look for it?
6       A.   Not to my knowledge.
7       Q.   So Safeco isn't taking a position
8    one way or the other whether or not a system
9    was in place?
10      A.   No.
11      Q.   If you flip to the next document
12   that was in that packet of my letter with the
13   exhibits attached, after the inventory is the
14   February 11 denial letter.  You drafted that
15   letter?
16      A.   Yes.
17      Q.   That's your electronic signature on
18   the signature page?
19      A.   Yes.
20      Q.   You don't have any reason to believe
21   it wasn't sent out on February 11, 2004?
22      A.   No.
23      Q.   Did anybody review this other than
24   you before it went out to the insured?
25      A.   I don't recall.  I discussed this at

Page 64

1           P. Smith - by Mr. Victoria
2    length with Gene Oberjohann.  Whether he
3    actually looked at this letter before it went,
4    I can't say.
5       Q.   What was the nature of your
6    discussion with him before?
7       A.   That I had indicated my
8    recommendation that based on what we had so
9    far, we did not have these policy requirements
10   met and that we would have to issue a letter of
11   denial, and we discussed the reasons and the
12   why's and the wherefore's, and then I drafted
13   this letter.
14      Q.   This letter denies coverage based
15   upon an exclusion in the policy, correct?
16      A.   Yes.
17      Q.   Are you familiar at all with
18   Pennsylvania law regarding an insured's duty to
19   prove or to the burden of proving the
20   applicability of an exclusion?  I'm sorry.  The
21   insurer's burden of proving the applicability
22   of an exclusion.  Are you familiar with that at
23   all?
24      A.   No.
25           MR. MAYER:  I wanted to object

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

---

Page 65

1          P. Smith - by Mr. Victoria
2    to the form of that question.
3              MR. VICTORIA:  I'll ask it
4    again.
5              MR. MAYER:  Okay.
6      Q.   Are you familiar at all with
7    Pennsylvania law regarding an insurer's duty or
8    burden of proving an exclusion?
9              MR. MAYER:  The reason I am
10   objecting to the form of the question is we do
11   not agree that what you're referring to as an
12   exclusion is an exclusion in the policy.
13   That's the reason for the objection.
14     Q.   But the person who handled the claim
15   referred to it as an exclusion, correct?  I
16   asked you the question, and you said it was an
17   exclusion.
18     A.   It's in the conditions.
19     Q.   So is that a condition or an
20   exclusion?
21     A.   This is conditions that must be met,
22   I believe.
23     Q.   It must be met for what to happen?
24     A.   For coverage to be applicable.
25     Q.   But a policy will issue even if that

---

Page 66

1          P. Smith - by Mr. Victoria
2    condition isn't met?
3      A.   I can't speak to underwriting.  But
4    it's certainly possible that a policy could get
5    issued even though someone was not complying
6    with these conditions.
7      Q.   I'll ask you the question, and you
8    can say you don't speak to underwriting.  But
9    would Safeco have done anything at the outset
10   of the relationship with the insured to confirm
11   that this was or was not in place in accordance
12   with the conditions of the policy?
13     A.   I can't say.
14     Q.   Is that an underwriting question?
15     A.   Yes.
16     Q.   So you sent this letter to the
17   insured.  What happened next?
18     A.   I was waiting for a response from
19   the insured and the documentation that we had a
20   fire suppression system and that there was an
21   independent contractor servicing that so that
22   we could move on.
23     Q.   If you flip to the next document in
24   there, it's a letter dated February 21, 2004.
25   Now, rather than -- I don't want to be accused

---

Page 67

1          P. Smith - by Mr. Victoria
2    of playing games with you here.  Was there some
3    confusion between you and the insured regarding
4    whether you received certain correspondence
5    from the insured?
6      A.   Yes.
7      Q.   And could you explain that situation
8    to me so we don't waste time with dates and --
9    I want to avoid playing games with dates.  I'm
10   trying to get the true story here.
11     A.   He was indicating he was sending
12   things to me that I had no recollection of
13   receiving, and there were some e-mailed
14   documents that I did not receive.
15     Q.   So both e-mail and written
16   documents?
17     A.   Yes, sir.
18     Q.   Now, is it your position that he
19   never sent them, that he's not telling you the
20   truth about that?
21     A.   No, sir.  I have no reason to doubt
22   he would have sent --
23     Q.   If you look, there's a February 21,
24   2004 letter and then two or three pages later a
25   March 24, 2004 letter.  And then the next page

---

Page 68

1          P. Smith - by Mr. Victoria
2    is an April 28, 2004 letter.  Are those the
3    letters that you told him you didn't receive?
4    When I say didn't receive, I mean didn't
5    receive immediately after he sent them?
6      A.   Immediately, yes.
7      Q.   At some point did he send you
8    additional copies of those letters?  Do you
9    recall?
10     A.   I believe so.
11     Q.   I'm going to go back to something I
12   skipped over.  You said you talked to Gene
13   Oberjohann about the denial letter before it
14   went out, correct?
15     A.   Yes, sir.
16     Q.   Was it your decision or did you have
17   to get his approval to send the letter out?
18     A.   It was collaborative.  I mean, we
19   had this conversation, and we discussed how it
20   should be handled and what should be done.  And
21   then I sent the letter with his approval.
22     Q.   But did you have authority in your
23   position to make that determination on your
24   own, or did you have to have it approved first?
25     A.   I may have had that authority.  But

---

17  (Pages 65 to 68)

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 69

1          P. Smith - by Mr. Victoria
2    under this type of circumstance, I would have
3    always gotten his approval.
4        Q.    Just to be clear for the record, at
5    the time you sent the denial letter, what were
6    the facts as Safeco understood them that they
7    based their denial on?
8        A.    That these conditions that we quoted
9    had not been met.
10       Q.    Which conditions?
11       A.    That the fire suppression system was
12   in place, while it was in place that it was UL
13   approved, that it was serviced by an
14   independent contractor on a semi-annual basis
15   and cleaned by an independent contractor on a
16   quarterly basis.
17       Q.    What additional information did you
18   want from the insured to support the insured's
19   claim?
20       A.    Ultimately the documentation that
21   these conditions were met.  The request to him
22   -- and this is fairly common, just tell us who
23   did it, and we'll contact them, and they'll
24   supply us with the information we need.
25   Because he said, you know, the records might be

Page 70

1          P. Smith - by Mr. Victoria
2    burned up.  I don't have them.  Whatever.
3    That's pretty common in a fire at a restaurant
4    that we need these, they might not be something
5    that someone would readily have.  But they know
6    who services their equipment and is in there
7    every three months.  So I asked him, and I know
8    my supervisor Gene Oberjohann asked him the
9    exact same thing.  Just give us a name,
10   tell us who did it, and we'll make the contact
11   and we'll get this resolved.  We'll get over
12   this hurdle of this fire suppression issue.
13       Q.    Other than Mr. Beck, did you talk to
14   anyone else, and I mean anyone else, any
15   witnesses, any third parties, to determine
16   whether a fire suppression system was in place
17   and/or whether it was being maintained?
18       A.    Not to my knowledge.  Could I amend
19   that briefly?
20       Q.    Sure.
21       A.    Except what we already said that we
22   spoke with the agent.
23       Q.    You had a discussion with the agent.
24   I am referring more to witnesses.
25       A.    I thought you were.  I wanted to be

Page 71

1          P. Smith - by Mr. Victoria
2    clear there.
3        Q.    This is the Churchwell Fire
4    Consultant's report.
5             (Smith Deposition Exhibit No. 11
6    was marked for identification.)
7        Q.    In the report that was the result of
8    Safeco's obtaining Churchwell Fire Consultants
9    to investigate the fire?
10       A.    Yes.
11       Q.    What was it that you asked or Safeco
12   asked Churchwell to do?
13       A.    I actually made the contact with
14   Mr. Churchwell and asked him to complete the
15   standard cause and origin investigation.  We do
16   that for subrogation purposes as well as just
17   wanting to know why this fire started.
18       Q.    You've said that Mr. Churchwell or
19   his Churchwell Fire Consultants, Inc., they
20   interviewed witnesses, correct, in the normal
21   course of an investigation?
22       A.    Sometimes, yes.
23       Q.    Had you used this company prior to
24   the Beck's fire?
25       A.    Yes.  This is one of a number of

Page 72

1          P. Smith - by Mr. Victoria
2    companies that I use.
3        Q.    But you had --
4        A.    Yes.  I used them before.
5        Q.    You understood that they would
6    interview witnesses to the fire?
7        A.    If need be.
8        Q.    That was something that he had done
9    in the past on prior investigations?
10       A.    On occasion, yes.
11       Q.    And that they would visit the site?
12       A.    Yes.
13       Q.    They would take samples at the site?
14       A.    Again, if necessary.
15       Q.    They would inspect the debris?
16       A.    Yes.
17       Q.    Why did Safeco want this report,
18   this investigation and report done?
19       A.    On a large fire, this is pretty much
20   a standard operating procedure, to have an
21   investigation done.  It's done for subrogation
22   purposes in the case that we can obviously have
23   a party to go to after to recover monies.  It's
24   done obviously for possible criminal intent.
25   It's pretty much standard operating procedure

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 73

1    P. Smith - by Mr. Victoria
2  to ascertain what caused the fire.  And that's
3  beyond an adjustor's scope in this case.
4    Q.    Safeco's not contending that Walter
5  Beck Corporation, Mr. Beck, Mrs. Beck, had
6  anything to do with setting this fire?
7    A.    No.
8    Q.    The date of this report is
9  February 13, 2004, correct?
10   A.    Yes.
11   Q.    And that was sent out after your
12 denial letter?
13   A.    I would have received this after my
14 denial.
15   Q.    So you didn't view the contents of
16 this report as being relevant to your decision
17 to deny coverage?
18   A.    Let me say this:  I had spoken with
19 Mr. Churchwell a number of times in the course
20 of this investigation, and he had already told
21 me that his cause would be undetermined.
22   Q.    Did you ever ask him if there was
23 any evidence of a fire suppression system on
24 the site?
25   A.    I don't recall ever asking that.  I

Page 74

1    P. Smith - by Mr. Victoria
2  may have.  I may have, but I don't think I did.
3    Q.    Did you review this report when it
4  was received, when you received it?
5    A.    Yes.
6    Q.    Is there any discussion in the
7  report of whether or not a fire suppression
8  system, to your knowledge, to your
9  recollection, of whether a fire suppression
10 system was in place?
11   A.    I'll have to review this.
12   Q.    It speaks for itself.  I'm more
13 asking whether you recall having seen it in
14 there at the time.
15   A.    I don't.
16   Q.    Did you ask him in the course of his
17 investigation to check and see if a fire
18 suppression system was in place?
19   A.    No.
20   Q.    Why not?
21   A.    That's information that would come
22 from Mr. Beck.  He would be able to tell me I
23 had one, this is what it was, this is who
24 serviced it.  This is kind of a very --
25 normally a very easy hurdle, a one-shot deal

Page 75

1    P. Smith - by Mr. Victoria
2  where he says it's by ABC Fire Extinguisher and
3  I contact them.  Either he provides the
4  contract, or I contact ABC Fire Extinguisher
5  and they provide the contract.  This was a very
6  easy conversation customarily between an
7  insured and myself.
8        (Discussion was held off the
9  record.)
10   Q.    So let's talk about the post-denial
11 letter period.  And we started to do that in
12 going through the letters that Mr. Beck said he
13 had sent and you had told him you hadn't
14 received.  The way I'm going to do this, again,
15 is to refer both to the Sundahl activity log as
16 well as the correspondence that's been
17 produced.  So do you have that handy?
18      If you look at the bottom of page
19 29, that's the page we were on before, I think.
20      MR. MAYER:  Of the Sundahl?
21      MR. VICTORIA:  Of the Sundahl
22 documents, thank you.
23   Q.    And there's just a one-line or two-
24 line entry there that carries over to the next
25 page, page 30.  It's dated 5/24/2004.  It says

Page 76

1    P. Smith - by Mr. Victoria
2  Harold Beck called to set up an appointment to
3  discuss this claim.  Apparently he has left
4  messages for Paul Smith and sent a letter and
5  is not getting any response.  I advised I will
6  call Paul Smith.  Do you recall receiving a
7  call from Sundahl that said Mr. Beck's trying
8  to get -- and I'm paraphrasing obviously.  I'm
9  not asking you for an exact quote.  In some way
10 telling you, hey, Mr. Beck's trying to get in
11 touch with you?
12   A.    Yes.  I think sometime after that I
13 got a call.
14   Q.    If you look --
15   A.    Yes.  Yes.
16   Q.    That was May 24.  If you look a
17 couple lines down, there's a May 25 entry.
18   A.    Okay.
19   Q.    It says, spoke with Paul Smith and
20 then a phone number (330) 757-9403.  Would that
21 have been your phone number?
22   A.    Yes.
23   Q.    Advised that Harold had called upset
24 that he, Paul Smith, had not returned call.
25 Paul will call Harold and send us a copy of

19 (Pages 73 to 76)

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

---

Page 77

1            P. Smith - by Mr. Victoria
2    declination.  Do you have any reason to believe
3    that that phone call did not take place that's
4    referenced there?
5        A.    No.
6        Q.    Do you recall having a conversation
7    with them as described here?
8        A.    I'm sure I did, yes.
9        Q.    Do you have any reason to believe
10   that that's not the accurate date of the phone
11   call?
12       A.    No.
13       Q.    Do you recall specifically whether
14   it is or isn't?
15       A.    I don't recall.
16       A.    I didn't think so, but I had to ask.
17   I'll ask you to flip back to the packet of
18   letters.  If you go to the next letter after
19   those three that we talked about, there is a
20   June 2, 2004 letter from Mr. Beck to Mr. Ridley
21   at Sundahl.
22       A.    Yes.
23       Q.    Do you know if you've seen this
24   letter before?
25       A.    Yes.

---

Page 78

1            P. Smith - by Mr. Victoria
2        Q.    When did you review this letter?
3        A.    It would have been last week.
4        Q.    Do you recall if at the time this
5    letter, at the date of this letter you had
6    called Mr. Beck back in response to the May 25,
7    2004 phone conversation with Sundahl?
8        A.    I don't recall.
9        Q.    If you flip to the next page.
10   There's a letter from Mr. Beck to you dated
11   June 10, 2004, correct?
12       A.    Yes.
13       Q.    Have you seen this letter before?
14       A.    Yes.
15       Q.    Was this a letter that you received
16   from Mr. Beck on or after June 10, 2004?  In
17   that time period?
18       A.    Yes.
19       Q.    So this wasn't one of the letters
20   that got lost in the shuffle somewhere?
21       A.    No.
22       Q.    It says this letter is in response
23   to your phone call on Thursday, June 3, 2004,
24   correct?
25       A.    Yes.

---

Page 79

1            P. Smith - by Mr. Victoria
2        Q.    Do you recall if that was the phone
3    call returning or responding to Sundahl
4    Insurance conversation you had with them on
5    May 25, 2004?
6        A.    I don't recall.  I mean, there may
7    have been more.
8        Q.    Do you know if there was one between
9    May 25 and June 3?
10       A.    I'm not sure.
11       Q.    Would there be a reason that there
12   was a delay of a week or so between your
13   conversation with Sundahl and your contacting
14   the Becks?  Or Mr. Beck?
15       A.    I couldn't say if I was out of town
16   or on vacation.  I'm not sure.
17       Q.    Now, would this be the first letter
18   that you actually received from Mr. Beck
19   outlining his position regarding the fact that
20   he had a fire suppression system?
21       A.    I can't say it's the first, but --
22   and I think I've explained it's a package.
23       Q.    I understand.  I'm not trying to
24   trick you there.  We'll call it the fire
25   suppression system issue.  You had a phone call

---

Page 80

1            P. Smith - by Mr. Victoria
2    with them.  You don't have any reason to
3    believe that you didn't have a phone
4    conversation with him on June 3, 2004?
5        A.    No.
6        Q.    What went on during that phone
7    conversation?
8        A.    I don't recall specifics, except I
9    would have been asking him for the
10   documentation we needed to get over this
11   hurdle, that this -- you had the system, that
12   it was serviced by an independent contractor on
13   that semi-annual and quarterly basis was
14   required.
15       Q.    Do you recall having --
16       A.    Just to the point of my supervisor
17   and myself begging him just give us the name
18   and we'll get the information.
19       Q.    What was his response to you?
20       A.    He was very angry, and it would go
21   off in other areas.
22       Q.    Did he ever say to you, I don't know
23   who it is?
24       A.    He may have.
25       Q.    You don't recall?

---

20  (Pages 77 to 80)

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

---

Page 81

1     P. Smith - by Mr. Victoria
2     A.   I don't recall.
3     Q.   But you did receive this letter from
4   him?
5     A.   Yes.
6     Q.   And does this letter reflect the
7   things that he told you during the telephone
8   conversation, or is this supplemental to the
9   conversation, if you recall?
10     A.   I don't recall exactly.  He may have
11   referred to this Halon system in our
12   conversation.
13     Q.   One of the things in this letter is
14   he states, well, it's the second to last
15   paragraph on the page.  I did not indicate the
16   system was removed in 1996 or 1997.  I stated
17   that on or about that time, new Halon systems
18   became unavailable because of their
19   environmental impact.  I also indicated the
20   Halon tanks, two of them, were replaced on or
21   about December 2001, but I didn't know if
22   future replacements would be available, but at
23   the time of the fire, the tanks were fully
24   charged.  I've read that accurately?
25     A.   Yes, sir.

---

Page 82

1     P. Smith - by Mr. Victoria
2     Q.   When you received this letter, what
3   was your reaction to that information?
4     A.   This long after the fire, I'm
5   wondering why we still can't get to a name of
6   someone to document this for us, and I can tell
7   you I had no reason to doubt that there was a
8   misunderstanding or not.  We're just -- at this
9   point, we're struggling to get a name so we can
10   document and move on.
11     Q.   Now, in the next paragraph, he talks
12   about the original underwriting of the Rainbow
13   Inn, and he says that special note was taken
14   that the system was in place.  Do you have any
15   knowledge of that special note being taken by
16   Safeco?
17     A.   No.
18     Q.   Did you do any investigation to
19   determine whether Safeco had anything in its
20   records that would reflect that the fire
21   suppression system was in place?
22     A.   Yes.
23     Q.   What did you do to try to --
24     A.   I contacted the underwriting
25   department at the underwriters and asked them

---

Page 83

1     P. Smith - by Mr. Victoria
2   to search the file and find out what we had.
3     Q.   And?
4     A.   And whether this was inspected or a
5   loss control person inspected it or what.
6     Q.   What was their response?
7     A.   They didn't have any record.
8     Q.   So does that mean it never happened
9   or they just didn't have a record?
10     A.   That means they didn't have a
11   record.
12     Q.   It's possible that someone went out
13   there?
14     A.   I believe in going through all these
15   documents post suit, that there was evidence
16   that a loss control person was there but could
17   not get in the building.
18     Q.   Are you able to testify to whether
19   or not it's standard practice to have someone
20   investigate the property at the outset of the
21   insurer's relationship with the insured?
22     A.   I cannot.
23     Q.   You don't know?
24     A.   No.
25     Q.   That's an underwriting question?

---

Page 84

1     P. Smith - by Mr. Victoria
2     A.   Yes.
3     Q.   Mr. Beck also advises in the letter
4   that he was a licensed fire and sprinkler
5   installer in the State of Texas and a licensed
6   fire alarm inspector capable of inspecting and
7   certifying these systems.  You read that at the
8   time, correct?
9     A.   Yes.
10     Q.   Do you know if that's true or not?
11     A.   I do not.
12     Q.   Do you do any investigation to
13   determine whether it was true?
14     A.   I did not.  Again, the form calls
15   for an independent.  So the fact that he was or
16   wasn't was not what we were looking for.  We're
17   looking for that independent contractor.
18     Q.   If you flip to the next document
19   there, June 23, 2004 letter.  Is that a letter
20   that you wrote?
21     A.   Yes.
22     Q.   That's your signature?
23     A.   Yes.
24     Q.   You drafted this in response to the
25   June 10 letter we just looked at?

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 85

1          P. Smith - by Mr. Victoria
2     A.    Yes, sir.
3     Q.    What was the purpose of this letter?
4     A.    To communicate to Mr. Beck what I
5  needed to get us over this hurdle of the fire
6  suppression system and the inspection by an
7  independent contractor.  That's the language I
8  had to get over.
9     Q.    So at this point in time, you were
10  documenting the things we talked about so far,
11  that you needed to know who the vendor was or
12  whoever the person was or entity was that
13  maintained the system?
14     A.    Yes.
15     Q.    If you flip to the next letter, the
16  July 25, 2004 letter, did you receive this
17  letter from Mr. Beck?
18     A.    Yes, sir.
19     Q.    Around the date of the letter?
20     A.    Yes.
21     Q.    In response to your June 23 letter
22  that we just looked at?
23     A.    I believe so.
24     Q.    Did you have some discussion with
25  Mr. Beck over the distinction between an Ansul

Page 86

1          P. Smith - by Mr. Victoria
2  and a Halon system?
3     A.    That may well have been my error,
4  using the generic Ansul system in place of fire
5  suppression system.
6     Q.    A lot of these documents relate back
7  to your initial conversation with Mr. Beck in
8  which you understood him to say that he took
9  the system out in '96 or '97, correct?
10     A.    Yes.
11     Q.    Do you believe that you
12  misunderstood something he said to you then?
13     A.    I don't know.  I been around life a
14  long time.  Can there be misunderstanding,
15  we'll all walk away from this table there can
16  be misunderstanding.  I believe I heard him say
17  he had the system removed.
18     Q.    Was there a discussion at that time
19  about Halon versus Ansul system?
20     A.    I don't recall.
21     Q.    I'm just trying to get at whether
22  the use of those terms may have caused a
23  misunderstanding at that conversation.
24     A.    I can't say yes or no.  But that
25  February 11 denial letter was very clear what

Page 87

1          P. Smith - by Mr. Victoria
2  we needed.
3     Q.    Other than asking Mr. Beck for the
4  vendor information, did Safeco do anything
5  independently to determine whether or not a
6  fire suppression system was in place and
7  whether it was maintained properly?
8     A.    I can't speak for all of Safeco.
9  But from my -- that I initiated, no.  Whether
10  something was done further in underwriting, I
11  can't say.  But, no.  From my standpoint, no.
12     Q.    If we flip to the next letter,
13  July 23, 2004.  You drafted this letter,
14  correct?
15     A.    Yes.
16     Q.    And it was sent on July 23, 2004?
17     A.    Yes, sir.
18     Q.    Again, you request the name of the
19  company who maintained your system so we can
20  get past this roadblock, correct?
21     A.    Yes, sir.
22     Q.    There's a series obviously of
23  correspondence and communication obviously
24  regarding this roadblock.  I'm trying to pin
25  down the times a little more.  We had talked a

Page 88

1          P. Smith - by Mr. Victoria
2  little bit earlier about whether you had these
3  sorts of conversations with Mr. Beck prior to
4  the denial letter or whether this was something
5  that just came up later.  Do you recall if --
6  what is your recollection of the timing of
7  these conversations?  Were they on both ends?
8  Were they mostly at this end of the transaction
9  or --
10     A.    They were at the front end.  But
11  they obviously, because of the time, they were
12  mostly at the back end of the denial.
13     Q.    Prior to the denial, did you ask him
14  for the vendor information?
15     A.    Yes.  And let me -- I think I've
16  said this before.  As also did my supervisor.
17     Q.    When did you resign from Safeco,
18  your position with Safeco?
19     A.    I retired very end of March.
20     Q.    March this year?
21     A.    Yes.  Began my new position in April
22  of this year.
23     Q.    So you remained -- I don't want you
24  to disclose any attorney/client communications,
25  all I'm asking is you remain the person in

22  (Pages 85 to 88)

Case 1:04-cv-00348-MBC    Document 25-5    Filed 12/06/2006    Page 23 of 30

Paul Smith                                    Walter Beck Corporation vs.
November 7, 2006                    Safeco Corporation American Economy, et al.

Page 89

1        P. Smith - by Mr. Victoria
2    Safeco responsible for this file even after
3    suit was filed?
4       A.   No.
5       Q.   Who would that be?
6       A.   Kathy London.
7       Q.   What's Kathy London do?
8       A.   She handles -- when a suit is filed,
9    we pack it up and send it to Ms. London.
10      Q.   Is she an attorney?
11      A.   Not to my knowledge.
12      Q.   What's her title?
13      A.   You know what, I am not even sure.
14   I met Kathy. I know her in passing. But
15   that's what I know, that she handles -- once
16   these suits go to litigation, she handles them.
17      Q.   So she doesn't funnel information
18   back to you about things that are produced in
19   the litigation or documents?
20      A.   No. Occasionally she may call with
21   a question on one. I do not recall that here.
22      Q.   So you don't recall discussing this
23   case with Kathy London?
24      A.   I can't say never. Not on any
25   frequent basis.

Page 90

1        P. Smith - by Mr. Victoria
2       Q.   I guess I want to clarify this as I
3    am looking at my notes. The letters that you
4    said you hadn't received from Mr. Beck either
5    simultaneously or shortly after they were sent,
6    do you recall if he sent you copies of those
7    after the fact?
8       A.   I believe he did.
9       Q.   That would have been around the time
10   when you started to communicate with him, May,
11   June time period?
12      A.   I believe so.
13      Q.   So as we sit here today, it's
14   Safeco's position that Mr. Beck has not
15   produced satisfactory evidence of the
16   maintenance of the system?
17      A.   I say that yes with this caveat,
18   that we are willing -- we were willing, and I
19   presume are, I can't speak now for them. I'm
20   no longer employed, but we're always willing to
21   -- if he just merely gave us a name, to
22   actually do the research and find out if he was
23   in compliance. We just needed a name. And let
24   me say this. That we've had many restaurant
25   fires with many insureds. This has been the

Page 91

1        P. Smith - by Mr. Victoria
2    only time I've ever had a problem obtaining
3    this. Sometimes I would have to do it with the
4    name. Somebody would say it's ABC Fire
5    Protection, and I would, you know, they are in
6    Pittsburgh, and I would --
7       Q.   You would contact it?
8       A.   Research it, contact them, and they
9    would get me the information. Overwhelming
10   majority of the time, the insured had that
11   information. But that was the only case where
12   I could not get it.
13      Q.   If the insured were to, and I
14   understand once the suit was filed, this case
15   was out of your hands, correct?
16      A.   Yes.
17      Q.   That's a fair representation of your
18   testimony?
19      A.   Yes, it is.
20      Q.   Speaking as Safeco generally, if
21   they would get this information after the suit
22   was filed, what would they do with it?
23      A.   I presume someone would review it,
24   process it and take what evidence was submitted
25   and apply it to the coverage and see if it

Page 92

1        P. Smith - by Mr. Victoria
2    meets the conditions of the policy.
3       Q.   Who would be the person that does
4    that?
5       A.   I couldn't say for sure. Once it's
6    in these -- and, you know, I worked out of my
7    home. So when I say this, logistically they
8    were in Indianapolis, Seattle or Cincinnati.
9    So I can't say who worked with Kathy London.
10      Q.   But, again, Kathy London is the
11   point person for that?
12      A.   She's point person.
13      Q.   So once suit's filed, as you
14   understand it, Safeco doesn't just ignore the
15   information that's coming in, correct?
16      A.   No. I believe they hire good
17   counsel who will also review those documents
18   and give her advice.
19      Q.   I'm not challenging the quality of
20   counsel in any way shape or form. And what I'd
21   like to do is discuss a few of these pieces of
22   information with you.
23           This may be best done with Kathy
24   London, but we'll see. Sir, this is our Rule
25   26 disclosures. Obviously you gentlemen

23  (Pages 89 to 92)

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 93

1         P. Smith - by Mr. Victoria
2  weren't involved in the case at this time
3  either. But so --
4         MR. MAYER:  Are you making
5  this an exhibit?
6         MR. VICTORIA:  Yes. I'm going
7  to mark it as an exhibit.
8         (Smith Deposition Exhibit No. 12
9  was marked for identification.)
10    Q.    Since you weren't involved in this,
11 I was going to ask you if you contacted any of
12 the people listed in here. But I think the
13 answer it's fair to say no because you -- is it
14 true that you've never reviewed this document
15 in your course of adjusting this claim?
16    A.    That's correct.
17    Q.    You believe if anybody from Safeco
18 had, the point person at least would be Kathy
19 London?
20    A.    Yes, sir.
21    Q.    I will ask you to flip to Exhibit A
22 to this document.
23    A.    I'm sorry. Which page would that
24 be?
25    Q.    It's very near the end. It's the

Page 94

1         P. Smith - by Mr. Victoria
2  third to last page and second to last page.
3  Have you ever seen that document before?
4    A.    Yes.
5    Q.    When did you see that document?
6    A.    My review for this deposition.
7    Q.    Just recently then?
8    A.    Recently.
9    Q.    Not around February or even I guess
10 we produced this to your counsel in June of
11 2005. So not that long ago?
12    A.    No.
13    Q.    Is this the sort of information you
14 were looking for from Mr. Beck? When you --
15 and I am referring to your letters and your
16 requests for information.
17         MR. MAYER:  I'm going to
18 object to the form of the question. You can
19 answer it if you can.
20    A.    This type of information, yes.
21    Q.    You said that times you would get
22 information from the insured and you'd have to
23 follow up with it, correct?
24    A.    Yes.
25    Q.    What would you have done had you

Page 95

1         P. Smith - by Mr. Victoria
2  received this letter?
3         MR. MAYER:  I'm going to
4  object. It calls for speculation. But you can
5  answer it if you are able.
6    Q.    Let me rephrase it. In the normal
7  course of your business experience as an
8  adjustor, what would you do with information
9  such as this?
10    A.    I would have contacted this Beck
11 Protective Systems.
12    Q.    Do you know if anybody from Safeco
13 has ever contacted Beck Protective Systems,
14 Inc.?
15    A.    I do not.
16    Q.    Should they have?
17         MR. MAYER:  Object to the
18 form.
19    A.    No.
20         MR. MAYER:  Also object
21 because it calls for speculation. I'm going to
22 actually instruct the witness not to answer
23 that question.
24         MR. VICTORIA:  Why?
25         MR. MAYER:  Because he's no

Page 96

1         P. Smith - by Mr. Victoria
2  longer an employee of Safeco, and while he's
3  here to testify for Safeco, he can't speak to
4  the company policies and procedures as they
5  stand today.
6         MR. VICTORIA:  Well, who can?
7  We'd like to depose them then. That's what we
8  asked for.
9         Is it Kathy London? Because we'll
10 have to take her deposition, too. Because
11 nobody from Safeco has ever called Beck
12 Protective Systems, despite the litany of
13 testimony today about how important it was to
14 have this information. Even if they don't like
15 the information they got, they should have at
16 least made a phone call. So we want to talk to
17 the person who hasn't made the phone call who
18 knows whether they should have or not.
19         MR. McDYER:  You're asking the
20 witness for an opinion, and I don't think for
21 him to comment one way or the other in an
22 opinion form would be appropriate. So that's a
23 problem. To some extent, it also is
24 argumentative.
25         MR. VICTORIA:  The question of

24  (Pages 93 to 96)

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 97

1    P. Smith - by Mr. Victoria
2  whether Safeco, in its normal course of
3  business, should have followed up on this
4  letter is an opinion?
5    MR. McDYER:  Yes.
6    MR. VICTORIA:  So if I brought
7  Kathy London here, you're not going to let her
8  answer the question either?
9    I'll let you think about it.  I
10  mean, you don't have to answer today, but, I
11  mean, I don't want to waste our time.  If we
12  have to clear that issue up on the front end
13  before a deposition, then I'd much prefer to do
14  that.  I'm sure you do, too.  I don't want to
15  have a deposition where we go through a series
16  of questions for the sake of the record and
17  then have to get it cleared up after the fact.
18    Of course, I can ask her if she or
19  anybody -- you're saying that she's the person.
20  I can ask if she or anybody at Safeco has
21  followed up on this?
22    MR. McDYER:  Well, see, the
23  problem is, that in the post suit situation,
24  where she's post suit claims representative,
25  what's happening is you're getting into trial

Page 98

1    P. Smith - by Mr. Victoria
2  preparation and counsel matters, and that
3  becomes a problematic issue.
4    MR. VICTORIA:  Well, I'm not
5  asking if counsel has contacted Mr. Beck,
6  although I think I can ask that question
7  because he's not a party to the case.  But I am
8  asking whether anybody at Safeco has.  I mean,
9  I'm asking what Safeco has done to continue to
10  investigate this claim.  Even after suit was
11  filed.  Because as far as Mr. Beck's concerned,
12  he's still trying to give the information that
13  Safeco wants, and, you know, we're glad to step
14  back and let Safeco make a few phone calls to
15  try to follow through with this stuff so we can
16  get the claim paid.
17    I mean, now, granted Mr. Beck from
18  Beck Protective Services has also sworn an
19  affidavit that everything in here is true.  I
20  mean, he's put probably his livelihood on the
21  line.  I think that that should be sufficient
22  for Safeco to at least reconsider its claims
23  decision.  But that's another issue altogether.
24    My question is, you're not going to
25  answer the question because your counsel has

Page 99

1    P. Smith - by Mr. Victoria
2  instructed you not to.  But we're going to need
3  to talk about whether Kathy London or not is
4  going to be the deponent here.  Because someone
5  has to answer whether or not they followed up
6  on this and whether it's company policy to do
7  it or not to do it after suit has been filed.
8  I think that's a question that can be answered
9  probably by -- I don't think you'd have an
10  objection to that question, would you, if you
11  -- is it the company policy to follow up on
12  information in support of a claim even after
13  suit has been filed?
14    MR. MAYER:  That's also
15  assuming that the information given was worth
16  following up on and that it actually meets the
17  condition of the policy.
18    MR. VICTORIA:  I'm just asking
19  the question.  That's a question that I don't
20  think that's asking for an opinion.  I don't
21  think it's asking for any speculation.
22    MR. McDYER:  Well, I don't
23  know.  In a vacuum it's hard to --
24    MR. VICTORIA:  That's why I
25  think we have to have the person here to talk

Page 100

1    P. Smith - by Mr. Victoria
2  to.  I mean, it's hard to put any of this in
3  context.  You're saying that Mr. Smith's not
4  the person to talk about this stuff, correct?
5    MR. McDYER:  Yes.
6    MR. VICTORIA:  I just don't
7  want to let him go and not ask him questions
8  and then have someone say you could have asked
9  Mr. Smith that.  I'm still going to go over
10  some things.  I'm going to save the hassle of
11  going through each of the affidavits.  The
12  other affidavits.  I presume you've seen in
13  preparation for your deposition today, the
14  other affidavits.
15  A.    In preparation, yes.
16  Q.    Have you ever spoken to any of the
17  other people that are listed?  And let's make
18  them exhibits.
19    MR. McDYER:  Let me put this
20  on the record.  While we were on break, counsel
21  and I have had discussion, and counsel wanted
22  to know the contentions of Safeco so that he
23  could formulate himself his position to
24  understand it, and I advised counsel that as it
25  states in the February 11, 2004 denial letter,

Case 1:04-cv-00348-MBC    Document 25-5    Filed 12/06/2006    Page 26 of 30

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 101

1        P. Smith - by Mr. Victoria
2    it's Safeco's position that we do not have a UL
3    listed system in existence on the date of the
4    fire, satisfactory demonstrable evidence
5    thereof, nor evidence of its quarterly or
6    semi-annual servicing as indicated and required
7    in the conditions of the policy. And with that
8    said, Mr. Smith, did I state the position
9    correctly?
10        THE WITNESS: Yes.
11        MR. McDYER: So that his
12    deposition is clear when we go over it, he may
13    have left something out there. He may have
14    said something about the system not being
15    there, not being whatever, I don't know.
16        MR. VICTORIA: I think
17    Mr. Smith is the right person to answer this
18    question.
19        Q.  What evidence does Safeco want to
20    prove this claim?
21        MR. McDYER: Well, you're
22    asking him to draw a legal conclusion, and I
23    don't think --
24        MR. VICTORIA: No, no. I'm
25    asking him as a claims adjustor.

Page 102

1        P. Smith - by Mr. Victoria
2        Q.  What evidence did you need to allow
3    the claim?
4        A.  February 11, I needed proof that we
5    had a UL approved fire suppression system.
6        Q.  Could I stop you there?
7        A.  Yes.
8        Q.  What sort of proof? Of just that
9    aspect of it, what would have been proof for
10    you?
11        A.  But that proof is more than
12    someone's verbal assurances. That's where I'm
13    going to the next, the semi-annual inspections
14    and the quarterly cleanings by an independent
15    contractor. So that independent contractor
16    supplies me evidence and dates which is
17    customary of that servicing. That would prove
18    the system is in existence, it would prove to
19    myself that there was -- that it was
20    semi-annually cleaned because it would have to
21    have the dates on that, and we would have his
22    documentation, and I would have the quarterly
23    cleanings that he did and those dates.
24        Q.  Absent that sort of information, is
25    there any sort any information that could have

Page 103

1        P. Smith - by Mr. Victoria
2    been provided to you that would have caused
3    Safeco to allow the claim?
4        A.  Not to my knowledge.
5        Q.  I'm just going to save the hassle of
6    even making the affidavits exhibits. It
7    doesn't seem to be necessary at this point.
8        I just want to run through a few
9    names with you and see if you can tell me
10    anything about the people or if you had any
11    interaction with them. Obviously you mentioned
12    Kathy London. Do you know who Debra Moreshed
13    is?
14        A.  That doesn't ring a bell.
15        Q.  John Carney.
16        A.  Can you give me a little more than
17    the name?
18        Q.  Did you have any -- these are just
19    names that are given here as potential
20    deponents. I'm just factually whether you have
21    any familiarity with them.
22        A.  No, I don't.
23        Q.  Maybe I'll ask counsel. Is
24    Mr. Carney the underwriting guy?
25        MR. McDYER: He's in the

Page 104

1        P. Smith - by Mr. Victoria
2    underwriting department.
3        MR. VICTORIA: If we wanted to
4    talk to somebody about underwriting on this
5    policy, would he be the person that we had to
6    talk to, assuming that you didn't object to
7    that, just factually speaking?
8        MR. McDYER: He is in the
9    underwriting department.
10        MR. VICTORIA: So he might be
11    the one?
12        MR. McDYER: Right.
13        MR. VICTORIA: I'm not going
14    to hold you to it. I just want to try to get a
15    ballpark of where we're going here.
16        Q.  Did you at any time assess the value
17    of the loss at issue here, the amount of
18    damages at issue?
19        A.  Can you define assess? I mean, we
20    set reserves based on the fact that the
21    building was pretty much destroyed. And then
22    we set reserves based on what we thought the
23    contents claim might be. So in that regard, I
24    assessed damage, but as far as specifically
25    doing an estimate or specifically going through

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 105

1          P. Smith - by Mr. Victoria
2   all of the business property, I did not.
3       Q.   Is this something you did prior to
4   the filing of the lawsuit?
5       A.   Yes.
6       Q.   What did you set the reserve to be
7   for the property damage?
8       A.   I don't recall.  That should be in
9   this file somewhere.  I mean, that's pretty
10  customary in any insurance company.  That's
11  something we do very quickly.
12          MR. VICTORIA:  If you give me
13  a few minutes, I'll wrap up pretty quickly.  If
14  you want to take a five or ten-minute break,
15  I'll flip through this stuff and we'll get
16  done.
17          (A recess was taken.)
18          MR. VICTORIA:  I didn't see a
19  single note or anything in the electronic file
20  that was produced to me by Mr. Smith.  That
21  seemed unusual to me, and given his testimony
22  today, it seems even more unusual.
23          MR. McDYER:  We can go back
24  and check that.
25          MR. MAYER:  Your request

Page 106

1          P. Smith - by Mr. Victoria
2   was --
3          MR. VICTORIA:  I just want to
4   make sure that we're --
5          MR. McDYER:  Not missing
6   anything.
7          MR. VICTORIA:  Yeah.  That's
8   the kind of stuff that we all want to see.
9          MR. MAYER:  Yes.
10          MR. McDYER:  It's one of the
11  problems when they go paperless.
12          MR. VICTORIA:  I've seen that
13  in the past, too.  Because of that, I'm not
14  going to say the deposition is closed when
15  we're done today.  I mean, if we maybe have to
16  ask some questions on the telephone or -- I'm
17  trying to make your life as easy as possible.
18  If those documents weren't produced, we may
19  have questions about them.  Obviously they are
20  your notes, so we may have to get into that.
21  It just seemed odd to me throughout.  In fact,
22  that's why I made the second document request
23  for them.  I thought, well, maybe under new
24  counsel, it might get re-investigated and turn
25  something up, and it didn't, so I don't know.

Page 107

1          P. Smith - by Mr. Victoria
2          MR. McDYER:  I was kind of
3   operating under the assumption that it had all
4   been produced to you.  I'll have to go back and
5   rework it.
6          MR. VICTORIA:  Thank you.
7       Q.   I just want to show you a couple of
8   things here.
9          (Smith Deposition Exhibit No. 13
10  was marked for identification.)
11      Q.   I put a document in front of you.
12  It's starts at Bates stamp number 92 and goes
13  to 102.  Generally speaking, do you know where
14  that document came from?
15      A.   It appears to be an electronic file
16  of underwriting document.
17      Q.   You said underwriting document.  I
18  just want to get at how the electronic file is
19  kept.  Is it divided by underwriting and
20  claims?
21      A.   Yes.
22      Q.   Because we've been produced what
23  appear to be all of the underwriting
24  information from the electronic file.  I have a
25  stack of -- these are just a tiny excerpt of

Page 108

1          P. Smith - by Mr. Victoria
2   those.  But there's nothing in claims, and it's
3   possible that they only produced us the
4   underwriting and not the claims information.  I
5   don't know.  This wouldn't be something that
6   you're normally reviewing in your course as an
7   adjustor?
8       A.   No.
9       Q.   Do you know what a large loss report
10  is?
11      A.   That would be something I would have
12  generated.
13      Q.   Well, then let me ask you about
14  that.  Is it correct for me to read this from
15  -- you can take a look at it.  It looks like a
16  series of e-mails here.  I've put them together
17  because I noticed the capitalized word more
18  with an ellipsis after that.  When that's no
19  longer there, I assume that's the end of a
20  document.  You'll see that the first page has a
21  more, and it continues to the end where there
22  is no more.  It looks like these messages go in
23  chronological order from the last to the first.
24          So I'm going to try to direct you
25  through it, and you can tell me if I'm wrong.

27  (Pages 105 to 108)

Case 1:04-cv-00348-MBC    Document 25-5    Filed 12/06/2006    Page 28 of 30

Paul Smith                                           Walter Beck Corporation vs.
November 7, 2006                          Safeco Corporation American Economy, et al.

Page 109

1          P. Smith - by Mr. Victoria
2     Page 98. No, I guess we start right at the
3     front of this one. I'm sorry. Because there
4     is a time there. Do you know who Bob Kroll is?
5         A.   I'm sorry. Which page are you on?
6         Q.   I'm sorry. Right at the front page.
7     There is e-mail, it appears, from John Carney
8     to Bob Kroll.
9         A.   No.
10        Q.   Well, this doesn't really get into
11    the large -- I want to avoid the underwriting
12    questions. This document, too.
13             (Smith Deposition Exhibit No. 14
14    was marked for identification.)
15        Q.   Unfortunately, I only have three
16    copies of this one. Is this the large loss
17    report you referred to that you prepared? I'll
18    give you a chance to flip through it. It's
19    Bates stamped 81 through 91.
20        A.   I'm taking my time with this because
21    it's a totally different format than I am used
22    to seeing this in bits and pieces. But I --
23        Q.   These documents are difficult to
24    follow. That's one of the reasons I am putting
25    it in front of you. I thought you'd maybe give

Page 110

1          P. Smith - by Mr. Victoria
2     us a little more guidance on the map.
3         A.   This is not the way they look in the
4     claims. If this is indeed -- I cannot honestly
5     answer that this is information that I would
6     have generated and perhaps was kind of collated
7     into an underwriting large loss report, but
8     this is not.
9         Q.   The report?
10        A.   The large loss report. There's that
11    dollar reserve is something that appears I
12    would have generated.
13        Q.   Before you go any further with that
14    statement, if you look at pages -- let's work
15    our way backwards -- 91 all the way back to --
16    well, I guess it's all the way from 85 to 91,
17    there is reference as to dollar figures, and
18    page 85 says building, and underneath it it
19    says $221,300. Would these figures that are
20    set out throughout here, is this you setting
21    reserves for the certain categories of loss?
22        A.   I believe so.
23        Q.   So the next page, personal property
24    $55,700, how do you go about -- what do you do
25    to determine a reserve amount?

Page 111

1          P. Smith - by Mr. Victoria
2         A.   On a loss that is not a building
3     that is not burned down, you actually have to
4     go through and, in your mind, without doing a
5     complete estimate, but just in your mind what
6     is this going to cost to repair. When a
7     building is as this was, down, it's pretty much
8     set at the policy limit.
9         Q.   Okay.
10        A.   I don't have those policy limits in
11    front of me, but I would presume that this was
12    base -- these reserves were based on the limits
13    of insurance.
14        Q.   Just so we're clear for the record,
15    what do you mean by reserve? What is a
16    reserve?
17        A.   Reserve is the actual expected loss
18    as kind of a not to exceed that I can notify
19    underwriting, our claims department and up the
20    ladder what the loss could be.
21        Q.   Would your large loss report have
22    included -- you see on page -- for example,
23    page 82, construction class F. Do you know
24    what that means?
25        A.   No.

Page 112

1          P. Smith - by Mr. Victoria
2         Q.   Or is that something that came from
3     the underwriting side?
4         A.   That is what alerted me that this
5     was not my report. That's one of the things.
6         Q.   You see there is an entry in there
7     underneath that that says sprinklered, and
8     there is an N next to that. You didn't do
9     that?
10        A.   No.
11        Q.   So you did the reserves, you set the
12    reserves, but you stated that you didn't do a
13    specific damage analysis for this claim,
14    correct?
15        A.   That's correct.
16        Q.   What's the difference between those
17    two things?
18        A.   The structure was basically burned
19    down. So I set the policy limit, I believe, as
20    a reserve. As opposed to going through and
21    developing a complete estimate on the cost of
22    rebuilding that structure.
23        Q.   That would be the same from the
24    personal property or business property
25    standpoint, would the difference be, the

Case 1:04-cv-00348-MBC   Document 25-5   Filed 12/06/2006   Page 29 of 30

Paul Smith                                                      Walter Beck Corporation vs.
November 7, 2006                              Safeco Corporation American Economy, et al.

Page 113

1        P. Smith - by Mr. Victoria
2    difference between just doing a general
3    estimate, the policy limits, versus going
4    through line by line and doing a specific
5    calculation?
6        A.   That's correct.
7        Q.   Of the replacement cost?
8        A.   Yes.  The building and all of its
9    contents are gone, so we're setting those
10   reserves as a kind of a maximum not to exceed.
11       Q.   What's the purpose of setting
12   reserves?
13       A.   I think I know.  I can't give you
14   exact definition.  Insurance companies need to
15   know the potential losses that are out there,
16   and they hold monies in reserve to cover those
17   losses.
18           MR. VICTORIA:  I think I'm
19   done.  That's it.
20           MR. MAYER:  I don't have any
21   questions.  Do you have any questions?
22           MR. McDYER:  No questions.
23           MR. VICTORIA:  The only thing
24   I guess I'm going to put on the record is you
25   guys are going to follow up in seeing if there

Page 114

2    are some Paul Smith electronic files out there,
3    large loss report, whatever these other things
4    are we talked about.  And we'll be in touch on
5    whether we need to talk about a Kathy London
6    deposition or any other witnesses.
7            MR. MAYER:  (Nods head.)
8            MR. VICTORIA:  I'll talk to
9    Josh about that, and we'll get back to you.  I
10   don't want to drag anybody here, so maybe what
11   we need to do is have a chat about what we
12   intend to talk about and whether you intend to
13   let her talk to us about it.
14           MR. MAYER:  That's fair.
15           MR. VICTORIA:  I don't presume
16   there is going to be any objection to taking a
17   deposition because we're past the discovery
18   deadline.  I mean, we've been pretty --
19           MR. McDYER:  When I talked to
20   Josh, he said rather than chase around with the
21   courthouse, we'll just try and get them done
22   quickly.
23           MR. VICTORIA:  I mean, we
24   continue to agree with that obviously this is
25   the first deposition taken in this case.  It's

Page 115

2    technically after the discovery deadline.
3            MR. McDYER:  I have no
4    objection.
5            MR. VICTORIA:  I just want to
6    make sure that we're not -- we've been playing
7    fair on the discovery deadline stuff, and I
8    want to continue that way, but if we -- worse
9    case, if we need to go and send a motion up to
10   the judge, I guess we'll do it.
11           MR. MAYER:  Okay.
12           MR. McDYER:  I mean, as you go
13   through these things, you know, you get some
14   ideas that maybe, well, I want to talk to this
15   person in underwriting, maybe I want to talk to
16   Kathy London, and, of course, I know we've got
17   the Beck scheduled.  But as we talk to them,
18   there may be --
19           MR. VICTORIA:  We understand.
20           MR. McDYER:  One or two other
21   that we want to slip in and try and get over in
22   a hurry before we get too far beyond with what
23   we've already gotten beyond.
24           MR. VICTORIA:  I understand.
25           MR. McDYER:  I understood that

Page 116

2    was sort of okay with Josh.
3            MR. VICTORIA:  It is.  And I
4    wanted to make sure we're still on the same
5    page.
6            MR. McDYER:  Yes.  We're not
7    holding your feet to the fire on a deadline.
8            MR. VICTORIA:  Well, thanks
9    for coming today.
10           (Signature not waived.)
11           (Whereupon, the above-entitled
12   matter was concluded at 12:29 p.m.)
13               - - - - -
14
15
16
17
18
19
20
21
22
23
24
25

29 (Pages 113 to 116)

Paul Smith
November 7, 2006

Walter Beck Corporation vs.
Safeco Corporation American Economy, et al.

Page 117

2  COMMONWEALTH OF PENNSYLVANIA  ) E R R A T A
   COUNTY OF ALLEGHENY        ) S H E E T
3
4  WALTER BECK CORPORATION
   vs.
5  SAFECO CORPORATION
6
       I, PAUL G. SMITH, have read the foregoing
7  pages of my deposition given on NOVEMBER 7,
   2006, and wish to make the following, if any,
8  amendments, additions, deletions or
   corrections:
9
   Pg. No.  Line No.    Change and reason for
10 change:
11
12
13
14
15
16
17
18
19
20 In all other respects the transcript is true
   and correct.
21
   _____
22       PAUL G. SMITH
23 Subscribed and sworn to before me this
   _____ day of _____, 2006
24
   _____
25    Notary Public          (CV)

Page 118

2  COMMONWEALTH OF PENNSYLVANIA)
   COUNTY OF ALLEGHENY      )
3
4      I, Christine M. Vitrano, a notary
   public in and for the Commonwealth of
5  Pennsylvania, do hereby certify that the
   witness, PAUL G. SMITH, was by me first duly
6  sworn to testify the truth, the whole truth,
   and nothing but the truth; that the foregoing
7  deposition was taken at the time and place
   stated herein; and that the said deposition was
8  recorded stenographically by me and then
   reduced to typewriting under my direction, and
9  constitutes a true record of the testimony
   given by said witness, all to the best of my
10 skill and ability.
11     I further certify that the inspection,
   reading and signing of said deposition were not
12 waived by counsel for the respective parties
   and by the witness and if after 30 days the
13 transcript has not been signed by said witness
   that the witness received notification and has
14 failed to respond and the deposition may then
   be used as though signed.
15
       I further certify that I am not a
16 relative, or employee of either counsel, and
   that I am in no way interested, directly or
17 indirectly, in this action.
18     IN WITNESS WHEREOF, I have hereunto
   set my hand and affixed my seal of office this
19 9th day of November 2006.
20
       S/Christine M. Vitrano
21 _____
22
23 _____
24
25

30  (Pages 117 to 118)