Case 1:04-cv-00348-MBC    Document 25-6    Filed 12/06/2006    Page 1 of 30

Walter Beck Corp. vs. Safeco Corp.    DO NOT COPY    Harold Beck   11/11/2006



**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WALTER BECK CORPORATION d/b/a  Civil Action No. 04-348-Erie
THE RAINBOW INN,
        Plaintiff,         Judge Maurice B. Cohill, Jr.
vs.
SAFECO CORPORATION, AMERICAN
ECONOMY INSURANCE COMPANY, and
AMERICAN STATES INSURANCE COMPANY,
        Defendants.
_____/

Deposition of:    Harold Beck

Taken by:    Defendants

Date:    November 11, 2006

Time:    11:00 a.m. - 1:21 p.m.

Location:    Holiday Inn Express,
             The Villages
             1205 Avenida Central
             Lady Lake, Florida

Reported by:    Leslie Richmond, RPR

ZACCO & ASSOCIATES REPORTING SERVICES
605 East Robinson Street, Suite 430
Orlando, Florida 32801
(407) 425-6789

**Page 2**

APPEARANCES:
APPEARANCES FOR THE PLAINTIFF
Joshua R. Lorenz, Esquire
Of: Meyer, Unkovic & Scott, LLP
    1300 Oliver Building
    Pittsburgh, Pennsylvania 15223

APPEARANCES FOR THE DEFENDANTS

Daniel P. McDyer, Esquire, and
Benjamin M. Mayer, Esquire
Of: Anstandig, McDyer & Yurcon, P.C.
    1300 Gulf Tower
    707 Grant Street
    Pittsburgh, Pennsylvania 15219

INDEX
Testimony of Harold Beck                    Page
   Direct Examination by Mr. Mayer            3
Certificate of Oath                         114
Certificate of Reporter                     115
Read and Sign Letter to Witness             116
Errata Sheet (to be forwarded upon execution)  117

**Page 3**

PROCEEDINGS
HAROLD BECK,
having been first duly sworn, testified as follows:
THE WITNESS: I do.
DIRECT EXAMINATION
BY MR. MAYER:
Q.   Good morning, Mr. Beck.
A.   Morning.
Q.   My name is Ben Mayer and I also represent the
insurance companies that were named as defendants in this
lawsuit that was filed regarding the fire which occurred at
the Rainbow Inn in 2003. You were present for your wife's
deposition earlier, correct?
A.   Correct.
Q.   And were you listening to the instructions that
were given to your wife regarding the deposition?
A.   Yes.
Q.   And did you understand those instructions?
A.   Yes, I did.
Q.   Do you understand that those same instructions
apply to this deposition?
A.   Yes, I do.
Q.   Have you ever had a deposition taken before?
A.   Yes, I have.
Q.   In what capacity?

**Page 4**

A.   As a plaintiff and as a defendant.
Q.   And tell me about when you were a plaintiff in
another lawsuit.
A.   I sued some lawyers.
Q.   And what did that involve?
A.   I sued them for a lot of money.
Q.   What was the nature of the case?
A.   They had misrepresented some facts against me in
their capacity as attorneys and I went after them.
Q.   Can you be more specific?
A.   It was a long, drawn out affair that took place in
the state of Texas when we were living there and we had Texas
Fire and Security. They had sued us on behalf of somebody
that we had done work for.
Q.   When you say, us, do you mean the corporation?
A.   They sued the company. They sued the corporation
on behalf of some work we did for them and they had got a
judgment against us.
Q.   Okay. Now, who sued the corporation?
A.   Somebody we had done work for. And I don't
remember the name.
Q.   Another company?
A.   No. This was a -- this was a client of Texas Fire
and Security sued --
Q.   A private person?

Walter Beck Corp. vs. Safeco Corp.    DO NOT COPY    Harold Beck  11/11/2006

---

5

1     A.   Yeah.  Sued us.  It was a homeowners association
2  for a building and they sued us.  And they achieved a
3  judgment against us.
4     Q.   And was this stemming from work that your
5  corporation had done for the homeowners?
6     A.   Yes.
7     Q.   I'm going to ask you -- I know you are anticipating
8  my question, but just for the sake of the court reporter,
9  could you wait until I'm finished asking the question before
10  you answer?
11     A.   Sure.
12     Q.   Thank you.  She just has trouble getting stuff down
13  if we're talking over each other.
14     A.   Okay.
15     Q.   So was this work an installation that you had done
16  for the homeowners association?
17     A.   Yes.
18     Q.   Okay.  And what kind of installation was it?
19     A.   It was a fire alarm system.
20     Q.   And the corporation was sued because of the work
21  that was done?
22     A.   Uh-huh.
23     Q.   And what was the nature of the lawsuit?  What did
24  they claim?
25     A.   They claimed that it was installed defectively.

---

6

1  They claimed a lot of different things.  The fact of the
2  matter is they didn't want to pay us.  That's what it was
3  about.
4     Q.   So you were never paid for the work that you had
5  done?
6     A.   We were paid for half of the work.  They didn't
7  want to pay the rest of it.
8     Q.   I see.  And you said they obtained a judgment
9  against you?
10     A.   Yes.
11     Q.   Did you hire an attorney to defend that lawsuit?
12     A.   Yes.
13     Q.   Do you remember the attorney that you hired?
14     A.   Robert Looney (ph.).
15     Q.   Robert Looney was your attorney?
16     A.   Yes.
17     Q.   And he's located in Texas?
18     A.   He's dead.
19     Q.   Oh, he's dead.  Is his law firm still in existence?
20     A.   No.
21     Q.   Was it in Austin, Texas?
22     A.   Yes.  He was disbarred after he lost that case.
23     Q.   Okay.  He was disbarred?
24     A.   Uh-huh.  He used to be Lyndon Johnson's personal
25  attorney.

---

7

1     Q.   Do you remember the name of the homeowners
2  association in any way?
3     A.   No.
4     Q.   Do you remember the name of the establishment where
5  the homeowners association controlled --
6     A.   No.
7     Q.   -- the business?  No.
8     A.   No.
9     Q.   Do you remember the location of that place?
10     A.   It was in Austin, Texas.
11     Q.   In Austin, Texas.
12     A.   Yeah.
13     Q.   Do you remember the name of any attorneys who may
14  have represented the homeowners association?
15     A.   The firm was Hilgers and Watkins.
16     Q.   Hilgers and Watkins?
17     A.   Yeah.  I forget the names of the players.
18     Q.   Now, when you say a judgment was obtained, did you
19  defend the lawsuit in court?
20     A.   Yeah.
21     Q.   And it went through trial?
22     A.   Yeah.
23     Q.   Was it a jury trial?
24     A.   No.  A judge.
25     Q.   A judge trial.  And was that in Austin, Texas?

---

8

1     A.   It was a good old boy judge.
2     Q.   You don't remember the name of the judge?
3     A.   No.
4     Q.   In what court was it?  Was it a state court or a
5  federal court?
6     A.   State court.
7     Q.   So a state court in Austin, Texas.  Is there just a
8  state court building in Austin, Texas?
9     A.   Yes.
10     Q.   And it was in Austin, Texas?
11     A.   Yes.
12     Q.   And after -- the result of that lawsuit was a
13  judgment against your company?
14     A.   Yes.
15     Q.   And after that suit took place you then became a
16  plaintiff in a lawsuit stemming from the original lawsuit?
17     A.   Yes.
18     Q.   What was the nature of that suit?
19     A.   We did an investigation and found the attorneys had
20  made up the evidence against us.
21     Q.   In what way?
22     A.   They made it up.
23     Q.   It was just completely fabricated?
24     A.   Yes.  They made up the evidence against us.  And I
25  went after the attorneys, and I had one of them disbarred,

---

Walter Beck Corp. vs. Safeco Corp.      DO NOT COPY      Harold Beck   11/11/2006

---

9

1   too.
2     Q.  One of the Hilgers and Watkins --
3     A.  Well, one of the players.
4     Q.  One of the --
5     A.  One of the players that was involved in suing us.
6     Q.  Okay.
7     A.  And the judgment was subsequently removed.
8     Q.  So there was no judgment at all?
9     A.  Yes.
10     Q.  Do you remember what counts were levied against
11  your company in the original lawsuit, what legal counts they
12  were suing you for?
13     A.  They ultimately got us under deceptive trade
14  practices, Texas Deceptive Trade Practices Act, which was
15  later declared unconstitutional as a result of what I did.
16     Q.  I see.  And the judgment was completely removed and
17  there's no longer a judgment against that company?
18     A.  No.
19     Q.  Or you personally in any way?
20     A.  No.
21     Q.  Okay.  And you said that you were also a defendant.
22  When you said you were also a defendant in a lawsuit, were
23  you referring to the original lawsuit?
24     A.  Yeah.  I was a -- I gave depositions on both sides.
25     Q.  I see.  And there were two separate lawsuits?

---

10

1     A.  Yes.
2     Q.  Okay.  Are those the only other two lawsuits you've
3  ever been involved in personally?
4     A.  To the best of my recollection.
5     Q.  Okay.  Let's talk a little bit about your personal
6  background.  Where were you born?
7     A.  Pittsburg, Pennsylvania.
8     Q.  Okay.  In what year?
9     A.  1946.
10     Q.  Your birth date?
11     A.  June 14.
12     Q.  What part of Pittsburg?
13     A.  Baldwin Township.  South Hills.
14     Q.  Did you go to high school there?
15     A.  South Hills Catholic High School.
16     Q.  What year did you graduate?
17     A.  '64.
18     Q.  Did you have any education after high school?
19     A.  California State College, California, Pennsylvania
20  from 1964 to 1966.
21     Q.  What did you study there?
22     A.  Baseball, booze and broads.  And for my sins, I got
23  to serve in the Vietnam War.  And then I went back to
24  California State College and graduated from California State
25  College in 1972.

---

11

1     Q.  And what was your degree?
2     A.  English.
3     Q.  And after you graduated in 1972, did you then go to
4  work?
5     A.  I went to graduate school.
6     Q.  Where did you go to graduate school?
7     A.  East Carolina University.
8     Q.  What did you study there?
9     A.  English.
10     Q.  Did you get a master's degree?
11     A.  Yes.
12     Q.  And what year did you obtain your master's?
13     A.  '74.
14     Q.  And what did you do after that?
15     A.  Went to work selling cars.
16     Q.  In what area?
17     A.  North Carolina.  Washington, D.C.
18     Q.  And how many years did you do that?
19     A.  Two.
20     Q.  So that would take us up to about 1976?
21     A.  Yep.
22     Q.  What did you do then?
23     A.  Then I went to work for Liberty Mutual Insurance
24  Company in Pittsburg.
25     Q.  What did you do for them?

---

12

1     A.  I was a -- I was a group health underwriter.
2     Q.  Group health?
3     A.  Yes.
4     Q.  How many years did you do that?
5     A.  I worked with Liberty Mutual until 1981.
6     Q.  So from '76 to '81 while you were working for
7  Liberty Mutual Insurance Company, did you receive any
8  insurance training?
9     A.  Oh, yes.
10     Q.  What kind of training would you have received?
11     A.  Life underwriter training, sales training.
12     Q.  Did you receive any certificates or licensure?
13     A.  I was licensed in numerous states to sell life and
14  health insurance and underwrite it.  I was licensed in New
15  York, Pennsylvania, Ohio, Illinois, Massachusettes.  At the
16  end of my tenure with Liberty Mutual, I was a national
17  accounts representative.  I handled big corporations.
18     Q.  Okay.  Did you sell any other type of insurance for
19  Liberty Mutual or underwrite any other type of insurance?
20     A.  Business insurance.
21     Q.  Business?
22     A.  Property and casualty.
23     Q.  So were you also licensed as a property and
24  casualty --
25     A.  Yes.

---

Walter Beck Corp. vs. Safeco Corp.                    DO NOT COPY                    Harold Beck    11/11/2006

13

1    Q.  You were also licensed as a property and casualty
2  insurer?
3    A.  Yes, I was.
4    Q.  And what types of businesses would you have sold
5  property and casualty insurance to?
6    A.  Manufacturing facilities.  I handled workman's
7  compensation for the Ford Motor Company, Xerox Corporation.
8    Q.  And you also you said wrote property and casualty
9  insurance?
10   A.  Yes.
11   Q.  Did you do any property and casualty insurance for
12 restaurants?
13   A.  No.  I hated them.
14   Q.  And then -- so you stayed there until 1981, and
15 then you moved on to something else?
16   A.  1981, I went to work for myself.  I started Texas
17 Industrial Systems International.
18   Q.  What was that?
19   A.  I sold a fresh water pipeline that ran from Turkey
20 to Saudi Arabia through the entire nation of Iraq.
21   Q.  And this was a business solely owned by you?
22   A.  Yes.
23   Q.  And how did you become involved in that business?
24   A.  I came across a brand new product, internal coating
25 for pipe.  And I became the international representative for

14

1  the people that made the internal coating, and I had an in
2  with Aramco, the Arabian American Oil Company, and I sold
3  them the pipeline.
4    Q.  And how many years did that business exist?
5    A.  Texas Industrial Systems International stayed in
6  business for about two years.
7    Q.  What was the reason that it stopped doing business?
8    A.  Aramco didn't pay me.
9    Q.  I see.  Were you involved in a lawsuit over that?
10   A.  Initially, but we dropped it because we couldn't
11 gain access to the international courts because we were
12 dealing with Arabians, with Arabs.
13   Q.  And you couldn't file the suit for some reason?
14   A.  That's exactly true.  It was -- would have cost
15 more than I had available to me.
16   Q.  I see.  So the whole deal was dropped basically and
17 you went on to something else?
18   A.  That's right.
19   Q.  What did you do after that?
20   A.  Texas Fire and Security Systems.
21   Q.  How did you become involved in that?
22   A.  My brother was in the burglar and fire alarm
23 business.  The City of Austin passed a ordinance requiring
24 all apartments to have smoke detectors installed.  I had
25 access to cheap smoke detectors that were UL listed.  I made

15

1  a deal in bulk to buy them, and then I made deals with
2  individual homeowners or individual apartment complexes to
3  install them, and that was the beginning of Texas Fire and
4  Security Systems.
5    Q.  Okay.  Prior to your becoming involved in that
6  business, did Texas in any way require you to go through
7  training or licensure?
8    A.  Yes, you had to be licensed.
9    Q.  How did you obtain that license?
10   A.  I -- based on my qualifications through my brother,
11 because I had done work for him on the side, when he would
12 get a contract out of state, a lot of times I would -- as a
13 -- working with Texas Industrial Systems International, I
14 would do the installation work for him.  I would take a crew
15 and go manage it and do the installation work.  So based on
16 my experience, I was qualified to be licensed in the state of
17 Texas.  I sat for the test, passed the test, and became
18 licensed.
19   Q.  Okay.  Did you train with your brother then?
20   A.  Yes.
21   Q.  And all of the knowledge that you have about fire
22 suppression or burglar alarm systems came from your brother?
23   A.  No.
24   Q.  How else did you get it?
25   A.  I'm smart.  I can pick stuff up, too.

16

1    Q.  I didn't mean to imply that you weren't smart.
2    A.  No, I -- no.  You learn as you do.
3    Q.  And so -- but your original training came from your
4  brother?
5    A.  Yes.
6    Q.  And how did he receive his training in that field?
7    A.  He was in law enforcement originally.  And he did
8  inspections, he investigated fires, investigated burglaries,
9  things like that.  And from law enforcement, he went into
10 this particular type of business, work.
11   Q.  Does he have a license in that area?
12   A.  Yes, he does.
13   Q.  Is that in the state of Ohio?
14   A.  He's licensed in many states.  He does work across
15 the nation.  He works for the federal government.
16   Q.  Okay.  Do you still have a license in Texas for --
17   A.  No.
18   Q.  -- installation, inspection of burglar and fire?
19   A.  No.
20   Q.  When did you let that license lapse?
21   A.  When I sold the company to Network Security, there
22 was no reason for me to be licensed anymore.
23   Q.  Okay.  Did the state of Texas require any
24 additional training to keep your license?
25   A.  All I had to do -- well, for the fire -- there were

Case 1:04-cv-00348-MBC    Document 25-6    Filed 12/06/2006    Page 5 of 30

Walter Beck Corp. vs. Safeco Corp.    DO NOT COPY    Harold Beck   11/11/2006

17

1    two different licenses I held.
2        Q.    Explain those to me.
3        A.    One was the security license.  And that was in
4    three stages.  There was the installation of burglar alarms,
5    there was running a guard company, and there were private
6    investigations.  I sat for all three parts and passed all
7    three parts and was qualified in all three areas.  The fire
8    marshall required that anybody doing the installation of
9    anything involved with fire alarms or fire signals be
10   licensed by the state fire marshall's office.  I sat for that
11   test, passed that, and did a physical demonstration for them
12   of an installation which qualified us to install them,
13   inspect them, and certify them.
14       Q.    Okay.  And after your received those two
15   licensures, let's talk about the fire one, was there any
16   further training --
17       A.    No.
18       Q.    -- that was required?
19       A.    No.  Once you're licensed, you're licensed.
20       Q.    So you just paid an annual fee?
21       A.    That's correct.
22       Q.    And no further classes that you had to take from
23   the state, or --
24       A.    No.
25       Q.    -- any other agency?

18

1        A.    No.
2        Q.    Now, let's talk a little bit about Texas Fire and
3    Security Systems.  What exact kind of systems were sold by
4    your company?
5        A.    We sold burglar alarm systems from protecting this
6    room to protecting this entire complex.  We had national
7    accounts like Kentucky Fried Chicken where we protected
8    individual Kentucky Fried Chicken stores.  We picked up -- we
9    did work for Pepsi-Cola Bottling Company, Pepsico.  We
10   protected their entire bottling facilities with key access,
11   security, fire alarm, fire suppression, the whole deal.
12       Q.    Okay.  These are all done on a contractual basis?
13       A.    Yes.
14       Q.    And each work, each job that you did was an
15   individual contract --
16       A.    Yes, it was.
17       Q.    -- for a company?  And you would -- how did you
18   sell these systems?  How did you obtain the businesses -- I'm
19   sorry, the contracts that your business --
20       A.    I would go out and sell them.
21       Q.    Did you actually go out and do the leg work and
22   talk to the companies that may need the systems?
23       A.    Yes.  I met with the -- Pepsico was headquartered
24   in New York at that time, and I went to New York, visited
25   with them, and they gave me one in Colorado, Pueblo,

19

1    Colorado.  And it was a small plant, only 100,000 square
2    feet.  And we did that, then they said, how about our Las
3    Vegas facility.  And we did that.  And then they had this
4    enormous one on the west coast out in California.  All in
5    all, I think we did about 10 of them.
6        Q.    When you started this business -- correct me if I'm
7    wrong -- it was only -- you were only installing fire
8    detection systems?
9        A.    Fire.  Not fire alarms.  Smoke detectors.  That's
10   all I -- my wife and I started it on our dining room table
11   selling smoke detectors.
12       Q.    And it just built from there?
13       A.    Yes.
14       Q.    When did you become involved in selling fire
15   suppression systems?
16       A.    Almost immediately.  Once we were doing the smoke
17   detectors -- my wife doesn't remember these things, but I do.
18   A place by the name of Scopes Slide Service in Austin, Texas
19   was a company that stored valuable records, Lyndon Johnson's
20   personal diaries, things like that, and they needed a special
21   fire suppression system so if there was a fire -- if there
22   was a fire or if the thing was inadvertently activated, it
23   wouldn't damage the records.  And that was my first exposure
24   to Halon fire suppression systems.
25       Q.    What year would that have been?

20

1        A.    That would have been about 1982, '83, right in that
2    area.
3        Q.    And so this Scopes Slide Service specifically
4    requested your company to get them --
5        A.    Install a Halon fire suppression system.  That was
6    the first time I ever used Halon.
7        Q.    How did you obtain the Halon systems that your
8    company used?
9        A.    I bought it through a distributor.
10       Q.    Do you remember the name?
11       A.    It was called Alarm Supply from Dallas, Texas.
12       Q.    And you just researched different places that
13   provided these kind of systems and came up with this place?
14       A.    People that -- these big alarm supply stores
15   generally sell everything, and they're your source of
16   information.
17       Q.    When you got involved in fire suppression systems,
18   did you personally do any research or training regarding
19   these kind of systems?
20       A.    Well, I knew -- already knew how to install
21   plumbing for any type of system.  I had done that for my
22   brother.  Okay?  We had installed sprinkler systems, and I
23   knew how to bend pipe, and I knew how to make the connections
24   and do the plumbing.  Beyond that, a Halon system is very
25   uncomplicated.  All it is is a fire extinguisher with a pipe

Walter Beck Corp. vs. Safeco Corp.    DO NOT COPY    Harold Beck  11/11/2006

---

21

1  coming out of it going to an end, and it's activated by a
2  detector or a pull -- manual pull station. It's a very
3  simple system.
4      Q.  So it wasn't --
5      A.  It's a no brainer.
6      Q.  I understand. After you installed this first
7  system for Scopes Slide Service, did you have occasion to
8  sell other Halon fire suppression systems?
9      A.  This became my showpiece.
10     Q.  It was your main business?
11     A.  It was -- it became my showpiece, because back then
12  the little laptops we use for our computer, they used to be
13  in a room larger than this, and they had to be protected.
14  And Halon was a perfect agent for protecting a computer room.
15  And as big companies computerized and they got their computer
16  room, this was a natural.
17     Q.  How long did you stay involved in that kind of
18  business, installing and maintaining?
19     A.  Until we sold to Network Security. And we sold to
20  Network Security in 1987.
21     Q.  Did your company also have contracts with these
22  companies that you installed the systems in to maintain the
23  systems?
24     A.  Yes, we did.
25     Q.  And so you maintained every system that you

---

22

1  installed?
2      A.  Yes, we did.
3      Q.  Did Texas require maintenance by a certain period
4  of time? Meaning, were the systems required to be serviced
5  every so often by months or years?
6      A.  The City of Austin had an ordinance that required
7  fire suppression systems in restaurants to be serviced
8  annually. They had another requirement that required
9  sprinkler systems to be serviced semiannually.
10     Q.  I see. And so you had supplied fire suppression
11  systems to restaurants in the Austin, Texas area?
12     A.  Yes.
13     Q.  And in other areas as well?
14     A.  Yes. Because our company gradually grew, we were
15  -- we bought a company in Colorado Springs. I started a
16  company in Phoenix, Arizona. And so we had three branches.
17  There were two other branches besides Austin. And we were
18  all over the state of Texas. We were in Houston, Dallas,
19  Fort Worth. We were everywhere in Texas.
20     Q.  The other areas where you installed these, did they
21  also have requirements for maintenance?
22     A.  Dallas did, Houston did. All the big cities in
23  Texas were going that way.
24     Q.  Did you have a crew that would do this kind of
25  maintenance work, or did you do it personally?

---

23

1      A.  I had many crews. At one point, our company
2  employed as many -- with guards and installers and
3  everything, as many as 200 people.
4      Q.  But did you personally do these?
5      A.  Oh, yeah. I was hands on. I'd sell it, I'd
6  install it. I mean, I was out there with the guys.
7      Q.  Are you familiar with Underwriters Laboratory?
8      A.  I sure am.
9      Q.  And the systems that you sold, meaning the Halon
10  fire suppression systems, were they listed by Underwriters
11  Laboratory?
12     A.  Every single system I installed was a UL system.
13  It is not just the equipment. It is the way the system is
14  installed, how the wires are run, whether they are in
15  conduit, whether there are wires with the proper coating. I'm
16  trying to think of the proper coating. It's been so long
17  now. Red wires with proper coating. They can either be
18  teflon coated, I think, or they can be -- or they're put in
19  conduit. But Underwriters Laboratory has specific rules and
20  regulations, a book that thick, on certain installation, and
21  every system we put in, whether a burglar alarm or fire alarm
22  system, was UL certified, because I had the ability to
23  certify a system for Underwriters Laboratory.
24     Q.  How did you get that ability?
25     A.  By having my license with the state of Texas.

---

24

1      Q.  So automatically through having that license, you
2  were --
3      A.  Yes. I sat for a test for Underwriters Laboratory
4  one time, too, and that gave me that.
5      Q.  What did that involve?
6      A.  Just taking a test showing that you understood the
7  book.
8      Q.  So they would give you a book to study, you studied
9  it, then you took a test?
10     A.  Yes.
11     Q.  Then you became certified by Underwriters
12  Laboratory?
13     A.  Yes.
14     Q.  Did you have an actual certificate from
15  Underwriters Laboratory?
16     A.  I'm sure I did someplace a long time ago.
17     Q.  You don't have it anymore?
18     A.  No.
19     Q.  Do you still have any of the books that you would
20  have studied?
21     A.  No.
22     Q.  Do you still have any maintenance or catalogs or
23  anything from that business in Texas?
24     A.  Anything that I had was moved en masse to
25  Marshburg, Pennsylvania, and it was stored beneath the

---

Walter Beck Corp. vs. Safeco Corp.            DO NOT COPY                    Harold Beck   11/11/2006

---

**25**

1  Rainbow Inn, and it was all destroyed in the fire.
2      Q.   I see.  When you say that you had installed some of
3  these systems in Texas and other areas in restaurants, about
4  how many of those jobs would you have done?  Many?
5      A.   Couple dozen.
6      Q.   Were any of the type of fire suppression systems
7  that would have gone over the hood of a stove?
8      A.   Oh, yeah.  I installed the brand name Ancil system
9  from time to time.
10     Q.   Why would you have installed an Ancil system rather
11  than --
12     A.   People specifically asked for it.
13     Q.   Okay.  When -- if people didn't ask for an Ancil
14  system, would you just normally install a Halon system?
15     A.   I'd ask them what they wanted.  A Halon system was
16  generally a little bit more expensive, but I would explain
17  the differences.
18     Q.   What were the differences?
19     A.   Ancil system brings down foam, and once it's done,
20  you have to clean it up.  And that foam is not necessarily
21  easy to clean up.  The Halon system just brings down an inert
22  gas that goes directly to the source of the fire and
23  eliminates it.  It takes the oxygen away from the fire.  It
24  actually seeks out the fire and takes away the oxygen.
25     Q.   In your opinion as an installer and maintainer of

---

**26**

1  these kind of systems, was there a better system for that?
2      A.   Halon is the best one.
3      Q.   For restaurant work?
4      A.   It is in my opinion.  It was really customer
5  friendly as far as clean up.  The danger is in having one of
6  these things -- if somebody triggers it, these tanks are
7  very, very expensive.  Halon is very expensive.
8      Q.   So the expense to the restaurant could be great if
9  it's triggered?
10     A.   Yeah.  By accident.
11     Q.   Would you recommend a Halon system for a restaurant
12  if you were asked?
13     A.   No.
14     Q.   Why not?
15     A.   Because restaurants probably can't afford it.
16     Q.   I see.  So whenever you were advising these
17  restaurants as to which type of system they could have, what
18  would you tell them?
19     A.   Well, I'd tell them there were two available.  They
20  could use an Ancil system which was very simple and very
21  easy.  Keep in mind, an Ancil system isn't cheap either.  3-,
22  $4,000 back when I was doing it.  And that was a lot of
23  money.  A Halon system is about twice that.
24     Q.   When you were installing these systems in
25  restaurants, was it only in kitchens?

---

**27**

1      A.   Yes.
2      Q.   That's the only place you ever installed --
3      A.   It's the only place you'd need it.
4      Q.   So you wouldn't ever install it in the dining area,
5  or the --
6      A.   No.  No.
7      Q.   And when you say, installed in the kitchen, was it
8  only usually above stoves, or --
9      A.   Above the stove in the hood.
10     Q.   And nowhere else in the kitchen?
11     A.   Keep in mind, the hood of a stove is not the little
12  hood you have in your kitchen.  It's an enormous thing like
13  this table, and it has -- it actually locks stuff off, keeps
14  the air up in it.  There's -- you know, if that gets full and
15  it's coming out, you've got a fire.
16     Q.   I see.  And these hoods are generally attached to
17  some kind of ventilation?
18     A.   Yes.
19     Q.   And the ventilation would then be blown by a fan to
20  the outside of the restaurant?
21     A.   There's fans in the hoods, generally one on each
22  end, and they go into a plem and then they have a duct work
23  that goes outside.
24     Q.   So they're designed basically to suck air up into
25  the ventilation system and out of the building?

---

**28**

1      A.   Yes.
2      Q.   And where exactly on the hood would the fire
3  suppression system be located?
4      A.   Right up top.  Right in the center.  Right across
5  the -- right across the center of it.
6      Q.   So across the actual intake, air intake chamber?
7      A.   You would have pipes up there, and then you'd have
8  rotating nozzles on there.  You'd have your heat detectors up
9  in there to sense whether there was a fire or something, and
10  these would activate the system, and then the rotating
11  nozzles would just start dispensing what you needed.
12     Q.   And they were actually designed to put out fires on
13  the stove themselves?
14     A.   Yes.
15     Q.   So if it was like a grease fire or an electrical
16  fire, it could put out any kind of fire?
17     A.   Yes.
18     Q.   Even if it was a natural gas fire, that kind of
19  thing?
20     A.   Well, an explosion, you're not going to get any
21  help in an explosion, but a fire going there, it will put it
22  out.
23     Q.   Okay.  Why did Texas Fire and Security Systems go
24  out of business?
25     A.   We didn't.  We sold.

---

Walter Beck Corp. vs. Safeco Corp.                DO NOT COPY                Harold Beck   11/11/2006

29

1    Q.   Okay.
2    A.   At the time, the state of Texas was caught up in
3  the savings and loan scandal.  The Bush family was behind it,
4  obviously.  But, anyway, the savings and loan scandal --
5  banks were going out of business.  We had about a half
6  million dollar loan floating at all times, construction
7  loans, things like that.  My bank went out of business.  They
8  were taken over by somebody else.  The state -- the federal
9  examiners started coming in, calling notes.  My note got
10  called.  I couldn't pay it off.  I couldn't get other outside
11  funding, so I found a white knight to buy me out, give me a
12  job and take over my existing contracts.  We were a valuable
13  commodity.  We had major contracts with Kentucky Fried
14  Chicken, Pepsi-Cola, Xerox.  We had -- I had something I
15  could sell.
16    Q.   Okay.  In what time frame are we talking about when
17  the lawsuit against Texas Fire and Security Systems occurred?
18  How many years prior to your selling the business did that
19  occur?
20    A.   It was all happening at the same time.
21    Q.   So the lawsuit was still going on when you sold the
22  business?
23    A.   Yes.  And I gave them a hold harmless clause.
24    Q.   So you -- are we talking about the lawsuit where
25  you were being sued, or the lawsuit that you sued the law

30

1  firm?
2    A.   I was suing the law firm back at that time.
3    Q.   Okay.  So the other lawsuit had been --
4    A.   They had already had a judgment against Texas Fire
5  and Security.
6    Q.   Okay.  And then you had already started the other
7  lawsuit and the business was sold?
8    A.   Yeah.
9    Q.   Okay.  When you sold the business, did you say that
10  you were given a job by the company that bought the business?
11    A.   I was vice president of sales.
12    Q.   And did you stay in Austin?
13    A.   Yes.  I travelled all over the country out of
14  Austin, though.
15    Q.   As a sales representative for the company?
16    A.   Yeah.
17    Q.   But you were residing in Austin?
18    A.   Yes.
19    Q.   And you weren't married, or you were married at
20  this time?
21    A.   Of course.
22    Q.   Okay.
23    A.   25 years March 11.  I knew.
24    Q.   Good for you.  Your wife had stated that she worked
25  for Texas Fire and Security Systems.

31

1    A.   Yes.
2    Q.   In what capacity did your wife serve the company?
3    A.   She was the boss.
4    Q.   What was her day-to-day activity?
5    A.   She ran the -- she ran the day-to-day activity of
6  the company.  She handled all the paperwork, all the banking.
7    Q.   She was like an office manager, business manager
8  type of person?
9    A.   Yeah.  Yeah.  All the guys answered to her.  She
10  knew.  When I wasn't around, they answered to her.
11    Q.   When the business was sold, what did your wife do?
12    A.   She went to work at Network Security as the branch
13  manager for Austin, Texas.  All she did was keep her
14  capacity, got a title, and they merged their smaller business
15  into our larger business.
16    Q.   So you were both working for the same company?
17    A.   Yes.
18    Q.   How many years did you stay with Network Security?
19    A.   Oh, about 12 or 13 months.  After one year was up
20  and they got everything they needed from us, they got rid of
21  us.  That's par for the course when you sell your business.
22    Q.   And what did you do after that?
23    A.   We went to -- went back to Pennsylvania, bought the
24  Rainbow Inn.
25    Q.   What year was that?

32

1    A.   We started it in '88 and finally concluded the sale
2  in '89.
3    Q.   When you say you started it in '88, that means you
4  were putting out inquiries?
5    A.   No.  We began to buy it.  It took forever with the
6  Pennsylvania State Liquor Control Board to get the thing
7  transferred over.
8    Q.   The license?
9    A.   Yes.  I took over the Heasley's establishment as
10  their manager.  I became the manager.  I paid them monthly
11  rent and I ran the business myself the way I saw fit.
12    Q.   And they were still the property owners at that
13  time?
14    A.   Yes.
15    Q.   That was because of the liquor license problems?
16    A.   Yes.
17    Q.   And when you finally obtained the liquor license
18  from the Heasleys, that was when you actually completed the
19  sale?
20    A.   That was in January of 1989.
21    Q.   Now, we already had some information from your wife
22  regarding how the business started and what building it was
23  in.  There was another restaurant on this property; is that
24  correct?
25    A.   Yes.

Case 1:04-cv-00348-MBC    Document 25-6    Filed 12/06/2006    Page 9 of 30

Walter Beck Corp. vs. Safeco Corp.                DO NOT COPY                Harold Beck  11/11/2006

33

1    Q. That had burned down?
2    A. There were two buildings. There was the restaurant
3  down front by the road, and behind it, immediately behind it,
4  was a two-story building. It was an eight room motel. The
5  motel rooms were upstairs. Downstairs there were like garage
6  doors and there was storage underneath it.
7    Q. I see. And what year did the -- I'm sorry, let me
8  go back a little bit. When the property was purchased, whose
9  name was on the deed?
10   A. My wife's and mine.
11   Q. Personally?
12   A. Yes.
13   Q. Has that ever changed?
14   A. No. We still own the property.
15   Q. As individuals?
16   A. Yes.
17   Q. When did you start the Walter Beck Corporation?
18   A. When we were buying the property. We were buying
19  the liquor license.
20   Q. So was it the Walter Beck Corporation that was
21  applying for the liquor license?
22   A. Yes.
23   Q. Okay. And you were just registered in the state of
24  Pennsylvania as a corporation?
25   A. Yes.

34

1    Q. Has that ever changed? Were you ever registered
2  elsewhere?
3    A. No.
4    Q. How was the corporation set up? Who were the
5  officers? Who was in charge of the corporation?
6    A. Initially, my wife and I were officers. I was
7  president. She was vice president, secretary-treasurer and
8  sergeant at arms. And that stayed that way until about 1994
9  when I decided to run for public office.
10   Q. And due to your running for public office --
11   A. I was running for county commissioner in 1995 and I
12  took myself off of the liquor license completely because of
13  the law saying that public officials can't be involved with
14  liquor licenses.
15   Q. I got you. Did you remain involved in the business
16  in other capacities even though you were no longer an officer
17  of the corporation?
18   A. I paid bills for her. I was a bouncer. I was a
19  bartender. I was a cook.
20   Q. Was there any time where you would not have
21  considered yourself an employee of the Walter Beck
22  Corporation?
23   A. From the time that I divested myself of my -- I
24  would say I was a customer of the Walter Beck Corporation
25  more than an employee. Probably from the -- when I was not

35

1  reelected in 1999, from that point on, I really did little,
2  if any, work. Like I didn't tend bar anymore, whatever, at
3  the bar. And I just -- I was doing other things from that
4  point on.
5    Q. So your involvement in the Rainbow Inn was limited
6  at best?
7    A. Yes. I was a personality that people would come to
8  see there, and I was one of their best customers.
9    Q. You weren't drawing any kind of salary or income --
10   A. No.
11   Q. -- from Walter Beck Corporation?
12   A. No. If anything, I was supporting it.
13   Q. What --
14   A. No. There isn't a thermostat in here. I looked.
15   Q. It is hot in here.
16   A. We could open up that door if you want.
17   Q. How did the arrangement for the lease of the
18  Rainbow Inn property come about? How did you decide that you
19  and your wife would own the property individually and lease
20  it to Walter Beck Corporation?
21   A. The accountant insisted we do that for IRS
22  purposes.
23   Q. Okay. Did he give you any reason that it would be
24  a better arrangement for you?
25   A. At some point in time, she expected the business to

36

1  make money. And when it did, we had to be able to show
2  offset. The company lost money year after year after year.
3  I subsidized it. But it was something my wife enjoined doing
4  and we kept it. It was something that we liked and we kept
5  it. And at the point in time the company -- at this date,
6  the Rainbow Inn would owe me -- I have a figure someplace. I
7  don't know how much it is, but it's a lot of money. And if
8  it started making money, I could start recouping the money I
9  lent to it.
10   Q. Was the money that you lent personally to the
11  Walter Beck Corporation, was that ever written down on a
12  document, like a promissory note or any legal document?
13   A. No.
14   Q. So how would that amount of money be supported if
15  you were to collect it? How would you prove what money is
16  owed to you?
17   A. We would probably have done it after the fact
18  backwards. Because it -- you know, there was -- I personally
19  paid the mortgage every month. I personally paid the
20  insurance payments every month. There were things that were
21  never figured into the expenses that were on your IRS forms
22  that I personally paid for. If I went down to town and
23  picked up beer, I paid for it with cash and I brought it up
24  and put it in the inventory. If I bought liquor, I paid for
25  it with cash and I put it in the inventory.

Walter Beck Corp. vs. Safeco Corp.                    DO NOT COPY                    Harold Beck  11/11/2006

---

37

1  Q.  Were any of those amounts that you lent to the
2  Walter Beck Corporation ever reflected on your personal
3  income tax?
4  A.  Never.
5  Q.  Do you know how the original building burned down
6  on the property?
7  A.  It was an electrical fire.  An inspector came in
8  from Columbus, Ohio and showed us exactly where the line from
9  the pole to the bar shorted out causing the fire.
10  Q.  Was there any type of litigation over that fire?
11  A.  No.
12  Q.  Did you receive an insurance payment due to that
13  fire?
14  A.  Yes.
15  Q.  Who was your insurer at that time?
16  A.  Potter County Grange.
17  Q.  And how did you purchase that insurance policy?
18  Through whom?
19  A.  That was the policy that was on the building when I
20  bought it from the Heasleys, and the agent came out and he
21  just switched it over into our name.
22  Q.  Do you know who that agent was?
23  A.  No.
24  Q.  So you continued to make the premium payments after
25  the Heasleys sold you the business?

---

38

1  A.  Yes.
2  Q.  And the policy was transferred?
3  A.  Yes.
4  Q.  Was it transferred to your name personally, or --
5  A.  No.  It was changed to the name of the corporation.
6  Q.  So the corporation owned that policy?
7  A.  Yes.
8  Q.  So was it then -- was the policy then done as kind
9  of a renter's insurance since the building was being leased,
10  or was it -- how did that work?
11  A.  Just insured the building.
12  Q.  Just insured the building itself?
13  A.  Yeah.
14  Q.  Okay.  And why are you no longer -- why were you in
15  2003 no longer insured by Potter County Grange?
16  A.  They went out of business.
17  Q.  In what year would that have been?
18  A.  I have no idea.  But I never -- once the -- once we
19  had the first fire and we did the renovation, were getting
20  ready to open for business, a local agent, a fellow just down
21  the road came and said, I'd like to write your insurance for
22  you.
23  Q.  That was the Sundahl Agency?
24  A.  No.
25  Q.  Who was that?

---

39

1  A.  I forget what agency it was.  I didn't go to
2  Sundahl until about 1997 or '98.
3  Q.  Okay.  Who were you insured by after Potter County
4  Grange?
5  A.  I couldn't tell you.
6  Q.  You don't know the overall company either?
7  A.  No.
8  Q.  Was there a reason that you switched from that
9  policy to the policy that you had?
10  A.  Money.  Money.  I shop around.  I used to sell
11  insurance.
12  Q.  So a lower premium?
13  A.  Yes.  And I would shop for coverage.  I'd shop for
14  money, you know.
15  Q.  And was the next policy that was written for you
16  the one that was written by Sundahl?
17  A.  Yeah.  Well, once I went with Sundahl, I didn't
18  switch again.
19  Q.  And your original policy with Sundahl was the
20  policy that you had in 2003, the same policy?
21  A.  Yes.  Actually, I was with Sundahl from about 1995
22  on.  I think it was about the time I became county
23  commissioner.
24  Q.  At the time that the original building burned, the
25  original restaurant building burned, how long had it been in

---

40

1  operation as a restaurant?
2  A.  Since 1934.
3  Q.  And had you personally -- or, I'm sorry, the Walter
4  Beck Corporation operated that original building as a
5  restaurant prior to its burning down?
6  A.  Yeah.  We operated it.  We took possession of it
7  legally in January of 1989 and it burned down in February of
8  1989.
9  Q.  So only for a month?
10  A.  Yes.
11  Q.  Were you operating it?  Were you familiar with the
12  equipment that was in that restaurant in that period of time?
13  A.  Yes.
14  Q.  Did that restaurant have a fire suppression system?
15  A.  No.
16  Q.  Not at all?
17  A.  Not at all.  That was something that was an
18  improvement I had intended to make.
19  Q.  After you took over the business?
20  A.  Yes.
21  Q.  Do you know if your original insurance policy that
22  you had with Potter County Grange required that restaurant to
23  have a fire suppression system?
24  A.  I don't know.
25  Q.  Do you know if the interim insurance policy that

---

Case 1:04-cv-00348-MBC    Document 25-6    Filed 12/06/2006    Page 11 of 30

Walter Beck Corp. vs. Safeco Corp.                DO NOT COPY                Harold Beck   11/11/2006

41

1  you got required any restaurant that Walter Beck Corporation
2  was maintaining or owning to have a fire suppression system?
3     A. I don't know whether the policy required it, but I
4  did have it.
5     Q. Okay. Now, when you remodeled the motel building,
6  you, meaning Walter Beck Corporation --
7     A. What I just -- the answer I -- I had thought that
8  you were just talking about the new remodel.
9     Q. That's what I was talking about.
10    A. Okay.
11    Q. You didn't get that interim insurance policy until
12  the remodel, correct?
13    A. Well, that's right. I -- you know, the motel was
14  back there. It was -- we didn't have insurance on the motel
15  because I didn't see the motel as worth anything until the
16  other building was gone and that was the only source of going
17  back into it.
18    Q. I see. Now, when you -- when I keep saying, you,
19  I'm really referring to the Walter Beck Corporation because
20  Walter Beck Corporation owned these establishments. So when
21  I'm saying, you, that's what I am referring to.
22    A. Yeah. I ceased to be the Walter Beck Corporation
23  in 1994.
24    Q. I understand that. But at the time, you were the
25  Walter Beck Corporation when the building was remodeled,

42

1  correct?
2     A. Yes.
3     Q. Okay. Now, how long of a process was it between
4  the original fire and the remodeling of the motel?
5     A. The fire was in February. We began remodeling
6  April 1, and we were open on May 28.
7     Q. Mr. McDyer, when he was questioning your wife,
8  asked her if there was any consultation with anyone regarding
9  the remodeling of the motel into a restaurant. Do you recall
10  that?
11    A. Yes.
12    Q. Was there any consultation?
13    A. Her -- her cousin is an architect. He laid it out
14  for us.
15    Q. Do you know his name?
16    A. David. David Walter.
17    Q. David Walter.
18    A. Uh-huh.
19    Q. Does he do business in McKean County?
20    A. Yes. He's out of Jamestown.
21    Q. Jamestown, New York?
22    A. Yeah. He drew up a -- he drew up several sets of
23  plans for us. One was to build a new building on the old
24  site. One was the renovation of this one.
25    Q. Is he still in business in Jamestown?

43

1     A. I think so.
2     Q. Would he have any of the original plans on record?
3     A. I doubt it. He did it for us as a favor, relative.
4  He came on down and he lined it out, and he said, you need
5  this, you need this, you need this.
6     Q. Okay.
7     A. This is the way it will work.
8     Q. And after he laid it out, you then -- you, meaning
9  Walter Beck Corporation, then hired a contractor to do the
10  work?
11    A. Man's name was Douglas DuPont.
12    Q. Is he still in business?
13    A. No.
14    Q. Is he alive?
15    A. I don't know.
16    Q. Where was his business located?
17    A. In Bradford. He had a -- he was a plumbing
18  contractor. He went through a big time bankruptcy.
19    Q. Okay.
20    A. About 10 years ago, I guess.
21    Q. And no one took over his business?
22    A. No. They went out of business. They lost
23  everything.
24    Q. So then all the business records would be gone?
25    A. I think he lost his house, too.

44

1     Q. And after the work was completed by Mr. DuPont, had
2  there been -- have there been any major changes to that
3  building up to the time of the fire?
4     A. The building was initially a two-story rectangular
5  building. We didn't want steep steps going up to a second
6  story bar so we built a series of decks around the bar on the
7  west side and the north side of the -- west side and the
8  south side of the bar. And there were three decks that
9  ascended every fourth -- four steps to the first deck, four
10  steps to the second deck, four steps to the top deck, which
11  was then at the -- on the level of the bar. And it was
12  initially the building with the decks around it. After the
13  first year, we realized that these decks in Bradford,
14  Pennsylvania, Marshburg, Pennsylvania, we could only use them
15  about maybe a month because it was so cold, and we really
16  wanted a larger dining area. So I hired a man by the name of
17  Paul Pingy (ph.), and I assisted him, and we put -- we
18  enclosed the decks on the west side of the building and we
19  made that a dining room with big glass windows facing the
20  forest and big windows in the front, and we had a bottom
21  entrance to the dining room down here and a top entrance to
22  the bar up top on the side of the deck. My wife didn't
23  describe that very well to you. And so we enclosed the west
24  side decks and made that a dining room.
25    Q. Okay. Was that the only renovation that would

Walter Beck Corp. vs. Safeco Corp.                    DO NOT COPY                    Harold Beck   11/11/2006

45

1   have --
2       A.  That was a major improvement.  That was the last
3   major improvement we made to the place.
4       Q.  How about minor improvements?
5       A.  The Halon system that I initially installed had to
6   be replaced.
7       Q.  Let's talk about the installation of the Halon
8   system.  When would -- when was that system installed?
9       A.  May of 1989.
10      Q.  So when the original remodeling of the motel into a
11  restaurant occurred?
12      A.  That's right.
13      Q.  And in May of 1989, was that when the entire
14  kitchen was installed --
15      A.  Yes.
16      Q.  -- as well?  Okay.  Can you describe the stove that
17  was in that kitchen?
18      A.  It was a five-foot long Garland cast iron stove.
19  It was -- it worked off of propane gas.  It had a griddle
20  top, four burners, and two ovens underneath it.
21      Q.  Did you say four burners?
22      A.  Yes.  Actually, it had a place for six.  We had
23  another griddle in the middle.  There were two more burners.
24  It could have been a six burner if I wanted.
25      Q.  And there was a double stove underneath?

46

1       A.  Yeah.
2       Q.  Where did you purchase the stove for the
3   establishment?
4       A.  Some restaurant supply place in Erie.
5       Q.  In Erie?  You don't remember the name?
6       A.  No.
7       Q.  Was it purchased new or used?
8       A.  New.
9       Q.  And what kind of hood was over this stove?
10      A.  That was a -- the hood was 12 feet long and I
11  believe three or four feet wide.  It was enormous.  It was
12  overkill for our kitchen.  In fact, when you would work on
13  it, you would actually have to duck under totally.  It would
14  come down on almost eye level and I would work inside it.
15      Q.  Your head was actually under the hood?
16      A.  Yeah.
17      Q.  Who installed the hood and the duct work?
18      A.  Doug DuPont's people did the manual installation of
19  the hood and the duct work.  My brother came and I assisted
20  him in the actual hook up of the system that went with it.
21      Q.  When you say, the system, you mean the fire
22  suppression system?
23      A.  Yes.  Because they're one and the same.  They work
24  hand and glove.
25      Q.  So as soon as the hood was installed, your brother

47

1   and you began to work on the --
2       A.  Yes.
3       Q.  -- fire suppression?
4       A.  And, again, like I said, that is a no brainer.
5   That is something that can be done in a matter of five, six
6   hours.
7       Q.  What year are we talking about?
8       A.  1989 initially.
9       Q.  May of '89?
10      A.  Yeah.
11      Q.  So the decision as to what type of fire suppression
12  system would be originally installed under the hood --
13      A.  Was mine.
14      Q.  That was your personal decision?
15      A.  Yeah.
16      Q.  Did you consult with your brother about it at all?
17      A.  Yeah.  Well, he said, why do you want to spend so
18  much money?  I said, because it's the best one.
19      Q.  So it was your decision to put the original Halon
20  system in?
21      A.  Yeah.  I liked it.
22      Q.  Was it the same type of system that you were
23  selling in Texas?
24      A.  Sure was.
25      Q.  Was it the same manufacturer?

48

1       A.  The parts vary.  You know, you've got different
2   people that make the control panels that activate it.  Over
3   the course of the history of that system, I replaced the
4   control panel several times.  You would have things like
5   lightning strikes that would take out the burglar alarm
6   system and that -- and that would kill the system, and you
7   would have to replace that immediately.
8       Q.  Okay.
9       A.  Actually, it got to the point where lightning was
10  so bad there for awhile, I had extra equipment there that I
11  could replace at any time.
12      Q.  Let me ask you this.  I will warn you right away I
13  am completely unfamiliar with these kind of systems, so the
14  questions that I ask you may seem very simple and no brainer.
15      A.  No problem.
16      Q.  But I know nothing about these.  When you purchase
17  a Halon fire suppression system, what do you purchase?  What
18  is it?
19      A.  You are basically purchasing two big tanks of Halon
20  gas.  You are purchasing a control panel that reads the
21  sensors and throws a switch when the sensors are activated to
22  dispense the gas.
23      Q.  Okay.  When you purchase one of these systems, do
24  you purchase the components separately or together?
25      A.  You purchase -- whoever gives you the best price.

Case 1:04-cv-00348-MBC    Document 25-6    Filed 12/06/2006    Page 13 of 30

Walter Beck Corp. vs. Safeco Corp.          DO NOT COPY                    Harold Beck   11/11/2006

49

1    I mean, if you're going to buy a control panel and you got a
2    good price on the control panel one place, you buy it there.
3    If you're -- if you go to buy the tanks -- and the tanks come
4    in all different sizes and all different pressures, so you
5    can -- you go where the best price is.
6        Q.   When you purchased the original system that was
7    installed in May of 1989, do you remember any of the
8    suppliers who sold you the components?
9        A.   No.
10       Q.   Would these have been suppliers that you may have
11   worked with in Texas?
12       A.   Possibly.
13       Q.   Could they also have been suppliers that supplied
14   for your brother's business?
15       A.   Yes.  And he changes them like he changes his
16   shirt, so --
17       Q.   Okay.  So when you purchased this system in May of
18   1989 after consulting with your brother and deciding on the
19   best system, all you purchased were two tanks of Halon gas, a
20   control panel, the sensors, and the pipes?
21       A.   The rotating nozzles.
22       Q.   And the nozzles.
23       A.   Plumbing and all that.
24       Q.   And these would have all been purchased from
25   different suppliers or maybe the same supplier?

50

1        A.   A lot of this -- like the pipe, I could buy
2    locally.  Okay.  The nozzles, we may have had them laying
3    around.  You know, these things, you use.  Buying a
4    restaurant, if I had equipment -- you know, my first burglar
5    alarm system in there was equipment that I brought with me
6    from Texas.  So for me to say I bought it brand new or
7    whatever, I can't say initially.  But a lot of the stuff I
8    had.  Wiring, I had.  Conduit, I had.  Things like that.
9        Q.   And anything that would have recorded any of these
10   purchases would probably have been lost in the fire?
11       A.   We kept all our records underneath the Rainbow Inn.
12   I had fixed it up there.  I had a vault type thing there.
13       Q.   Would you have paid cash for all of these
14   components?
15       A.   Cash, check, whatever.
16       Q.   Did you ever attempt to retrieve any records,
17   banking records, that may have reflected these purchases?
18       A.   You know how many times these banks in Pennsylvania
19   have changed names?
20       Q.   Yes, I do.
21       A.   Okay.
22       Q.   So it would be impossible to --
23       A.   Yes.
24       Q.   Okay.  Take me through the process of the actual
25   installation of the original Halon system.  What did you

51

1    actually have to do to install this thing?  Take me through
2    step one through the final step.
3        A.   First thing you do is find a place where you are
4    going to put your tanks.  And our place was on the ground
5    floor underneath the pantry.  The pantry was immediately to
6    the right-hand side of the Garland stove.  It was separated
7    by a wall, and there was a pantry there.  We kept dry goods
8    in this area.  And directly beneath it was a storage space,
9    and that was a nice clean dry place to store the tanks.  So
10   we located the tanks there.  We ran two sets of pipes.  We
11   ran the copper tubing for the Halon gas to run in up the
12   wall, and then in above the hood, and then connected it to
13   where the nozzels would have to be.  We had it come out in a
14   -- off as a T and then go down into the two nozzels.  There
15   was also a third one in the actual plem.  When -- the concept
16   being that, if the fire is underneath, the chances are it can
17   get up into the duct work.  And the idea was to kill any fire
18   that would be in the escape hatch.  You know, the air going
19   outside.  So we had -- there were actually three in there.
20   And just sitting here listening, it refreshed my memory that
21   there was an active -- a device inside the plem itself.  Then
22   we connected the -- we'd have to place the heat detectors in
23   place, put them in place inside the hood, and then run the
24   wiring back to the panel.  Okay.  Then you'd make your
25   connection at the panel.  In this particular installation, we

52

1    had two more heat detectors that I put in out away from the
2    hood in the kitchen itself.  I was afraid of fire.  After
3    that first fire, I was afraid of fire.  And so I wanted the
4    entire kitchen protected.  Because grease could have fallen
5    on the floor, set something on fire, whatever, anything.  And
6    I just wanted -- if we had a fire, it could be activated.
7    We had a manual pull station on that wall separating the
8    panel and the Garland stove.  It was right there on the wall.
9    It was pretty much like that one there.
10       Q.   And you're referring to a pull alarm system that's
11   installed in this room.
12       A.   Yes.  But that thing, that alarm -- by pulling
13   that, though, that would activate the Halon gas.  The heat
14   detector didn't have to go off.  That was a fail safe.  If we
15   had a fire on the stove and the heat detectors didn't
16   activate, the employee could still pull that thing and put
17   the fire out.
18       Q.   Okay.  And --
19       A.   All you do is make the connections.
20       Q.   The electrical connections and the --
21       A.   Yeah.
22       Q.   -- gas connections?
23       A.   We had backup batteries on it to make sure if the
24   power went out, it would operate on a 24 hour basis.  We had
25   to have a backup power supply that would keep the system

53

1    alive for 48 hours.
2        Q.  And why is that?
3        A.  That's an Underwriter Laboratory requirement, as I
4    understood it.
5        Q.  Okay.  Prior to your installing this system in
6    1989, did you do any research into Underwriters Laboratories'
7    requirements regarding these systems and their components?
8        A.  Of course.  I was -- I had the book.
9        Q.  I know you were licensed in Texas.
10       A.  Yes.
11       Q.  Do you know of any changes which may have occurred
12   since you got that original book and the time that you
13   installed it in 1989?
14       A.  No.  No.  It's pretty cut and dry.  There aren't
15   any improvements to wiring and conduit and things like that.
16       Q.  So you were under the impression that the book that
17   you studied to get your original license, or your original
18   certification from Underwriters Laboratories hadn't changed
19   in any significant way at the time that you installed this
20   system?
21       A.  There were improvements to Underwriters Laboratory
22   or additions, but there weren't any changes from the basic
23   system I installed, because Underwriter Laboratories would
24   never approve, for example, a wireless burglar alarm system.
25   But now Underwriter Laboratories certifies wireless burglar

54

1    alarm systems.
2        Q.  But you were comfortable that the system that you
3    installed and its components would have been certified by
4    Underwriters Laboratories?
5        A.  Yes, I was.
6        Q.  And specifically certified for being a fire
7    suppression system for a restaurant --
8        A.  Without a doubt.
9        Q.  -- hood?  Okay.  When this system was being
10   installed, and we went through the whole process, was your
11   brother there for the entire process?
12       A.  Yes.  He came over for the day.  He liked to get
13   away.
14       Q.  Sure.  And do you have any recollection whatsoever
15   of the cost of any of the original components that you
16   installed?
17       A.  I think the whole system was somewhere around 6- or
18   $7,000.  And I'm using that as a rule of thumb.  I knew what
19   they cost, and I was getting it wholesale, and that's about
20   what it cost me.
21       Q.  After the system was installed in May of 1989, how
22   was it maintained?  Meaning, who did the maintenance work on
23   it and how often was that maintenance work done?
24       A.  My brother was always there.  His son -- he had a
25   son living in Erie, Pennsylvania, which is just 60, 70 miles

55

1    away from us.  And he wouldn't stay in Erie, Pennsylvania.
2    When he would come to see his son, he'd come and stay with
3    me.  I had a big house right there.  And so he was under foot
4    all the time.  He was over the -- he liked to go over to the
5    bar recreationally, and every time he was there he'd walk
6    through and check everything.  Keep in mind, I was doing
7    day-to-day checks on everything there, too, when I was there.
8        Q.  How often would you say -- from May of 1989 until
9    any changes to this fire suppression system occurred, how
10   often would it be checked?
11       A.  By my brother, a minimum of four, a maximum of
12   seven or eight times a year.
13       Q.  And do you recall the actual process that he used
14   to check the system?  What the step by step process was?
15       A.  There's not a whole lot to check on this system.
16   Okay.  You've got heat detectors that are there.  And they
17   don't -- there's no way to check a heat detector.  You don't
18   test the heat detector.  Once it activates, you have to
19   replace it.  So it either works or it doesn't work.  And the
20   nozzles, you can spin them with your finger.  If they spin
21   with your finger, they're not clogged up.  As far as cleaning
22   the hood and plem, that was something that was done on a
23   regular basis because Sharyn was very meticulous about --
24   she'd look in that hood and see a spec of grease and she
25   wanted that cleaned.  And the fans, they need -- you needed

56

1    to clean those fans on a regular basis because the grease
2    would get up there and clog them up and they wouldn't work.
3    So that was something that was done all the time, the
4    degreaser, liquid degreaser, the whole works.
5        Q.  Okay.  There wasn't a specific schedule for
6    maintenance of this fire suppression system at that time,
7    from 1989 until the time it was changed?  It wasn't, I'm
8    going to check it the first of every month, or --
9        A.  No.
10       Q.  It was just when your brother happened to be in
11   town --
12       A.  Yes.
13       Q.  -- visiting, he checked it?
14       A.  Yes.  It wasn't anything like it was being ignored,
15   though.
16       Q.  No.  I didn't mean to suggest that.
17       A.  And the interesting thing about this system is you
18   you can physically eyeball it.  It has a green ready light on
19   it.  It has a yellow trouble light.  It has a red light
20   indicating that you've got a problem.
21       Q.  This was on the control panel?
22       A.  Right on the control panel.
23       Q.  Okay.
24       A.  And that's something that you can physically
25   eyeball.

Walter Beck Corp. vs. Safeco Corp.                    DO NOT COPY                    Harold Beck  11/11/2006

---

57

1    Q.  Was there any way to turn off the system --
2    A.  No.
3    Q.  -- electrically?
4    A.  If you unplugged it, it still was on --
5    Q.  Battery?
6    A.  -- battery backup.  Then you'd be putting up with
7  this irritating wine.  It would beep every so often.
8    Q.  I see.  I meant to ask you and I forgot to ask you,
9  the fan that is in the hood that leads up into the --
10   A.  There were two fans.
11   Q.  There were two fans.  Okay.  Where were the fans
12 located in relation to the hood?
13   A.  They were in the hood on either end.  Maybe a foot
14 or two in, I guess.  I remember.
15   Q.  Where were they in relation to the nozzles of the
16 fire suppression system?
17   A.  They were outside of them.
18   Q.  Meaning --
19   A.  There were two nozzles inside.  The fans were out
20 here.
21   Q.  Okay.  The fans that were in the hood, were they
22 always on?
23   A.  No.
24   Q.  When were the fans on?
25   A.  They would turn the fans on when they needed them.

---

58

1  If it got too hot in the kitchen, they'd turn the fans on.
2  And you could turn one on, one off.  You could use one or the
3  other.
4    Q.  This was a manual switch to operate the fans?
5    A.  Yes.
6    Q.  And were the fans always on when the stove was in
7  use?
8    A.  Not necessarily.
9    Q.  How was the decision made?  Was it just based on
10 the heat of the kitchen?
11   A.  Yeah.  If you couldn't stand the heat of the
12 kitchen, you turned on the fan.
13   Q.  Got you.  Was it also used in the event of maybe
14 smoke in the kitchen, or --
15   A.  Yes.
16   Q.  But there was no particular procedure in place for
17 when these fans were supposed to be on or off?
18   A.  No.
19   Q.  It was just the decision of whoever was using the
20 stove?
21   A.  Sure.  I had fans in the barroom, too, to get smoke
22 out, and we turned them off and on, too.
23   Q.  Do you have any knowledge of the power of the fans?
24   A.  They were pretty powerful.  I remember when I
25 bought them I used to say they did so many cubic feet per

---

59

1  minute.  But I couldn't tell you.  I would -- when I turned
2  them on, I could suck all the heat out of the kitchen in the
3  wintertime in no time at all and make the barroom cold.  So
4  I'd be careful.
5    Q.  So they were --
6    A.  Powerful fans.
7    Q.  Were they unusually powerful for the job that they
8  were doing?
9    A.  It was a big hood.
10   Q.  So they had to be powerful fans just to make the
11 hood useful?
12   A.  Uh-huh.
13   Q.  Okay.  Do you recall at any time that it was
14 necessary to put on both fans at once?
15   A.  Oh, yeah.
16   Q.  I'm going to take you back a little bit because I
17 skipped some questions in my plan.
18   A.  Okay.
19   Q.  What were -- take me through a history of your
20 duties as they existed at the Rainbow Inn.  What did you do
21 for the Rainbow Inn?
22   A.  I did everything.
23   Q.  Be a little bit more specific.
24   A.  Sometimes I tended bar.  Sometimes I cooked.  I'd
25 do maintenance, clean.

---

60

1    Q.  This would have been 1989 until you ran for office?
2    A.  Yes.  And then I worked fulltime as a county
3  commissioner at the courthouse for four years.
4    Q.  So you had occasion then to operate the stove and
5  the switches on the fans and all of the stuff in the kitchen?
6    A.  Uh-huh.  Yes.
7    Q.  Okay.  Thank you.  And then in about 1994, was it,
8  that that duty ceased?
9    A.  Yes.
10   Q.  Did you have any specific hours of work for the
11 Walter Beck Corporation in 2003?
12   A.  No.
13   Q.  So this was the time when you were more of a
14 personality who was at the bar, or am I being --
15   A.  When I was there, I was a personality at the bar.
16 From 2000 on, I was.
17   Q.  So you weren't really working at the Rainbow Inn at
18 that time?
19   A.  No.  If somebody got sick, I'd get behind the bar
20 and tend bar.
21   Q.  Right.  Okay.
22   A.  If I was there.
23   Q.  Can you give me a description of the dimensions of
24 the kitchen as they existed after 1989?
25   A.  I couldn't say.

---

Walter Beck Corp. vs. Safeco Corp.                    DO NOT COPY                    Harold Beck  11/11/2006

---

61

1  Q.  Did you hear your wife's description of the cooking
2  appliances?
3  A.  Yes.
4  Q.  Would you agree with that?
5  A.  Yes.
6  Q.  Was there any --
7  A.  She left out the microwave.
8  Q.  Was it a big industrial microwave?
9  A.  Yeah.
10  Q.  Was that located near the stove, or --
11  A.  No.  It was over by the sink.
12  Q.  Now, you had mentioned earlier that at some point
13  the fire suppression system was changed in some way.
14  A.  Yes.
15  Q.  Can you describe that?
16  A.  We replaced the tanks about 2002.  2001, 2002.
17  Q.  Why did you do that?
18  A.  No more pressure on them.  It's like a fire
19  extinguisher.  You have a fire extinguisher, you see where
20  it's safe, all of a sudden it goes down, you replace it.
21  Q.  So there was an indicator somewhere on the tank
22  that indicated the air pressure?
23  A.  Yes.
24  Q.  And it had gone down to a level that you couldn't
25  -- they were no longer useful?

---

62

1  A.  It's a helium base, and eventually it just loses
2  it.
3  Q.  And this occurred sometime in 2001, 2002?
4  A.  Yeah.  That was the second time I had to replace
5  them.  They were good for probably four or five years.  I
6  replaced it around '95, '96, too.
7  Q.  Each time you replaced the tanks, were they
8  replaced with the same kind of Halon tank?
9  A.  Yeah.
10  Q.  Do you have any recollection of where those tanks
11  would have been purchased?
12  A.  No.  They were shipped to me.
13  Q.  So you just would take out the old tank, put in the
14  new tank, and dispose of the old tank somehow?
15  A.  Yes.
16  Q.  Is that the only kind of update that was ever done?
17  A.  We had to replace the panel several times when we
18  had lightning strikes.
19  Q.  Those are the only changes which occurred?
20  A.  Yeah.
21  Q.  So the system as it was originally installed in
22  1989 remained essentially the same until 2003?
23  A.  It was unchanged.
24  Q.  With the exception of a couple of control panels
25  and a couple of tanks?

---

63

1  A.  Yes.
2  Q.  Okay.
3  A.  We may have changed the heat detectors, too, just
4  to be on the safe side.  I think when I changed a panel, I'd
5  change the heat detectors, because when you get a surge that
6  takes out the panel, you don't know what it does to the
7  equipment, et cetera.
8  Q.  After the change which occurred to the system, any
9  change, the panel change, the tank change, did the procedure
10  for checking the system at any time change?
11  A.  My brother was there on a regular basis, and my
12  brother had started -- my wife asked him to -- we kept a book
13  of records.  State of Pennsylvania got real particular at one
14  point about cleaning the tap system.  So she had a book where
15  the tap system had to be cleaned by somebody who was licensed
16  to clean them.
17  Q.  You are referring to the beer tap system?
18  A.  Yes.  Once a week.  And when she started keeping
19  these records, she kept records on just about everything at
20  that point.  And when my brother was there, he had a regular
21  inspection sheet, and he'd put it in the book for her.  I
22  remember seeing them in there.
23  Q.  The original installation of the fire suppression
24  system in 1989, was your brother paid for his work?
25  A.  Yeah.

---

64

1  Q.  How was he paid?
2  A.  I paid him cash or check.  I forget.
3  Q.  When you say, I, did that -- did those funds come
4  from your personal funds?
5  A.  Yeah.
6  Q.  So it wasn't the Walter Beck Corporation?
7  A.  I underwrote a lot of that.
8  Q.  So it wasn't the Walter Beck Corporation?
9  A.  No.  When we had the fire, the fire was beneficial
10  only to the previous owners.  They were going to be paid out
11  over a period of 10 years.  As soon as we had the fire, they
12  got paid off immediately.  And the majority of the funds went
13  to the previous owners.  So I had to take out a loan to do
14  the reconstruction and put us back into business.
15  Q.  Okay.  What were the months of operation of the
16  Rainbow Inn?
17  A.  It was a 12 month -- it was a 12 month operation.
18  We were open 363 -- 362 days a year.
19  Q.  And this was from 1989 all the way to 2003?
20  A.  Yeah.  In the business, with her closing the thing
21  down for three months in 2003, that was just her.  She lost
22  the manager, she didn't want to do it, and I was in Florida
23  doing the radio show, and she was cranky, and she didn't want
24  to do this, she didn't want to do that.  She wanted to sell
25  our house.  And I just said, do what you want.  If you want

---

ZACCO & ASSOCIATES REPORTING SERVICES

Case 1:04-cv-00348-MBC    Document 25-6    Filed 12/06/2006    Page 17 of 30

Walter Beck Corp. vs. Safeco Corp.    DO NOT COPY    Harold Beck  11/11/2006

65

1  to sell the house, sell the house. If you're going to close
2  the bar up, you make sure the bar is closed up properly, that
3  everything is secure and operational. And my broker went
4  over there and helped her with that. So that would have been
5  -- and it wasn't in June. It was more like in July or
6  August, because the license was in safekeeping for exactly 89
7  days. I know it because we counted the days, and when we
8  tried to get the license back from the liquor control board,
9  they went ahead and dragged their feet to make it 91 days,
10  and I had to pay $100 to get it back because it went over 90
11  days.
12      Q. During the time in 2003 that the business was
13  closed down, were there any -- was there any maintenance or
14  inspections done on the restaurant?
15      A. It was done before she closed and it was done
16  immediately when we reopened.
17      Q. But it wasn't done in between?
18      A. No. There wasn't anybody in there.
19      Q. All right.
20      A. I had somebody checking on it on a weekly basis to
21  make sure everything was secure, but that was it.
22      Q. A cursory check of the locks and the windows and --
23      A. Yeah.
24      Q. But nobody was inspecting the fire suppression
25  system or the duct work or cleaning?

66

1      A. There was no reason to. It wasn't -- nothing was
2  happening.
3      Q. I didn't mean to imply that there was. I just
4  wanted to make sure no one did.
5      A. No.
6      Q. When your brother did maintenance and inspections
7  of the fire suppression system, was he paid each time?
8      A. No.
9      Q. Was he ever paid for that work?
10      A. Yes.
11      Q. How was he paid?
12      A. Once a year probably. I think I -- at
13  Christmastime, I'd give him, what do I owe you this year, and
14  he'd say, you owe me 300 bucks.
15      Q. That was never drawn up through an invoice? It was
16  just verbally an agreement between the two of you?
17      A. I'd slip him the cash, and he'd probably put it in
18  his pocket and probably didn't even tell his wife he got
19  paid.
20      Q. Okay. So he would have no records of payments?
21      A. I don't know.
22      Q. He may have or may not?
23      A. Yeah. I don't know.
24      Q. Did anyone else besides you or your brother do any
25  kind of maintenance or inspection work on the fire and

67

1  suppression system?
2      A. No.
3      Q. Were you personally involved in any way with the
4  purchase of the insurance policy as it existed in 2003 on the
5  Rainbow Inn?
6      A. Yeah.
7      Q. How were you involved?
8      A. I paid it.
9      Q. Were you involved in the decision as to what
10  coverages would be in the policy?
11      A. Yeah.
12      Q. So did you actually meet with the Sundahl Agency
13  personally?
14      A. I met with the agent that was -- the agent that
15  initially sold me the policy. I met with him, we discussed
16  the coverages. After that, Sundahl just renewed the policy
17  automatically and never came to see me. I wanted replacement
18  cost coverage, I wanted certain removal coverage in the event
19  of a fire or something like that. But beyond that, we did
20  not meet on an annual basis to update the policy. The policy
21  would come, I'd look it over, it was -- it had what I wanted
22  and we were happy with it.
23      Q. When did you first purchase that policy?
24      A. I think it was 1995. Because it was when I was
25  elected county commissioner. I was running and a young man

68

1  was working for them as a sales agent and his family was
2  influential so I bought it from him.
3      Q. Incidentally, what were your duties as county
4  commissioner? What is basically involved?
5      A. What are the duties of the county commissioners in
6  Allegheny County? I did the same thing. I was just like the
7  three chumps you used to have in Allegheny County before you
8  went to the home rule business. I ran the county. We were
9  the legislative and executive branch of the government.
10      Q. Okay. Are you aware of any state, county, local
11  regulations regarding fire suppression systems in restaurants
12  in McKean County, Pennsylvania?
13      A. I believe there is a requirement in McKean County
14  that all restaurants have fire suppression systems. I
15  believe there is. And I know the health department
16  certainly, when they came through, noted the fire suppression
17  system. In fact, your inspectors, the inspectors for Safeco,
18  noted the fire suppression system.
19      Q. We'll get back to that. But what I am asking
20  specifically is, so you are aware of a county regulation?
21      A. I believe there is a regulation that requires
22  restaurants to have fire suppression systems.
23      Q. And how would that have been noted by the county?
24  You said it was noted. How would it have been noted?
25      A. It would have been noted by the health department.

Walter Beck Corp. vs. Safeco Corp.                DO NOT COPY                Harold Beck   11/11/2006

---

69

1  Health department came, inspected everything, looked under
2  the hood to make sure there wasn't grease caked in there.
3  They would have noted it.
4      Q.  So do you think they would have records of --
5      A.  They might.  They might.
6      Q.  Would it be the McKean County health department, or
7  what?
8      A.  I don't know what health department it is.  I think
9  it's the state health department because we got a state
10  health license.  And they used to come by once a year and go
11  through.  I know they probably have regional people that
12  check restaurants.  But they came through.
13     Q.  Do you know if there was a McKean County health
14  department?
15     A.  No.  We didn't have one, per se.  I was the county
16  commissioner.  I would have been paying for it.  I would have
17  known.
18     Q.  That's why I'm asking.  You seem to be the man to
19  ask about that.  Getting back to the insurance policy, when
20  the insurance policy was written in, you say around '94, '95?
21     A.  '94, '95, yeah.
22     Q.  Were you provided a copy of the policy?
23     A.  Yeah.
24     Q.  Did you read the policy?
25     A.  Probably not.  Probably looked at the dec and

---

70

1  looked at the coverage.  I was interested in a couple things.
2  I was interested in replacement cost.  I was interested in
3  what my deductible was.  I was interested to make sure that I
4  didn't have any necessary exclusions on coverages that I
5  needed.  I knew how to look through it pretty quick and
6  identify what was pertinent, what wasn't, and go from there.
7      Q.  Do you recall if, when you first looked through the
8  policy, your cursory inspection of the policy, whether a
9  provision existed regarding a fire suppression system?
10     A.  I can't say one way or the other.
11     Q.  Do you ever recall reading a provision in the
12  policy regarding the fire suppression system?
13     A.  After the fire.
14     Q.  But prior to that --
15     A.  No.
16     Q.  -- you don't recall that being there?
17     A.  No.
18     Q.  Do you know of any changes that were made to the
19  coverage and/or the exclusions and/or anything regarding the
20  policy from 1994, '95 up to the time of the fire?
21     A.  No, I don't.
22     Q.  Let's talk a little bit about the fire.  Where were
23  you at the time of the fire?
24     A.  Home in bed.
25     Q.  Had you been in Florida that year, in 2003?

---

71

1      A.  Yes.
2      Q.  What months would you have been in Florida?
3      A.  January through November.
4      Q.  And you returned in November?
5      A.  I was back and forth.  I'd get off the radio at 10
6  o'clock in the morning, and I could be at the airport by
7  11:30, and I could be in Buffalo by 4 o'clock.
8      Q.  Real quickly, I don't want to get too deep into it
9  because I'm not sure -- I just want to -- I'm just trying to
10  determine times when you were in Florida and when you were
11  here.  When did you get the radio job that you had?
12     A.  January, 2003.
13     Q.  And this was a radio show that you did yourself?
14     A.  Yeah.  It was called the Bud Beck Show.
15     Q.  The Bud Beck Show.  And this was only broadcast in
16  Florida?
17     A.  Yes.  It was in the Tampa Bay area.
18     Q.  How did you become involved with that?
19     A.  I had written a couple books.  A woman I knew had a
20  radio show, told me I would be a natural.  She set me up with
21  a station owner.  We met each other.  He offered me my own
22  time slot if I wanted to do it.  I took it and I went to
23  work.
24     Q.  So this original meeting occurred in Florida --
25     A.  Yeah.

---

72

1      Q.  -- regarding the radio show?  And you had to be in
2  Florida to do the show?
3      A.  Yes.  Initially, yeah.
4      Q.  At that time, how many months out of the year would
5  you spend in Florida originally when you first did the radio
6  show?
7      A.  You mean before I did the radio show?
8      Q.  No.  When you first got the job.
9      A.  Well, I was here five days a week.
10     Q.  You were in Florida five days a week?
11     A.  Yeah.  I had to be.  I had to be physically in the
12  radio station.
13     Q.  Monday through Friday?
14     A.  Monday through Friday, three hours a day.
15     Q.  This began when?
16     A.  January.
17     Q.  Were you in Florida for any period of time prior to
18  you getting a radio show?
19     A.  Oh, yes.  I owned a home here.  I bought my home in
20  the Villages in November 2000 as an investment.
21     Q.  And how many months out of the year would you spend
22  since November 2000 up until the time you got the radio show?
23     A.  It was off and on.  When I could get away from what
24  I was doing, I loved being here.  I liked it here.  My wife
25  liked it in Pennsylvania.

---

Case 1:04-cv-00348-MBC     Document 25-6     Filed 12/06/2006     Page 19 of 30

Walter Beck Corp. vs. Safeco Corp.                DO NOT COPY                Harold Beck   11/11/2006

73

1      Q.  So you used it as a vacation home?
2      A.  Yeah.  Actually, I bought it as an investment so my
3   in-laws could live in it in the winter time.  They were
4   living in a little trailer over here in Recreation
5   Plantation, and he kept talking about how the Villages was a
6   great place and if he had the money, he would buy it.  And I
7   had the money, so I bought a place.
8      Q.  Did they pay you rent for their use?
9      A.  More or less.  He paid me $300 a month.  It didn't
10  even cover the utilities.  And he drank up my whole year.
11     Q.  So it was through the time that you had spent down
12  here that you got the contacts to get the radio show?
13     A.  Yes.  Well, the contacts for the radio show came
14  through my writing.
15     Q.  I see.  So when you got the job on the radio, you
16  were spending Monday through Friday here 12 months out of the
17  year?
18     A.  No.  I was in Pennsylvania.  I'd go out on the road
19  and do book signings.  I've written five books, so --
20     Q.  I'm just trying to determine the times.
21     A.  I can't tell you.  To tell you the truth, I'm a
22  married man, I have a wife who complains a lot, and she
23  complains when I'm there, she complains when I'm not there.
24  So --
25     Q.  I'm not trying to get into your marital relations.

74

1      A.  No.
2      Q.  All I'm trying to do is determine -- you got the
3   job in 2001, 2002, somewhere around there.
4      A.  2003 I got the job.
5      Q.  I'm sorry.  I didn't write that down.  I'll write
6   that down.  What were your requirements in 2003 as far as
7   being in Florida?  When did you have to be here to do the
8   radio show?
9      A.  I had to be here everyday from 7:00 in the morning
10  until 11:00 in the morning to do my radio show.
11     Q.  Everyday?
12     A.  Monday through Friday.
13     Q.  12 months a year?
14     A.  It was until further notice.  You know, I was --
15     Q.  When did that change in 2003?
16     A.  In 2003, I became a very big personality in a very
17  big area.  In the Tampa Bay area, three million people.  I
18  suddenly had 250,000 listeners a day.  And that is a lot of
19  people.  Rush Limbaugh only has 50,000 listeners in the Tampa
20  Bay area a day.  And I was being -- I was one of a few people
21  being looked at for a national contract with Air America,
22  which is now defunct, I guess.  But I became a very big
23  personality in a very short period of time with the
24  democratic party.  So I was offered the opportunity to do my
25  radio show from Washington, D.C. for a week in November and

75

1   three weeks in December and three more weeks in January,
2   which meant I would have had to relocate up north.  But the
3   station didn't want to lose me.  So I purchased my own
4   broadcast equipment that was satellite linked that I could do
5   my show from anywhere in the nation.  Anywhere in the world,
6   really.  And it would sound like I was right in the studio.
7   So when I made this initial purchase to buy this equipment,
8   that gave me the freedom to go wherever I wanted.
9      Q.  When was that?
10     A.  That began the end of October of 2003.  And I went
11  back to Pennsylvania and I began doing my show from my home
12  in Pennsylvania, which I loved.  It was nice being back home.
13  And I had intended -- I had even said -- at the back of the
14  Rainbow Inn, out the dining room, there were back doors that
15  went onto a little porch, and I always intended to enclose
16  that.  I said, I could make that my radio studio right there.
17  And I intended to do that at the Rainbow Inn.  And I could do
18  my radio show from there rather than being in Florida.  And I
19  had other radio stations that wanted to pickup the show now.
20  We were about to syndicate it.  And so I had the freedom to
21  go where I wanted.  And it made her happy because I was up
22  north and she could be around the grandkids and the kids and
23  all that.  So we did our week in Washington, D.C.  And I had
24  been working to get the electric turned back on to do
25  different things.  You know, we had -- we had things

76

1   operating and we had to -- I had to get -- I was doing
2   different things up there to get ready.  And we -- I guess we
3   reopened right after I came back from Washington, D.C.
4      Q.  When was the last time that the fire suppression
5   system was inspected prior to the 2003 fire?
6      A.  Thanksgiving.
7      A.  Thanksgiving weekend?
8      A.  Thanksgiving day.
9      Q.  Thanksgiving day.
10     A.  My brother has this enormous mini home that he
11  travels in, and he came up and parked it in my driveway, and
12  the family was -- he brought my mother over.  It was the last
13  time she left Ohio.  He brought her over for Thanksgiving,
14  and she got to see all the grandchildren, saw the whole
15  family, and everybody was -- we had one big Thanksgiving
16  dinner at my house.  And first thing we did that morning --
17  he got there on Wednesday, but first thing we did
18  Thanksgiving morning, he said, come on, let's go over to the
19  bar.
20     Q.  And the two of you went?
21     A.  Yeah.
22     Q.  And you both inspected the fire suppression system?
23     A.  Yeah.  We did the burglar alarm, we did everything.
24  We tested the burglar alarm, all the doors, everything.  So
25  the whole place was ship shape at that time.

Case 1:04-cv-00348-MBC    Document 25-6    Filed 12/06/2006    Page 20 of 30

Walter Beck Corp. vs. Safeco Corp.    DO NOT COPY    Harold Beck  11/11/2006

77

1    Q.  Incidentally, because the bar had been closed for
2  three months, did you say the electric was turned off?
3    A.  Not the complete electric.  Okay.  I had a power --
4  I had a cabin out back that I kept electric on, and the power
5  was supplied to the essential systems through there.
6    Q.  Including the fire suppression system?
7    A.  Yeah.
8    Q.  That's why I was asking.
9    A.  Yeah.  But I could throw the -- I could throw the
10 master switch on all the other stuff.  So that's what we did.
11   Q.  You say you were home in bed the evening of the
12 fire, correct?
13   A.  Yeah.
14   Q.  How were you alerted that the fire was occurring?
15   A.  I just read it in my statement today.  It was 3
16 o'clock in the morning.  A woman -- and I had forgotten this.
17 She was deaf and dumb, and she was banging on my door at 3
18 o'clock in the morning.  My wife woke me up.  She said,
19 there's somebody banging on our door.  And I went there and
20 she just started motioning.  And I could see a red glow in
21 the sky.  And I said -- came back in.  I said, there's a fire
22 someplace, Sharyn.  You better call 911 and tell them there's
23 a fire in Marshburg.  And I threw on jeans, boots -- there
24 was snow on the ground -- and a jacket.  And I went out the
25 back of our house and started towards the bar.  You could get

78

1  to the bar from our house by going through the woods.  I
2  could see the sky lit up, but the bar looked fine to me from
3  the west side.  I was coming at it from the west side.  And
4  as I got to the front -- as I got to the back of the bar, I
5  started to see flames, and the north -- southeast corner of
6  the bar was on fire.  The -- under the deck and all.  That
7    Q.  Do you recall how long it took to put the fire out?
8    A.  They didn't put the fire out.
9    Q.  They never put it out?
10   A.  No.  The fire company took 35 minutes for the fire
11 truck to get there, and then he sat in the truck for another
12 10 minutes, and then he got out and walked around and looked.
13 Nobody got any hoses out.  Nobody did anything.  Nobody even
14 tried to put the fire out.
15   Q.  And you were watching all this occur?  You were
16 present on location?
17   A.  Well, I was back and forth to the house.  I was
18 calling 911.  And then in the process my wife had a heart
19 attack and I had to call the EMS.  They had to come in an
20 ambulance and take her to the hospital.  So I've got my bar
21 on fire, my wife is having a heart attack.
22   Q.  And you didn't go to the hospital with your wife?
23   A.  I went to the hospital with my wife.  The hell with
24 the bar.  I went to the hospital.
25   Q.  So you left the scene?  I'm not implying --

79

1    A.  Yeah, I know.  I left, but the bar was engulfed by
2  that time.
3    Q.  And when did you return to the scene after the
4  fire?  When did you first return?
5    A.  I came up the hill probably another -- somewhere
6  around 10:00 or 10:30, somebody brought me up so I could
7  change clothes, get a shower, get a car.  I didn't have any
8  car down there.  I had ridden down in the ambulance.  They
9  had had her stabilized by that time.  And then go back down.
10   Q.  And at that time did you speak to anyone on scene
11 about the fire?
12   A.  No.
13   Q.  When was the first time you spoke to somebody
14 regarding the fire?
15   A.  When I was down there the first time with my wife
16 in the emergency room, Pennsylvania state trooper walked into
17 the emergency room while I was out in the hall and started
18 asking my wife questions.  And I walked and got in his face
19 and threw him the hell out of the room.
20   Q.  And did you speak to the officer at that time?
21   A.  Yeah.
22   Q.  What was the nature --
23   A.  I told him to get the hell out.
24   Q.  That was the only conversation you had with him?
25   A.  Yeah.  He said, we need to ask her some questions.

80

1  I said, she's had a heart attack.  Leave her alone.
2    Q.  Were there still troopers around when you returned
3  to the scene of the fire?
4    A.  Yeah.
5    Q.  Did you speak to them then?
6    A.  No.
7    Q.  So what was the first contact you had with anybody
8  who may have been investigating the fire?
9    A.  Your man.
10   Q.  Who was?
11   A.  Paul Smith.
12   Q.  That was the first time you spoke to anybody
13 regarding the fire?
14   A.  Yeah.
15   Q.  Other than your wife or people involved in the
16 business?
17   A.  Yeah.  Nobody -- nobody came to talk to us.  Nobody
18 came to talk to us.
19   Q.  Okay.  What was your first conversation with Paul
20 Smith?  What did that consist of?  Did you call him?  Did he
21 call you?
22   A.  No.  He came to my front door.  I don't remember if
23 it was that day or the following day, to tell you the truth.
24 I don't know what day it was that he came.  She was in the
25 hospital over the weekend, so it could have been -- the fire

Case 1:04-cv-00348-MBC    Document 25-6    Filed 12/06/2006    Page 21 of 30

Walter Beck Corp. vs. Safeco Corp.          DO NOT COPY          Harold Beck  11/11/2006

81

1 was a Friday morning. I had to make arrangements for
2 somebody to do my radio show for me real quick. And it might
3 have been that day, that afternoon. It might have been the
4 next day. I don't know. But he came to me and wanted to
5 talk about the fire. And I said, okay. I'll talk to you.
6     Q.   What did that conversation consist of? What did
7 you talk about?
8     A.   He told me how much the coverage was. And I was
9 surprised. I didn't know how much the coverage was. He
10 said, do you know how much you're insured for? I said, no.
11 And he threw a number at me. And I said, I'm shocked.
12    Q.   Shocked in what way?
13    A.   I thought it was a lot of money.
14    Q.   You thought it was a lot of coverage?
15    A.   Yeah. I didn't know what it was. I didn't know
16 how much I was insured for at that point.
17    Q.   That was the entire conversation? You were just
18 talking about coverage?
19    A.   Yeah. Well, he didn't talk about coverage. He
20 just told me he -- I don't know if he took a statement from
21 me or not, to tell you the truth.
22    Q.   And what was your next step in dealing with the
23 fire after you talked to Mr. Smith?
24    A.   State police came and took a statement from me.
25    Q.   And after that?

82

1     A.   Nothing.
2     Q.   There was -- you weren't involved in any
3 investigation of the fire?
4     A.   Oh, ATF came in, Alcohol, Tobacco and Firearms.
5 Because I was a county commissioner. I was a high profile
6 person. So because I was who I was, the ATF came and did the
7 investigation. And that started all kind of rumors around
8 town that I had started the fire, that, you know, I was going
9 to be arrested. All this because ATF was there.
10    Q.   But the results of those investigations didn't --
11    A.   Oh, they came and dragged me out -- they came to
12 get me. One day I was sitting -- Saturday, I had left the
13 hospital, came up the hill. I was sitting in my chair trying
14 to catch -- with a beer just trying to catch my breath, let
15 everything catch up with me, and ATF comes over and says, we
16 need you to come with us now.
17    Q.   Did they indicate you were under arrest?
18    A.   No. They said, we need you to come with us now. I
19 said, where? Over to the bar. I said, fine. So I got my
20 beer and I went with them. And I walked over to the bar.
21 And they walked me over to a spot on the ground where --
22 which would have been the basement of the bar -- and said,
23 what was sitting here? And I said, a blue can of kerosene.
24 They had their sniffing dogs there, so they sniffed
25 something. Why did you have kerosene there? I said, over

83

1 there was a torpedo heater, and it stopped working. We used
2 to use it to take the chill off real quick in the mornings.
3 And, I said, it stopped working. That can sat there for a
4 year, period.
5     Q.   That was the only contact with them?
6     A.   Then they asked me about the expended ammunition
7 they found. My father had died, and he used to reload 38
8 caliber -- he was a policeman -- so he could shoot all the
9 time. So I had his reloading machine and all this empty
10 ammunition and that's what they found. So they had some
11 questions to ask me. But, you know, they were trying to --
12 trying to be big guys, you know.
13    Q.   Did they ever give you any specific reason why you
14 were being investigated? Did they ever tell you what --
15    A.   Because I was the county commissioner.
16    Q.   They told you that specifically?
17    A.   Well, because I was who I was. I was a very high
18 profile person in McKean County. I still am.
19    Q.   But they never gave you any specific reasons why
20 they may have suspected why you set the fire?
21    A.   They didn't come out and say that. They never said
22 that, no.
23    Q.   Did you have any suspicion as to why they thought
24 that?
25    A.   Because if they could pin something on me, they

84

1 would.
2     Q.   I got you. Obviously, the investigation was
3 fruitless.
4     A.   Right.
5     Q.   You didn't have any --
6     A.   I'm sitting here.
7     Q.   What was your next step in dealing with the fire?
8 What did you do?
9     A.   Paul Smith must have called and said he needed an
10 inventory. And we put together an inventory that you have
11 there.
12    Q.   Right. Those were used as exhibits in your wife's
13 deposition?
14    A.   Yes.
15    Q.   Okay.
16    A.   And he wanted it e-mailed to him. So I e-mailed it
17 to him. And then I asked if he got it, and he said, no. And
18 I e-mailed it to him again. And he still didn't get it. So
19 finally, I sent it to him certified mail and somebody signed
20 for it. Then he got it.
21    Q.   How did you obtain Mr. Smith's e-mail address?
22    A.   He gave it to me.
23    Q.   Personally when he was on site?
24    A.   Yeah.
25    Q.   After he said he got the inventory, what happened

Walter Beck Corp. vs. Safeco Corp.                    DO NOT COPY                    Harold Beck   11/11/2006

---

85

1   next?
2       A.   He paid the -- we got a letter denying the claim.
3       Q.   And what was your reaction to that?
4       A.   I tried to get in touch with him.  He wouldn't
5   respond.
6       Q.   Okay.  Did you ever get in touch with him after
7   that?
8       A.   Finally.  When I went to Sundahl in June and told
9   them I was going to sue them.
10      Q.   Sue Sundahl?
11      A.   Yeah.  Sue Sundahl.  And I'm going to ruin you so
12  nobody will ever buy any policy from you here.
13      Q.   So Sundahl put you back in touch with Smith?
14      A.   Sundahl got Smith in touch with me.
15      Q.   What happened next?
16      A.   Smith wanted me to give him records of inspections
17  and all that.  But he hadn't been dealing in good faith with
18  me by that time and I could just see him just dragging his
19  feet.  He was giving me the run around.  And that's when I
20  started looking for an attorney.
21      Q.   So when was the first time Mr. Smith asked you for
22  records of maintenance of the fire suppression system?
23      A.   June.
24      Q.   And --
25      A.   July actually.  I think it was July.  It wasn't

---

86

1   June.
2       Q.   Of 2004?
3       A.   Yeah.
4       Q.   And did you ever provide any information to Mr.
5   Smith in response to that request?
6       A.   No.
7       Q.   And your reason for that was?
8       A.   Any records I had were burned up in the fire to
9   begin with and I wasn't about to go reconstructing something
10  for him when he wasn't dealing in good faith with me.  He was
11  ignoring -- I sent him probably four or five different
12  letters.  I attempted to call him probably 40 or 50 times and
13  he wouldn't respond to me at all.  So at that point I had had
14  enough.
15      Q.   Understood.  Did Mr. Smith ever ask you to simply
16  give him the name of the people who maintained your fire
17  suppression system?
18      A.   Never.
19      Q.   Do you recall any letters that he may have sent
20  that asked you to give him the name?
21      A.   In July, June or July, he sent me a registered
22  letter asking me for this stuff, but by that time I was
23  looking for a lawyer.
24      Q.   Okay.  So you were in no way interested in dealing
25  with Mr. Smith anymore by June or July when he was requesting

---

87

1   that information?
2       A.   That's right.
3       Q.   And you made the decision not to provide him that
4   information because you were looking for counsel to file a
5   lawsuit?
6           MR. LANE:  Objection.  What information are you
7       talking about, because I believe actually if you look in
8       the letter it asks for the records which Mr. Beck has
9       already testified were burned in the fire to the extent
10      they existed.
11      Q.   Did Mr. Smith ever ask you to simply provide him
12  the name of the people who did the maintenance?  Do you
13  recall that?
14      A.   No.  No.
15      Q.   So there was never any request from Mr. Smith or
16  from the insurance company?
17      A.   Not that I recall.
18      Q.   If they had asked you for that information, would
19  you have provided it at that time?
20      A.   If they had asked me for the information in January
21  or February or March or April, I would have cooperated.  You
22  know, if he would have said, hey, it appears there's a
23  misunderstanding here.  I'm talking about an Ancil system,
24  you're talking about a Halon system.  I think we're both
25  talking about a fire suppression system.  I'm sorry that I

---

88

1   misunderstood you.  Had he said that, I would have been right
2   back on board with him and given him -- done whatever I
3   needed to do to prove to him what he needed.
4       Q.   But he hadn't done that?
5       A.   No.
6       Q.   Up until June?
7       A.   He had ignored me.
8       Q.   And he had ignored your requests for him to give
9   you information as to what was going on with the policy.  Is
10  that your position?
11      A.   Yeah.  Well, let me point something out to you.
12      Q.   Absolutely.
13      A.   I'm not a principal in this case.  I'm the property
14  owner.  My wife is the one.  The policy is in the name of the
15  corporation.  Him talking to me, he might as well have been
16  talking to that man sitting over there at the pool.  He never
17  once attempted to talk to my wife.
18      Q.   He never requested to speak with her?
19      A.   No.  No.  He never once -- everything was between
20  him and me.  And she was kind of ticked off.  She tried to
21  call him and he wouldn't return her calls.
22      Q.   At the time that you were contacted by Mr. Smith
23  personally that he talked to you personally about the fire,
24  did you ever make the suggestion that he might want to talk
25  to your wife because she was the president of the

---

Case 1:04-cv-00348-MBC    Document 25-6    Filed 12/06/2006    Page 23 of 30

Walter Beck Corp. vs. Safeco Corp.                DO NOT COPY                Harold Beck  11/11/2006

89

1  corporation?
2      A.  Yeah.
3      Q.  How did you tell him that?
4      A.  I said, I think you need to be talking to my wife.
5  She's upset because you haven't acknowledged what she's
6  sending you.
7      Q.  You told him that verbally?
8      A.  Yeah.
9      Q.  Over the phone or in person?
10     A.  Yeah.  Over the phone.  I only saw him once in
11  person.  He never came back.
12     Q.  And after you told him that he should be dealing
13  with your wife, he still --
14     A.  He still kept calling me.  I was on the radio in
15  Florida and he'd call me on my cell phone.
16     Q.  I see.
17     A.  In fact, that's how I got the news that we were --
18  that the coverage was being denied.  He called me on my cell
19  phone in the middle of my radio show telling me he was going
20  to deny the coverage based on the fact I didn't have an Ancil
21  system.
22     Q.  Let's talk about that a little bit.  When did he
23  first state anything was a problem with your fire suppression
24  system?  When do you recall that?
25     A.  The day he picked up the phone and told me he

90

1  wasn't going to pay the claim.
2      Q.  That was in June or July?
3      A.  No.  It was in February.
4      Q.  In February of 2004?
5      A.  Yeah.
6      Q.  And what was your reaction to that?  What did he
7  specifically say was the problem?
8      A.  He said, I'm not going to pay.  We're not going to
9  pay.  We're denying coverage because you did not have an
10  operating Ancil system.
11     Q.  And he specifically said Ancil was the problem?
12     A.  Yes, he did.
13     Q.  And your reaction to that was what?
14     A.  I said, the policy doesn't say I need to have an
15  Ancil system.  It says I have to have a fire suppression
16  system.  And I had that.
17     Q.  How did he respond to that?
18     A.  He said, we don't believe that.
19     Q.  Did you ever at that time in February of 2004 try
20  to prove to Mr. Smith that you had --
21     A.  I wrote him a letter.  I wrote him a letter
22  immediately.  And I told him that I received his letter of
23  denial.  He sent it to -- he sent it off to me.  I guess I
24  was in Florida.  I mean, he totally ignored my wife.  He sent
25  it to me and denied the coverage, and then I responded

91

1  saying, this is -- this is a mistake.  It calls for a fire
2  suppression system.  A Halon system is a fire suppression
3  system.  I've lived up to the letter of the policy.
4      Q.  When you sent that letter, did you attempt to
5  provide any other information other than your word that there
6  was a fire suppression system in there?
7      A.  No.  I didn't think I needed to because the company
8  had inspected this system no fewer than four times.  The
9  insurance company has come out physically, stood on the
10  premises, looked at the fire suppression system, said, okay,
11  went down, looked at the tanks, looked at the pressure.  You
12  know what they told me?  They had three things for me.  We
13  want you to paint this outside wall the wind and the snow had
14  been beating it, we want you to cover up this dumpster where
15  the bears go in and tear it apart, and what type of surface
16  is your roof made out of?  Those are the three things they've
17  asked me in four inspections.  They never once questioned the
18  fire suppression system.  And the company has been on the
19  premises installing it.  All of a sudden, the company is
20  saying I don't have one after they saw it themselves.
21     Q.  Okay.  Let's talk a little bit then about these
22  inspections that occurred.  When was the first time you
23  remember the insurance company inspecting the property?
24     A.  I can't give you an exact date.
25     Q.  Was it --

92

1      A.  It would have been shortly after the policy was
2  written.  Probably in '94 or '95.
3      Q.  '94 or '95.  And this was a representative of
4  American Economy Insurance?
5      A.  Safeco, whoever.  I don't know.
6      Q.  How did they approach you to do the inspection?
7      A.  They'd just show up at the bar one day, and the
8  bartender would be there.  And I'd be over at the house doing
9  whatever I was doing.  I'd get a phone call, there's somebody
10  from the insurance company here.  And I would go over.
11     Q.  Now, when they said, there's somebody from the
12  insurance company, did they specifically say which insurance
13  company?
14     A.  They would give me a card.  It was the people that
15  were doing the property insurance.  And they'd say they were
16  from the loss prevention department and that they were here
17  to do an inspection.  Sure.  I'll go with you.  I'll show you
18  whatever you want to see.
19     Q.  At the time of that first inspection that you
20  recall, do you recall where they said they came from?
21     A.  No.
22     Q.  Do you recall a name of the person?
23     A.  No.
24     Q.  The only thing that you obtained from them was a
25  business card?

Walter Beck Corp. vs. Safeco Corp.                    DO NOT COPY                    Harold Beck  11/11/2006

93

1    A.  Uh-huh.
2    Q.  That's how they identified themselves as an
3  investigator or an inspector?
4    A.  Uh-huh.  Loss prevention specialist.  I worked for
5  an insurance company.  We used to do loss prevention
6  inspections all the time.
7    Q.  Okay.  Was there any indication from this person as
8  to what exactly they wanted to inspect?
9    A.  They were inspecting the entire premises.  Because
10  they were carrying the fire insurance and the liability
11  insurance, and they wanted to see what their risk was.
12    Q.  And you took them through the property personally?
13    A.  Yes.
14    Q.  So they didn't ask for any other person but
15  yourself?  You were the person to take through the property?
16    A.  Well, they wouldn't -- they didn't care who took
17  them through.  They wanted permission to do it.  And the
18  bartenders would generally call one of us, Sharyn or myself,
19  and say, we've got somebody here.  Now, we would always go if
20  we were available, check the person out, see who they were,
21  because you don't know who's checking you out.
22    Q.  But the initial inspection that you recall, it was
23  you who took them through the property?
24    A.  Yeah.  Very first one.
25    Q.  Did they ask you any specific questions regarding

94

1  the systems that you had in place on the property?
2    A.  Just looked at them.  You know, they noted that I
3  had a burglar alarm system.  That's a plus.  Looked under the
4  hood.  I think he even twisted the nozzel, make sure it spun.
5  Looked at the fire detectors, you know, heat detectors.
6    Q.  How long of an inspection was it?  How long did it
7  take?
8    A.  He stayed maybe a half hour, 45 minutes.
9    Q.  And he was writing something down as he was there?
10    A.  Yeah.
11    Q.  Did it look like a form or did it look like just
12  notes on it?
13    A.  No.  He was operating on some kind of a form.  It
14  was an official inspection.  I could see that.
15    Q.  From that first inspection, did you receive any
16  notifications from the insurance company regarding it?
17    A.  No.
18    Q.  So there wasn't anything you needed to do after
19  that inspection?
20    A.  No.
21    Q.  This would have been around the time that the
22  policy was first written, you say?
23    A.  Yeah.  Within the first six months of the policy
24  probably.
25    Q.  Do you recall how long it was before another

95

1  inspector came out?
2    A.  I can -- I think -- you know, we've talked about, I
3  think, the total of about three or four.  I think four
4  inspections.  But the very last one was somewhere around
5  2002.  And I was back from a book trip, and I remember being
6  irritated that I had to get -- I was working on a new book,
7  and I was irritated that I had to break off doing what I was
8  doing and go over to the bar and meet with somebody.
9  Bartender didn't know and called me.  And that was when he
10  said to me that -- I forget the person, but he said -- he
11  started the business about the dumpster.  And that was very
12  irritating because a black bear, I don't care what you do.
13  If a black bear wants in your dumpster, he's getting in.  If
14  he wants to rip the wall off, he'd take the wall off.  And I
15  said, I'll do the best I can with that.  And he said, well,
16  you have to paint this wall, and he said, I'd like a sample
17  of what the roof is made of.  Fortunately, I had one of those
18  sheets and I cut a piece off and gave it to him.  And that
19  was the only thing he needed.  I mean, we walked through the
20  whole place.  He looked at the tanks, noted the pressure on
21  the tanks, looked under --
22    Q.  When you say, noted it, he wrote down something?
23    A.  He -- well, he looked at it, and, you know, he was
24  right there looking at it.  He had his form and he basically
25  said -- you know, looking around, saying, okay.  Never said a

96

1  word about anything.  Again, I showed him.  He said -- one
2  panel was there right in the middle of the kitchen.  I had
3  put in a new burglar alarm system.  And he said, what's that?
4  I said, that's our burglar alarm system.  That was an
5  improvement.  That was a UL wireless alarm system.
6    Q.  Okay.  When was the last time you remember an
7  inspector coming from the insurance?
8    A.  That was the one.
9    Q.  That was what year?
10    A.  It would have been about 2002.
11    Q.  Okay.
12    A.  It was before I was on the radio.
13    Q.  I want to go back to something because you just
14  reminded me of it.  Your wife had mentioned briefly -- and
15  she certainly was not sure of this -- but that there was some
16  kind of indication on one or several of the components of the
17  fire suppression system that it was UL listed.
18    A.  Yeah.
19    Q.  Do you recall anything --
20    A.  Any panel that you buy, control panel that's UL
21  listed, has a UL tag on the lower right-hand corner.  All the
22  tanks had UL tags on them.  Any fire, any smoke alarm, will
23  have a UL tag on it.  Everything, every component that is
24  sold that's manufactured for sale within the United States
25  for a fire system has to be UL listed.  Otherwise, it's not

ZACCO & ASSOCIATES REPORTING SERVICES

Case 1:04-cv-00348-MBC   Document 25-6   Filed 12/06/2006   Page 25 of 30

Walter Beck Corp. vs. Safeco Corp.          DO NOT COPY          Harold Beck  11/11/2006

97

```
 1   allowed to be sold.
 2       Q.  Let me ask you this, because I am completely
 3   unfamiliar with UL, and I know that you were formerly
 4   certified with UL.  When UL certifies a fire suppression
 5   system, do they do it by certifying the individual
 6   components, or --
 7       A.  Yes.
 8       Q.  -- or do they do it as a whole?
 9       A.  They do it by the individual components.
10       Q.  Now, is there any listing through UL for the
11   components as they are placed together, meaning once you have
12   the components built into a fire suppression system, does UL
13   have any listings or requirements regarding the system as a
14   whole?
15       A.  Yes.  It's the way the system is wired, the way the
16   system is configured.  It has to be configured a certain way.
17   It has to be wired within conduit or have the teflon coated
18   wiring, whatever.  So any single -- the smallest part that is
19   not UL listed wipes out the entire listing.  So you do not
20   ever purchase anything that is not UL listed.
21       Q.  Got you.  Does UL have any indications,
22   requirements, listings for specifically fire suppression
23   systems used in kitchens of restaurants?
24       A.  I have no idea.
25       Q.  So it's not something you would have come across in
```

98

```
 1   your certification process, or --
 2       A.  No.  If they do, I don't know.  I mean, it's been a
 3   long time.
 4       Q.  I don't know either.  That's why I'm asking.
 5       A.  I'm just simply saying that the requirement of the
 6   policy was a UL listed fire suppression system.  We did that.
 7       Q.  Okay.  Now, when was your last contact with Mr.
 8   Smith?
 9       A.  February, 2003, when he told me he was denying the
10   coverage.  He called me.
11       Q.  Okay.  That was a telephone call.  And you also got
12   a letter, I assume.
13       A.  Yeah.  I got a letter the next day.
14       Q.  You never attempted to contact Mr. Smith via
15   telephone or letter after February, 2003?
16       A.  That's not true.  I said --
17       Q.  I'm asking.
18       A.  I said I called him probably 30 or 40 times and he
19   wouldn't return my call, and I sent him probably five or six
20   letters.  I mean, I sent him a letter I think every 30 days.
21       Q.  That's why I'm asking you when was your last
22   contact.  By, contact, I mean either letter or --
23       A.  Then I talked to him in the July time that -- at
24   the very end.
25       Q.  What was that conversation?
```

99

```
 1       A.  That's when he started telling me, well, send me
 2   the records and we'll reconsider it.  It didn't sound very
 3   encouraging.
 4       Q.  And you decided that that was the last contact you
 5   were going to have with Mr. Smith?
 6       A.  That's right.
 7       Q.  Did Mr. Smith ever attempt to contact you after
 8   that?
 9       A.  No.
10       Q.  And then the lawsuit was filed shortly after that?
11       A.  Yes.
12       Q.  I think -- let me just really quickly go through
13   this.  I think that may be all I have, but let me just be
14   sure I'm not missing anything.
15       A.  Sure.
16       Q.  In your viewpoint, when did American Economy
17   Insurance breach the Walter Beck Corporation policy?
18           MR. LORENZ:  I'm going to object.  It calls for a
19   legal conclusion.
20           MR. MAYER:  Is he allowed to answer?
21           MR. LORENZ:  Well, he's not a -- he's not the
22   corporate representative.
23           MR. MAYER:  I understand that, but he's filed a
24   lawsuit alleging --
25           THE WITNESS:  I haven't filed any lawsuit.  Walter
```

100

```
 1   Beck Corporation did.
 2       Q.  Are you familiar with the lawsuit the Walter Beck
 3   Corporation filed?
 4       A.  Yes.
 5       Q.  Are you familiar with the counts of that lawsuit?
 6       A.  Yes.
 7       Q.  Were you involved in the formulation of that
 8   complaint against American Economy Insurance Company?
 9       A.  Yes.
10       Q.  So you helped to formulate that complaint --
11       A.  Yes.
12       Q.  -- in some way?
13       A.  Sure.
14       Q.  Are you familiar with the count against American
15   Economy Insurance that states that they breached the
16   insurance policy that Walter Beck Corporation had with them?
17       A.  Yes.
18       Q.  Is it your opinion that that contract was breached?
19       A.  Yes.
20       Q.  Why is that?  When did that occur?
21           MR. LORENZ:  Continuing objection.  It's calling
22   for a legal conclusion.
23           MR. MAYER:  Understood.  But is he allowed to
24   answer in that capacity?
25           MR. LORENZ:  In what capacity?
```

Walter Beck Corp. vs. Safeco Corp.                DO NOT COPY                Harold Beck   11/11/2006

---

101

1    MR. MAYER:  In the capacity that I just asked him.
2    MR. LORENZ:  Yeah.  You can answer the question.
3    A.  Okay.  I don't think Paul Smith ever intended to
4  pay the claim.  I think Paul Smith came in with the intention
5  of finding a way to deny the claim and hoping that he would
6  do enough damage to me that I couldn't afford to proceed the
7  way I am.
8    Q.  Okay.  The question that I asked you specifically,
9  though, is when was the contract breached?
10    A.  When he denied the claim.
11    Q.  So that would have been February of 2003, if that's
12  when you first heard of the denial, or 2004, excuse me,
13  February 2004?
14    A.  Yeah.
15    Q.  Okay.  I had some questions that my co-counsel had
16  written down.  They may jump around a little bit --
17    A.  Go ahead.
18    Q.  -- in order of time, but I'm going to ask a couple
19  questions about Halon.  Okay?  What pressure should a Halon
20  tank have in order to be used in a fire suppression system?
21    A.  I have no idea.
22    Q.  You have no idea?
23    A.  Not at this point.  I've probably forgotten it.
24    Q.  Do you recall the indicators that were on the
25  tanks?

---

102

1    A.  Uh-huh.
2    Q.  Do you recall, was it pounds per square inch?
3    A.  I think so.
4    Q.  Do you recall what the range was?
5    A.  No.
6    Q.  Was there some kind of line on the indicator that
7  would indicate when the pressure was too low?
8    A.  Yes.  It was a needle.
9    Q.  So if it dipped below a certain point --
10    A.  Uh-huh.
11    Q.  -- that's when you knew the tank had to be
12  replaced?
13    A.  Sure.
14    Q.  What type of Halon was in the tank?  I know
15  there's --
16    A.  Boy, I know there's a bunch that they -- we went
17  through a period of time there when the EPA was going to
18  outlaw Halon and then they came out with a different version
19  that didn't kill the ozone layer.  So right in the '90s,
20  about '93, '94, they switched Halons.  It was like Halon 1101
21  and then they went to Halon something or other and something
22  other other, and I didn't keep up with the numbers, but I
23  knew that in the '90s, there was a conscious switch there.
24  That's when they stopped using freon in air conditioning
25  systems and all that.  So they had changed Halon gases.  And

---

103

1  we had upgraded with the exchange.
2    Q.  Okay.  As far as you knew, you were purchasing the
3  most up to date Halon at any time you purchased a tank?
4    A.  Sure.  Yeah.
5    Q.  What size pipe is installed with the Halon system?
6    A.  I think it's three-quarter inch copper pipe.
7    Q.  And that's standard for any fire suppression system
8  using Halon?
9    A.  Now, I'm talking -- I haven't been in the industry
10  for a long time.
11    Q.  Absolutely.  But at the time that you installed
12  this --
13    A.  You know, we installed it in 1989.  If my memory
14  serves me properly, we were using three-inch copper tubing
15  for the plumbing.
16    Q.  Okay.  Let me ask a couple questions about your
17  brother and his business.
18    A.  Sure.
19    Q.  Does your brother sell or install fire suppression
20  systems for any specific manufacturer?
21    A.  No.  Not for any specific manufacturer.
22    Q.  Does he then design the systems himself with --
23  through component work, or --
24    A.  I always designed it myself.  I would suppose he
25  did, too.  Again, it's not rocket science.  It's -- you've

---

104

1  got -- you're going to locate them someplace.  You've got
2  nozzles, you got to get the pipe to the nozzles, you are
3  going to hang a panel in the wall.
4    Q.  Do you know if there's any manufacturers of fire
5  suppression systems that sell the systems as a whole rather
6  than --
7    A.  I believe Ancil does.  That's why Ancil has become
8  like a Kleenex.  Where is your Ancil system.
9    Q.  Because it's so pervasive in the industry?
10    A.  Ancil will sell you the hood, the whole works,
11  everything.
12    Q.  But none of the components that you ever installed
13  personally were -- I mean, actually you did install Ancil
14  systems.
15    A.  Yeah, we put in Ancil systems.
16    Q.  I'm sorry.  You did mention that.  Do you know if
17  your brother installs Ancil systems?
18    A.  I don't know.
19    Q.  Do you happen to know if your brother is certified,
20  a certified installer for any specific manufacturer of fire
21  suppression systems?
22    A.  I couldn't tell you.
23    Q.  Were you ever a certified installer for any
24  specific manufacturer?
25    A.  Not for any specific manufacturer.  I was certified

---

ZACCO & ASSOCIATES REPORTING SERVICES

Walter Beck Corp. vs. Safeco Corp.          DO NOT COPY          Harold Beck  11/11/2006

105

1    by the State of Texas generally, the way you become certified
2    by the state or the entity where you are working.
3        Q.  And your brother is certified in Ohio, is that --
4        A.  He holds a license in Ohio, yeah.  And I guess he
5    holds licenses in other states, too.  He has to.  He does
6    work for the federal government so he goes different places
7    on government installations doing work for them.
8        Q.  Do you have any knowledge as to your brother's
9    education or certification process to get licensed in Ohio or
10   other states?
11       A.  No.
12       Q.  Do you have any personal knowledge of what he had
13   to do?
14       A.  I can't speak directly to that.
15       Q.  Did you ever observe your brother replace any part
16   of the Halon system at your particular establishment?
17       A.  Sure.  We've replaced panels.  And, like I said, we
18   -- we've replaced the heat detectors.
19       Q.  That's the only thing you ever observed?
20       A.  Yeah.
21       Q.  You don't know whether he may have done something
22   when you weren't there to replace --
23       A.  I'm sure he might have done something when I wasn't
24   there.  If he ever imagined something needed to be fixed, he
25   fixed it.

106

1        Q.  And he'd have the parts with him already?
2        A.  Oh, yeah.  He's a traveling suitcase.
3        Q.  Do you have any reason to believe -- and I'm not
4    suggesting that you were in any way involved, but do you have
5    any reason to believe that the fire at your bar was an arson?
6        A.  I told the state police as much.
7        Q.  Why do you suspect that?
8        A.  We had all the business.  When we reopened the bar,
9    we had all the business in the area, and all of a sudden the
10   people that had the business had lost it.  I brought in a
11   pile of young girls that were real pretty, and the hunters
12   were coming up from Pittsburg and down from Buffalo and over
13   from Cleveland, and they're going to go where the pretty
14   girls are, and I had the pretty girls and the coldest beer,
15   and I had the Pittsburg Steelers on on Sunday.
16       Q.  So it's your belief that there may have been some
17   kind of plot or conspiracy from other bars in the area that
18   wanted to get your business?
19       A.  Probably.  One person probably.
20       Q.  Okay.
21       A.  I mean, you've got my statement to the state
22   police.
23       Q.  Absolutely.  I'm just wondering what prompted your
24   belief that it may have been an arson.  Can you talk a little
25   bit about the people that were hired to do the degreasing of

107

1    the duct work?
2        A.  Katy, she was a professional cleaner.  She worked
3    for the -- she worked for the Allegheny National Forest.  She
4    worked for the U.S. Government Department of Agriculture.
5    They run the Allegheny National Forest.  And she would do
6    professional cleaning for them down at the Kinzua Dam.  She
7    cleaned all that stuff down there at the Kinzua Dam.  So by
8    hiring Katy, my wife would have Katy in there on a regular
9    basis, and Katy would do -- would be up on top of the stove
10   inside cleaning all the grease out.
11       Q.  How did you become involved with Katy?  I mean, how
12   did --
13       A.  She was a customer.
14       Q.  And she had mentioned --
15       A.  After she'd get through working down at the dam, we
16   were a stop on the way home.  And she hit my wife up for some
17   work.  I can do work for you.
18       Q.  She mentioned that she could do that kind of
19   cleaning work?
20       A.  Yeah.  She said, I'll do any type of cleaning you
21   want.  And Sharyn paid her by the hour and she was happy.
22       Q.  She wasn't an employee of the Walter Beck
23   Corporation?
24       A.  No, no.
25       Q.  Did she have any kind of formal business in doing

108

1    this kind of work on the side?  Did she have a name for her
2    business or a phone number?
3        A.  I have no idea.
4        Q.  An office?
5        A.  No.  She did cleaning for the forest service on a
6    contract basis.  She did cleaning for a bunch of people on a
7    contract basis.
8        Q.  Her work for the Walter Beck Corporation wasn't
9    memorialized in a contract in any way, though?
10       A.  No.
11       Q.  Or was it?
12       A.  Probably not.
13           MR. LORENZ:  I'm going to object.  I think he's
14   testified as to what the terms of the contract were,
15   that it was an hourly basis.  Are you asking him was
16   there a written contract?
17           MR. MAYER:  Yeah.  That's what I meant.
18       A.  I couldn't tell you.  I don't know.
19       Q.  You don't know?
20       A.  No.
21       Q.  Do you know what she was paid for her work?
22       A.  I don't know.
23       Q.  Do you know how she was paid for her work?
24       A.  Probably cash.
25       Q.  Do you know how often Katy would clean the hood or

109

1  the duct work?
2      A.  At least once a month.
3      Q.  If not more often?
4      A.  At least once a month, I would guess.  Probably it
5  was once a month.  Sharyn was always very particular about
6  keeping the -- we had a -- we were not a dirty woods bar.  It
7  was a -- we were in the woods, but we were pretty clean.  We
8  were very clean.
9      Q.  The people from the insurance company that came out
10  to do the inspections, were they different people, or was it
11  always the same person?
12      A.  I never saw the same person twice.
13      Q.  So it was always a different person?
14      A.  Yeah.
15      Q.  Can you describe any of them, their appearance?
16      A.  No.
17      Q.  Man?  Woman?
18      A.  Just guys.
19      Q.  Always a man?
20      A.  I remember men.  You got to remember, whenever
21  anybody came, if I was available, I went over and met with
22  them.  I would meet with the liquor control board.  I would
23  meet with the health department.  I met with your loss
24  prevention people, you know, so --
25      Q.  Did the loss prevention people who came, the people

110

1  that you recall as loss prevention people, did they wear
2  anything that indicated their position?
3      A.  I don't remember anything like that.  I don't
4  remember whether they had a badge or whatever.  I don't know.
5      Q.  The only thing that you recall as a form of
6  identification was a business card?
7      A.  Sure.
8      Q.  Do you have any idea where those business cards
9  are?
10      A.  Who knows.
11      Q.  Just I have to ask.
12      A.  I have no idea.
13      Q.  Did you keep them?
14      A.  No.
15      Q.  Okay.
16      A.  Probably threw them in the garbage.
17      Q.  I'm going to ask you a little bit more about your
18  Texas licensure.  The fire marshall's test specifically that
19  you took, what topics were on the written test, if you recall
20  any of them?
21      A.  Generally how to wire, wiring things, questions
22  about how to wire a UL system, what temperature a heat
23  detector activates at, how a photoelectric smoke detector
24  works, how an ionization smoke detector works.  General
25  knowledge of the products themselves.  Knowledge of

111

1  placement.  How high you place a pull station on the wall,
2  where you can locate a smoke detector, how -- the difference
3  between a wet system and a dry system in a sprinkler system.
4  Those types of things.  Keep in mind, the Halon system is a
5  dry system.  It's only activated once one of the things go
6  off.
7      Q.  You said there was a physical component to the test
8  where you actually had to install something?
9      A.  Yes.  Well, they would take you in a fire
10  marshall's office and they'd go ahead and you would walk in
11  and you would have to wire something for them.
12      Q.  Do you know what you were asked to wire?
13      A.  I was wiring a panel, a fire alarm panel.
14      Q.  Was it a test of your electric skills?  Is that
15  what -- that was the purpose?
16      A.  Yeah.  To show that I knew what I was doing, not
17  that I -- that I not only had the book knowledge, I had the
18  actual practical knowledge to do it for them.
19      Q.  The written part of the test, how long did you have
20  to take it?  How long of a test was it?
21      A.  I have no idea.
22      Q.  Was it a day?  Was it a couple hours?
23      A.  I think I took it one morning.
24      Q.  We forgot to ask your wife her birth date.  Maybe
25  it was gentlemanly courtesy.

112

1      A.  February 11, 1947.
2      Q.  You mentioned that you wrote some books.
3      A.  Uh-huh.
4      Q.  What were the subjects of them?  What were they
5  generally about?
6      A.  First book I wrote was called Ripe for the Picking,
7  the Story of the Kathy Wilson Murder Case.  It's nonfiction.
8  It's a story about a woman in Jamestown, New York who
9  disappeared and how the district attorney in Warren County
10  and the Pennsylvania state police framed an innocent man for
11  her murder.  That's why they wanted to pin something on me.
12  The next one was about the Indian Chief Corn Planter, called,
13  Corn Planter Chronicles.  It was the book of the year for the
14  New York Library Association in 2002.  The third book was
15  called the First Terrorist Act.  It's a story about -- it's a
16  Vietnam War story set between September 11 and December 7,
17  2001.  Fourth book is a piece I'm very proud of.  It's a --
18  it's called Tyrannist Bush.  And I've got a book with an
19  agent right now called, The Wrong Arm of the Law.  And I've
20  just completed another book called, Rockford House.  And I'm
21  about to write another book called, DSC.
22      MR. MAYER:  Do you have anything else, Dan?  I'm
23  done, so --
24      (Discussion off the record.)
25      Q.  What are you doing right now for income?

Case 1:04-cv-00348-MBC    Document 25-6    Filed 12/06/2006    Page 29 of 30

Walter Beck Corp. vs. Safeco Corp.    DO NOT COPY    Harold Beck   11/11/2006



113

1    A.  I am a English professor at Webster College, and
2  I'm also the managing editor of Ocala Magazine.  I have to
3  work two jobs because of your client.
4        MR. MAYER:  I'm done.
5        MR. LORENZ:  We'll read.
6        (Deposition concluded at 1:21 p.m.)

115

CERTIFICATE OF REPORTER
1
2  STATE OF FLORIDA
   COUNTY OF ORANGE
3
4    I, Leslie Richmond, Registered Professional Reporter,
   certify that I was authorized to and did stenographically
5  report the deposition of Harold Beck; that a review of the
   transcript was requested; and that the foregoing transcript,
6  including 113 pages, is a true and complete record of my
   stenographic notes.
7
     Dated this 20th day of November, 2006.
8
9
10   _____
     Leslie Richmond, RPR and
11   Notary Public
     (This signature is valid only if signed in blue ink.)
12

114

CERTIFICATE OF OATH
1
2  STATE OF FLORIDA
   COUNTY OF ORANGE
3
4    I, the undersigned authority, certify that Harold Beck
   personally appeared before me and was duly sworn on the 11th
5  day of November, 2006.
6    WITNESS my hand and official seal this 20th day of
   November, 2006.
7
8    _____
9    Leslie Richmond, RPR and
     Notary Public

116

1  IN RE:  WALTER BECK CORPORATION V. SAFECO CORPORATION, et al.
2  CASE NO:  04-348-Erie
3  DEPOSITION OF:  HAROLD BECK
4  TAKEN ON:  NOVEMBER 11, 2006
5
6  November 21, 2006
7
8
   Joshua R. Lorenz, Esquire
9  Meyer, Unkovic & Scott, LLP
   1300 Oliver Building
10 Pittsburgh, Pennsylvania  15223
11
12   The above referenced transcript has been completed and
   awaits reading and signing.
13
     Please notify the deponent to contact your office to
14 make arrangements to read your copy of the transcript.
   Please complete by 30 days from the date of this letter.
15
     The original of this deposition has been forwarded to
16 the ordering party and the errata, once received, will be
   forwarded to all ordering parties as listed below.
17
     Thank you,
18   Leslie Richmond
19
20
21
22   cc:  Daniel P. McDyer, Esquire, and Benjamin M. Mayer,
        Esquire, 1300 Gulf Tower, 707 Grant Street,
23      Pittsburgh, Pennsylvania  15219

Walter Beck Corp. vs. Safeco Corp.          DO NOT COPY          Harold Beck   11/11/2006

117

1        ERRATA SHEET
2        Do not write on transcript - enter changes on this sheet.
3     IN RE:  WALTER BECK CORPORATION V. SAFECO CORPORATION, ET AL.
      DEPO OF:  HAROLD BECK
4     TAKEN ON:  NOVEMBER 11, 2006
5     Page #   Line #   Change/Correction      Reason
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
      Under penalties of perjury, I declare that I have read the
21    foregoing document and that the facts stated in it are true.
22
        Date            Signature of Deponent
23
                        Harold Beck
24
      Reporter:  LSR         Printed Name of Deponent
25

118

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ZACCO & ASSOCIATES REPORTING SERVICES