**Page 1**

```
IN THE UNITED STATES DISTRICT COURT
   FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WALTER BECK CORPORATION d/b/a   Civil Action No. 04-348-Erie
THE RAINBOW INN,
    Plaintiff,          Judge Maurice B. Cohill, Jr.
vs.
SAFECO CORPORATION, AMERICAN
ECONOMY INSURANCE COMPANY, and
AMERICAN STATES INSURANCE COMPANY,
    Defendants.
_____/


    Deposition of:    Sharyn Beck

    Taken by:         Defendants

    Date:             November 11, 2006

    Time:             9:00 a.m. - 10:58 a.m.

    Location:         Holiday Inn Express,
                      The Villages
                      1205 Avenida Central
                      Lady Lake, Florida

    Reported by:      Leslie Richmond, RPR




         ZACCO & ASSOCIATES REPORTING SERVICES
              605 East Robinson Street, Suite 430
                   Orlando, Florida 32801
                       (407) 425-6789
```

**Page 2**

```
APPEARANCES:
APPEARANCES FOR THE PLAINTIFF
Joshua R. Lorenz, Esquire
Of: Meyer, Unkovic & Scott, LLP
    1300 Oliver Building
    Pittsburgh, Pennsylvania 15223

APPEARANCES FOR THE DEFENDANTS

Daniel P. McDyer, Esquire, and
Benjamin M. Mayer, Esquire
Of: Anstandig, McDyer & Yurcon, P.C.
    1300 Gulf Tower
    707 Grant Street
    Pittsburgh, Pennsylvania 15219
Also Present:
    Harold T. Beck
```

**Page 3**

```
                    I N D E X
Testimony of Sharyn Beck                     Page
    Direct Examination by Mr. McDyer           4
Certificate of Oath                            70
Certificate of Reporter                        71
Read and Sign Letter to Witness                72
Errata Sheet (to be forwarded upon execution)  73


                  E X H I B I T S

Exhibit Nos.                                 Page
A  Rainbow Inn Inventory                      25
B  Rainbow Inn Liquor Inventory               29
C  Rainbow Inn Food & Beer Inventory          29
D  2002 Corporate Tax Return                  31
E  2002 State Corporate Tax Report            31
F  Beck/Perrigo Correspondence of 6/13/03     31
G  Year 2002 Income Rainbow Inn               31
H  Rainbow Inn Expenses 2002                  31
I  2001 Corporate Tax Return                  33
J  2001 State Tax Return                      33
K  2001 Income Rainbow Inn                    33
L  Rainbow Inn Expenses 2001                  33
M  2000 Corporate Tax Return                  33
N  2000 State Tax Report                      33
O  Rainbow Inn 2000 handwritten document      33
P  Rainbow Inn 2000 Expenses                  33
Q  Rainbow Inn 2000 Income                    33
R  Lease dated 1/1/1999 - 12/31/2004          39
S  Lease dated 6/1/1994 - 12/31/1999          39
X  Amended Notice of Deposition               61
```

**Page 4**

                    PROCEEDINGS
                    SHARYN BECK,
having been first duly sworn, testified as follows:
    THE WITNESS: I do.
                DIRECT EXAMINATION
BY MR. MCDYER:
    Q.  Good morning. My name is Dan McDyre, and I represent American Economy Insurance and the other insurance companies that suit has been filed against by the Walter Beck Corporation. Ben Mayer is with me today also representing the same defendants. We're going to have some questions for you today. This is a deposition. Do you understand that's why you are here today?
    A.  Yes.
    Q.  Okay. And I understand that in addition to testifying on behalf of yourself, Sharyn Beck, you are also the designee of the Walter Beck Corporation.
    A.  Yes.
    Q.  Okay. Have you ever been deposed before?
    A.  Yes.
    Q.  Okay. How long ago was that?
    A.  A long time ago.
    Q.  And what did that involve? What kind of lawsuit was that?
    A.  I'm not sure.

Case 1:04-cv-00348-MBC   Document 25-7   Filed 12/06/2006   Page 2 of 19

Walter Beck Corp. vs. Safeco Corp.   DO NOT COPY   Sharyn Beck 11/11/2006

5

1   Q. Were you the plaintiff? Did you bring a suit, or
2  were you being sued?
3   A. I believe we were the plaintiff.
4   Q. And what was the remedy you were seeking? What did
5  you want to -- what was your goal?
6   A. I can't really remember. It's been a long time
7  ago.
8   Q. Well, let me refresh then for you. You've been
9  sworn by the court reporter and expected to tell the truth
10 just as if you were in a court of law today. Do you
11 understand that?
12  A. Yes, I do.
13  Q. And do you understand that your questions, the
14 questions that I put to you, are being taken down by the
15 court reporter, and when you answer, you are expected to give
16 a full and complete answer just as if you were in a court of
17 law. Do you understand that?
18  A. Yes.
19  Q. And do you understand that if you do answer a
20 question without asking for any explanation, or if it happens
21 to be confusing to you and you respond, we'll have to assume
22 that you understood the question. So if there is anything
23 that's confusing to you, feel free to interrupt me and ask me
24 to repeat it. Do you understand that instruction?
25  A. Yes.

6

1   Q. Okay. The other thing is, for the court reporter's
2  benefit and our benefit after the deposition, if you could
3  keep all your responses verbal just as you are doing now very
4  nicely because she can't get a head nod or an uh-huh or
5  huh-uh down as a yes, no, or maybe. Can you follow that
6  instruction?
7   A. Yes.
8   Q. And is there any reason why you can't give a
9  deposition today and understand questions? Do you have any
10 health issues that would prevent you from hearing or
11 understanding?
12  A. No.
13  Q. Do you understand today we're going to ask you some
14 questions with regard to the Rainbow Inn and a fire that
15 occurred there --
16  A. Yes.
17  Q. -- on December 5? Okay. All right. Now, did you
18 give your full name to the court reporter?
19  A. Sharyn Beck.
20     MR. LORENZ: Dan, just one thing I'd like to put on
21  the record, too. This is kind of a minor point, but we
22  are -- we are taking the deposition here in The
23  Villages, Florida, but just by way of clarification, we
24  can all agree that the western district rules of civil
25  procedure will apply.

7

1     MR. MCDYER: Yeah. That's fine.
2     MR. LORENZ: Okay.
3   Q. The other thing is, Ms. Beck, what would you like
4  to be called? Mrs. Beck?
5   A. Mrs. Beck.
6   Q. Mrs. Beck, where do you reside currently?
7   A. I reside at 1116 Ricardo Avenue, The Villages,
8  Florida.
9   Q. And how long have you resided there?
10  A. Two and a half, three years. Since this fire.
11  Q. Since shortly after December of 2005?
12  A. Yeah. Couple months later.
13  Q. Who do you reside there with?
14  A. My husband.
15  Q. Anybody else?
16  A. No.
17  Q. And before that, where did you reside before this
18 address?
19  A. At 1 Spring Drive, Marshburg, Pennsylvania.
20  Q. And is that -- how long did you reside at that
21 address?
22  A. 15 years. 10 years, 12 years. I don't know. 15
23 years.
24  Q. Do you still have ownership of it?
25  A. Yes.

8

1   Q. And is that near to where the Rainbow Inn was?
2   A. Yes.
3   Q. And has the real estate for the Rainbow Inn been
4  sold, or do you still own that, or who owns it?
5   A. No, it has not been sold.
6   Q. When was the real estate purchased?
7   A. I'm not sure of the exact date. 19- --
8   Q. '89, '90?
9   A. '89, '90.
10  Q. Okay. And in whose names was it purchased?
11  A. In whose name the real estate? In my husband's
12 name and my name.
13  Q. And did that include the buildings on the real
14 estate, for example, the Rainbow Inn, which I take it was
15 subsequently built?
16  A. Yes, the real estate included the buildings.
17  Q. My question was, you and your husband, Harold Beck,
18 were the owners of the Rainbow Inn structure and the real
19 estate on which it was situated?
20  A. Yes.
21  Q. From 1989 or '90 on through the present?
22  A. Yes.
23  Q. Okay. And at the time of the fire, December 5, 19-
24 -- or 2003, that was the case, only you and Mr. Beck were the
25 owners?

Case 1:04-cv-00348-MBC   Document 25-7   Filed 12/06/2006   Page 3 of 19

Walter Beck Corp. vs. Safeco Corp.          DO NOT COPY                Sharyn Beck 11/11/2006

Page 9

1  A. Yes.
2  Q. And could you just give us a little bit of personal
3  background? For example, did you grow up in the Marshburg
4  area?
5  A. No.
6  Q. Where did you grow up?
7  A. I grew up in Warren County, Pennsylvania.
8  Q. And attended high school there?
9  A. Yes.
10 Q. And beyond high school, did you have any education?
11 A. Yes. I went to Katharine Gibbs in New York.
12 Q. And what did you study there?
13 A. I was -- it was a secretarial school.
14 Q. And any other post high school training?
15 A. I've taken various courses at community colleges
16 many years ago.
17 Q. And were they business type courses, or --
18 A. No. Courses for my pleasure.
19 Q. And how about employment? After high school, did
20 you obtain employment as a secretary?
21 A. Yes.
22 Q. How long did you do that?
23 A. I've had several jobs. I'm currently employed as a
24 customer service representative.
25 Q. Who would be your employer?

Page 10

1  A. I'm employed by Massey Services. And I also do
2  cleaning privately.
3  Q. What is Massey?
4  A. Massey is a pest, termite and lawn care company.
5  Q. How long have you worked with Massey?
6  A. Year and a half.
7  Q. And prior to Massey, what have been your
8  employment?
9  A. Oh, I have worked for an insurance company. I have
10 worked at a hospital.
11 Q. What insurance company did you work for?
12 A. I think at the time the name of it was Garrison
13 Wolf Insurance.
14 Q. Was that an agency?
15 A. Yes.
16 Q. What was your job title?
17 A. I was a secretary.
18 Q. And your duties?
19 A. Typing, filing, answering the phones, customer
20 service.
21 Q. And did the Garrison Insurance Agency have any
22 particular lines of business in terms of insurance that it
23 specialized in or did most of their work in?
24 A. I really can't recall. That was 40 years ago.
25 Q. Okay. And besides Garrison, you mentioned another

Page 11

1  company. I forget.
2  A. I worked for Bradford Hospital.
3  Q. Okay. A hospital. What did you do for Bradford?
4  A. I was a secretary in the purchasing department.
5  Q. And about how long would you have worked for the
6  Garrison Agency? One year? 10 years? Five years?
7  A. A year maybe.
8  Q. How about the hospital?
9  A. I worked for them 11 years, I believe.
10 Q. Any other major employers in your background?
11 A. No.
12 Q. Besides your work for the Rainbow Inn?
13 A. No. Not that I can think of.
14 Q. Okay. And between 1989 and '90 when you purchased
15 the property that the Rainbow Inn was developed on until the
16 time of the fire in 2003, did you have any employment?
17 A. Yes. I worked at Bradford Hospital.
18 Q. Is that the 11 year stint that we're talking about?
19 A. Approximately, yes.
20 Q. And when you worked at Bradford, what would have
21 been your hours through that 11 year period?
22 A. 7:30 till 4:00.
23 Q. And I'm assuming that this covers 1989 through
24 2003?
25 A. No. I had left -- I had left the hospital maybe in

Page 12

1  2001 or 2002. I wasn't employed there at that time.
2  Q. Were you employed there in 2003?
3  A. No.
4  Q. Did you have any employment in 2003 besides what
5  you did for the Walter Beck Corporation?
6  A. No.
7  Q. And what did you do for Walter Beck Corporation?
8  Did you hold an office in it?
9  A. Yes. I was the president of the corporation. I
10 did the book work, I did the ordering, the food supplies and
11 liquor supplies and beer supplies.
12 Q. And were you always the president?
13 A. Yes.
14 Q. And in 2003, were there any other officers?
15 A. Besides myself, no.
16 Q. And were you the person that created the
17 corporation, incorporated it?
18 A. Yes.
19 Q. When was it incorporated, do you know?
20 A. No. I'm not -- I'd have to see those papers. I
21 don't have them with me.
22 Q. Would it have been at the same time of the purchase
23 of the real estate?
24 A. Yes.
25 Q. And did you have an attorney incorporate the

Case 1:04-cv-00348-MBC   Document 25-7   Filed 12/06/2006   Page 4 of 19

Walter Beck Corp. vs. Safeco Corp.         DO NOT COPY                Sharyn Beck 11/11/2006

**Page 13**

1  company?
2  A. Yes.
3  Q. Do you remember who that was?
4  A. No, I don't.
5  Q. Did the company through it's existence from, say,
6  1989, '90 through the time of the fire have a corporate
7  counsel that you used for corporate matters for the company?
8  A. Yes. I don't remember those names, though. I
9  don't have those papers in front of me.
10  Q. And besides the -- besides the Walter Beck
11  Corporation, did you incorporate any other corporations in
12  your lifetime?
13  A. No. Not myself.
14  Q. When you say, not yourself, did you incorporate --
15  A. My husband and I had other corporations when we
16  were in business prior to buying -- to our buying the
17  Marshburg property.
18  Q. Prior to the Marshburg property, what corporation
19  would you and your husband have incorporated?
20  A. We had Texas Fire and Security Systems in Austin,
21  Texas.
22  Q. And is that where it was located, Austin, Texas?
23  A. Yes.
24  Q. I'm going to ask you to go back and get a little
25  bit of a location history so I can get an understanding of

**Page 14**

1  where you've been. You mentioned you went to school in
2  Pennsylvania, Warren County. After Warren County, where did
3  you reside?
4  A. I resided in Jamestown, New York for a few years.
5  Q. And after that?
6  A. Austin, Texas.
7  Q. How long did you live in Austin?
8  A. Several years.
9  Q. Three? Four?
10  A. No. More than that.
11  Q. Five? Six?
12  A. I'm not sure. More than six.
13  Q. Less than 10?
14  A. I'm not sure.
15  Q. After Austin, Texas?
16  A. Marshburg.
17  Q. And I can see you might have wound up in New York
18  as a result of attending school there.
19  A. In what place in New York are you speaking? I went
20  to school in Manhattan.
21  Q. Did that experience bring you to Jamestown?
22  A. No. No.
23  Q. What brought you to Jamestown?
24  A. I was married and my husband's employment was in
25  Jamestown.

**Page 15**

1  Q. And was that Mr. Beck?
2  A. No.
3  Q. And what brought you to Austin, Texas?
4  A. I moved there with my husband, Harold Beck.
5  Q. And when were you and Mr. Beck married?
6  A. 25 years ago this March, so you do the math.
7  Q. We usually like to ask the husband that question
8  because we test them and they generally don't remember and
9  then they're in trouble. And what was it about Austin, Texas
10  that Mr. Beck was involved or you were involved in that
11  brought you to Austin, Texas?
12  A. He was living there when I married him.
13  Q. How was he employed at that time of your marriage?
14  A. I can't answer that.
15  Q. I mean, did it involve this Texas --
16  A. No. We began that after we were married.
17  Q. Texas Fire and Security, is that still an existing
18  company?
19  A. No.
20  Q. When did it terminate?
21  A. We sold the business to Network Security and -- I'm
22  terrible with years -- moved back to Pennsylvania, so. We
23  sold it.
24  Q. What type of business was it?
25  A. We installed alarm systems, residentially and

**Page 16**

1  commercially.
2  Q. And when you say, alarm systems, what type?
3  A. Burglar and fire alarm systems.
4  Q. And the fire alarm system, did it include any fire
5  suppression equipment?
6  A. Yes.
7  Q. What type did it include?
8  A. We installed fire detection systems and fire
9  suppression systems such as Halon systems.
10  Q. Such as what type?
11  A. Halon systems.
12  Q. Alon?
13  A. Halon, H-A-L-O-N.
14  Q. Oh, Halon. Was there a particular manufacturer
15  that that was done for?
16  A. I don't recall the manufacturer of the equipment.
17  Q. And what types of businesses were the Halon systems
18  installed in? Any particular field of business?
19  A. No. Not a particular field. For whatever customer
20  requested that.
21  Q. I mean, like retail sales establishments, anything
22  else? Just --
23  A. Whatever was -- whatever business was -- whatever
24  we were contracted to do. I don't recall off the top of my
25  head the name of a specific business. Seems to me that it's

17

1  too many years ago to remember those specifics.
2     Q. And besides burglar alarms, fire alarms, and Halon
3  suppression systems, were there any other types of fire
4  control devices that were installed by this corporation in
5  Austin, Texas?
6     A. No. Not that I can recall.
7     Q. For example, sprinkler -- water sprinkler systems?
8     A. No. We did no sprinkler water.
9     Q. Systems that used something besides the Halon gas?
10    A. I don't know. I don't know the answer to that.
11    Q. Now, is this lawsuit that we're presently talking
12 about today against American Economy the only lawsuit that
13 you have been involved in? I know you mentioned you were
14 deposed one other time but couldn't remember what it was
15 about. Are there any other lawsuits that you can think of?
16    A. Not that I can think of.
17    Q. And in 2003, did you actually live each month,
18 January through December, at the Marshburg residence, or did
19 you spend some part of the year at some other residence?
20    A. I may have spent some time here.
21    Q. In Florida?
22    A. But that was my legal address.
23    Q. And would you have recalled how many months you may
24 have spent here in Florida that year, the year of the fire?
25    A. No.

18

1     Q. If you would have spent time here in Florida the
2  year of the fire, can you give us an idea which of the months
3  would have been the most likely?
4     A. No. I'm sorry. I can't.
5     Q. And can you tell me, the Rainbow Inn business, in
6  2003, the year of the fire, would it have been shut down for
7  the entire year prior to, let's say, November of 2003?
8     A. No, it was not shut down for the entire year. We
9  were open for most of the year into the summer months as I
10 recall and closed it temporarily. And I believe that was the
11 time I would have joined my husband here.
12    Q. And so, if you closed it, would those have been the
13 summer months, to the best of your recollection?
14    A. Yes.
15    Q. We're talking about June, July, August, maybe
16 September?
17    A. Yes.
18    Q. And prior to closing, can you tell me what type of
19 restaurant or tavern was the Rainbow Inn?
20    A. Well, we're a local tavern except during certain
21 times of the year when we have many visitors from Cleveland
22 or Pittsburgh or Buffalo that come there for seasonal
23 activity. And other than that, it's a local tavern.
24    Q. Besides serving beer and hard liquor, did it also
25 serve food?

19

1     A. Yes, we sold food.
2     Q. What types of food did you sell in 2003, say,
3  before you shut down for the summertime?
4     A. We had scaled our menu back from a full dinner
5  menu. We served sandwiches, soups, as I recall.
6     Q. And that was in the whole of 2003 that you scaled
7  back?
8     A. I'm not sure about the whole of 2003.
9     Q. And the -- can you describe for me the Rainbow Inn
10 itself a little bit? I never had a chance to see the
11 facility, never been in it, and, of course, it's burnt down
12 now. So can you tell me like how many rooms it consisted of?
13 Generally, what was its configuration?
14    A. Well, we had a dining area which was on three
15 levels separate from the barroom. The barroom itself had
16 tables and, of course, the bar. There were two restrooms and
17 there was a kitchen.
18    Q. And was the building generally rectangular in
19 shape?
20    A. Yes.
21    Q. And could I assume that the front door would have
22 brought you into the dining area?
23    A. There were two entries to the building in front.
24 One into the dining area and one into the bar area.
25    Q. And would the dining area have been closest, let's

20

1  say, to the road?
2     A. They were both.
3     Q. They were both side by side sort of?
4     A. Uh-huh.
5     Q. Okay. I was assuming maybe they might have been
6  back to back, with the bar in the back.
7     A. No.
8     Q. But they were side by side. Okay. And roughly the
9  dimension of the dining area, can you give me an idea on
10 that?
11    A. No, I can't.
12    Q. How about the bar?
13    A. I can't. I'm not good with that.
14    Q. Okay. I understand. When you say, three levels,
15 what do you mean there? That's got me a little confused.
16 You had a street level, dining area --
17    A. Yes.
18    Q. Did it go upstairs to another level?
19    A. A few steps, maybe four steps another level, and
20 another four or whatever steps another level, and that was --
21 that level was on the same level as the barroom.
22    Q. Okay. So when you came in the door, if you just
23 wanted to go to the bar, you had to go up a couple flights of
24 steps?
25    A. Yes.

Case 1:04-cv-00348-MBC   Document 25-7   Filed 12/06/2006   Page 6 of 19

Walter Beck Corp. vs. Safeco Corp.   DO NOT COPY   Sharyn Beck 11/11/2006

**Page 21**

1  Q. And then how about the kitchen? Where is the
2  kitchen in reference to these -- the dining areas and the
3  bar?
4  A. It was in back of the bar.
5  Q. It was up on the raised level behind the bar?
6  A. Yes.
7  Q. What was under the kitchen? A dining room?
8  A. Storage.
9  Q. So would you call the bar -- if somebody asked you
10 what level it was on, would you say like the second level,
11 third level, the bar?
12 A. I would just say it was on the top level, the way I
13 would say it, along with the kitchen and the bathrooms on
14 that level.
15 Q. And the kitchen is on that level, too. Okay. And
16 in 2003, did you work in the kitchen?
17 A. Yes.
18 Q. And what did you do?
19 A. Whatever needed to be done.
20 Q. And did you work in the bar?
21 A. Yes.
22 Q. You served drinks, or did you just supervise?
23 A. Sometimes. Mostly supervised.
24 Q. And in 2003, did you work in the bar in December,
25 that month? The fire happened on the 5th. Would you have

**Page 22**

1  been working in the bar?
2  A. Yes.
3  Q. Was it open for business?
4  A. Yes, it was open.
5  Q. Would you have been working in the Rainbow Inn in
6  November of 2003?
7  A. At the end of the month, yes.
8  Q. End of the month?
9  A. Uh-huh. As I recall.
10 Q. And would sometime in the latter part of November
11 have been the first time that the Rainbow Inn opened for
12 business prior to being closed from the summer months?
13 A. We were open a couple of weeks before.
14 Q. Before?
15 A. The holidays. Before Thanksgiving.
16 Q. Before Thanksgiving?
17 A. Or a week before. Days before. I'm not sure.
18 Q. Okay. So --
19 A. We were open at that time of the year.
20 Q. It would have opened for business sometime in
21 November after its closing?
22 A. The latter part. After having been closed.
23 Q. Prior to November, it would have been closed?
24 A. That's correct.
25 Q. Okay. And when you -- were you involved in

**Page 23**

1  reopening it for business in November of 2003?
2  A. I don't understand specifically what you're asking
3  me.
4  Q. Well, it was shut down for a number of months in
5  2003.
6  A. Right.
7  Q. I was assuming that there might be some things that
8  you have to do when you are going to reopen a restaurant.
9  A. Right.
10 Q. And I just wondered if you were involved in doing
11 those things.
12 A. Yes, I was.
13 Q. And besides, say, placing orders for restocking,
14 would there have been anything to the physical facility in
15 the kitchen that you would have been involved in doing to get
16 it ready?
17 A. Well, sure. I would have been checking supplies
18 and that type of thing.
19 Q. Would you have been doing anything to any of the
20 appliances in the kitchen to get it ready for reopening in
21 November?
22 A. Not that I can recall.
23 Q. What type of cooking -- what were the major cooking
24 appliances that were in the kitchen in November, December of
25 2003?

**Page 24**

1  A. We had a commercial stove, cook stove.
2  Q. When you say, commercial stove, did that have a
3  grilling surface on the top?
4  A. Uh-huh.
5  Q. Yes?
6  A. Yes.
7  Q. And I take it a baking facility underneath?
8  A. Yes. Two ovens.
9  Q. Okay. Besides this -- and the dimensions of the
10 cooking stove and the grill, can you give us an idea? It was
11 so many feet by so many feet?
12 A. I can't give you exact dimensions. A standard
13 kitchen stove in a home is 30 inches. It was bigger than
14 that.
15 Q. And was it a particular brand, that you recall?
16 A. Yes. I think -- I think it was a Garland. I'm
17 not --
18 Q. Garland?
19 A. Unless I look at all of these things, which I can
20 dig through and look at it right now, but I believe it was a
21 Garland.
22 Q. Okay.
23 A. It was a beautiful stove. It was large.
24 Q. Besides the Garland commercial stove, what other
25 major cooking appliances were there?

Case 1:04-cv-00348-MBC    Document 25-7    Filed 12/06/2006    Page 7 of 19

Walter Beck Corp. vs. Safeco Corp.    DO NOT COPY    Sharyn Beck 11/11/2006

25

1   A. I can stop and collect these.
2   Q. Sure you can.
3   A. Then I won't be telling you inaccurate information.
4      MR. LORENZ: I see it on there. What she's doing
5   is referring to the -- here, why don't we just have him
6   just show you the inventory, because that's what you're
7   looking for.
8   Q. Is that what you're looking for?
9   A. Yes, I am. I don't have the best memory in the
10  world.
11  Q. I have a one, two, three, four, five -- I have a
12  six page document bearing Bates stamp numbers 0032 through
13  0037. And I've premarked it Defendant's Exhibit A. It's
14  entitled at the top, Rainbow Inn - Inventory. Will that help
15  you?
16  A. Thank you. It certainly will. Thank you.
17  Q. Do you recognize the document?
18  A. Yes, I do. And I'm looking here to see if I was
19  correct when I said Garland. I think I am. Yes, I am. It's
20  a Garland and it's 60 inches in length.
21  Q. And then besides the Garland is there anything else
22  you recognize as being a major cooking appliance?
23  A. Major cooking appliance, yes. We had --
24  Q. Deep fat fryer?
25  A. Yes, we had a fryer. I would not have been able to

26

1   tell you the name of it. I see it here. It is a Hobart. It
2   was a large fryer.
3   Q. Anything else?
4   A. Any of the equipment I've listed here, I would --
5   was present at the time. Freezers, refrigerators.
6   Cooking-wise, that's my two large items.
7   Q. Okay. And it says, Steam Hot Food Table, Gas.
8   A. Yes.
9   Q. Is that sort of like -- well, tell me, what is
10  that? Is that a hot line or something?
11  A. That's what holds hot foods hot after you've
12  prepared them.
13  Q. Okay. Got it. Okay. Does that sum up the major
14  appliances for cooking?
15  A. Yes, sir.
16  Q. Incidentally, the Exhibit A that you have in front
17  of you that's titled, Rainbow Inn - Inventory, who prepared
18  the document?
19  A. I did.
20  Q. And did you type it up?
21  A. I would say I did, yes.
22  Q. And did you type it up from some other form? Like
23  did you type it up from your handwriting or something that
24  anybody gave you? I just wondered who made the list, who
25  developed it.

27

1   A. I originally developed it. We had a list of
2   equipment that we knew we had put in there, and from memory I
3   could tell you what was in there.
4   Q. When you say you had a list of equipment, what is
5   it that you are thinking of?
6   A. That I wrote when I -- after the loss, I had a
7   list.
8   Q. You sat down with a pen and paper and wrote up a
9   list from memory?
10  A. Yes.
11  Q. And then you typed it up, and this is the typed up
12  version, I take it?
13  A. I typed it up to submit it. I'm not sure if this
14  is my actual typing. I couldn't tell you that.
15  Q. Assuming it's the one that you submitted, this
16  would have been -- Exhibit A would have been your typed up
17  list from memory?
18  A. That's correct.
19  Q. And how did you determine the pricing and
20  quantities? Was that also from memory, or did you use
21  something to refresh your memory?
22  A. No. I did use something to refresh my memory.
23  Some of the items, I'm sure, were from memory. But other
24  items would have been from a restaurant supply catalog book.
25  Q. Okay. And did you look through a restaurant supply

28

1   catalog to refresh your memory as to the cost of things or
2   the existence of the particular item in your Rainbow Inn?
3   A. I don't understand what you're asking me.
4   Q. Well, were you looking through the catalog to see
5   things that restaurants have?
6   A. No. If you follow the list down -- as I look at
7   this now, the whole thing makes me I ill. I could have
8   visualized walking in the door of the dining room and pretty
9   much tell you what was in that room. And that's why the
10  order is -- I'm assuming. It's been a long time since I did
11  that. The order's a little crazy. You've got a brass wall
12  decoration stuck in the middle of forks and spoons. But I
13  could walk that room, you know, and tell you what was in each
14  area. And that's pretty much why it looks the way it does.
15  Q. Okay. And then how about the quantities of the
16  items that are listed? Did you use anything to help you
17  determine that, or is that from memory?
18  A. That's also from memory.
19  Q. And how about the column that's entitled, Price
20  Each, or Ea., on Exhibit A? Was that something you used the
21  restaurant book for, or was that something that you
22  recollect?
23  A. Well, sometimes I remembered, because I had
24  purchased the items, and I recalled -- I mean, I'm -- I would
25  say -- I'm sure if you asked me what my blouse cost, I could

Case 1:04-cv-00348-MBC    Document 25-7    Filed 12/06/2006    Page 8 of 19

Walter Beck Corp. vs. Safeco Corp.        DO NOT COPY        Sharyn Beck 11/11/2006

**Page 29**

1  say $25. Some items I would recall, other items I wouldn't
2  recall and would use some means of remembering.
3  Q. And the price column that you have there, that
4  would be, for example, the price that you paid for it upon
5  purchase, to the best of your recollection?
6  A. Yes. I would assume.
7  Q. Were you the only person that worked out the
8  inventory?
9  A. Yes.
10 Q. While we're working on inventories, let me show you
11 Exhibits B and C, which are two more inventories.
12 A. Yes.
13 Q. Okay. Do you recognize those documents?
14 A. Yes, I do.
15 Q. Are they inventories that you prepared similar to
16 the fashion you just described for us about Exhibit A?
17 A. Yes.
18 Q. And did you use anything to -- for example, with
19 Inventory, Exhibit B, which consists of four pages that have
20 been Bates marked 003- -- well, I've got two of them here.
21 It consists of two pages and they're Bates marked 0038 and
22 0039. Exhibit B is entitled, Rainbow Inn Liquor Inventory.
23 How is it you determined the quantities of liquor?
24 A. How did I? I determined them because this is
25 usually what I would keep in order, in stock, and replace

**Page 30**

1  when a bottle was empty. For instance, I'll just pick one,
2  Old Grand Dad, I don't need more than one bottle. I mean, I
3  know what I would sell and what I wouldn't sell, and that's
4  what I would stock. You see the line that says, Canadian
5  Club, for instance. I have three listed because that is a
6  whiskey I would sell. Particularly at that time of the year
7  when we were in the midst of hunting season and I have people
8  that were -- more people in the restaurant than usual.
9  Q. Okay. Did you use any documents, invoices or
10 anything to make the Exhibit B Liquor Inventory list, or is
11 it from memory?
12 A. I used the Pennsylvania State Liquor Catalog.
13 Liquor pricing is controlled in Pennsylvania, so no matter
14 what catalog from where you pick it up, it's going to be the
15 same price. And I got that catalog from the local liquor
16 store.
17 Q. Okay. But as to quantities that are listed on
18 Exhibit B, the liquor inventory list, did you use any
19 invoices or anything to refresh your memory?
20 A. They were all destroyed. As I said, I used my own
21 judgment because this is what I would have kept in stock.
22 Q. Okay. Exhibit C, we've marked Exhibit C, and it's
23 entitled, Rainbow Inn Food and Beer Inventory. It has been
24 stamped pages 0040 and 0041.
25 A. Right.

**Page 31**

1  Q. Two pages. And this also is a list that you have
2  prepared of inventory of beer and food?
3  A. That's correct.
4  Q. And how did you determine -- was it from memory
5  again, the list of items of beer and food on the inventory?
6  A. That's correct.
7  Q. And quantities, was that by memory or by reference
8  to some documents?
9  A. I had no documents. It was from memory.
10 Q. And pricing, how did you determine that? Did you
11 get a catalog or was that by memory?
12 A. Yes. We ordered all of our -- well, not all of it.
13 Some of it, I -- some of these items I would pickup from a
14 local grocery store. So in order to get a price for
15 Coffeemate, I took a price off a grocery store shelf. Other
16 items, we ordered from a distributor and I would have had a
17 catalog with that kind of pricing in it. Many of these items
18 are grocery store items.
19 Q. I'm going to give you what I've premarked
20 Defendant's Exhibit D, E, F, G, and H, and ask you to take a
21 look at those. Do you recognize those exhibits?
22 A. Yes. This is our 2002 tax return.
23 Q. Okay. That's for the Walter Beck Corporation?
24 A. Correct.
25 Q. And does that consist of the -- well, Exhibit D,

**Page 32**

1  that would be the federal tax return?
2  A. Correct.
3  Q. Exhibit E would be the Pennsylvania?
4  A. Correct.
5  Q. And Exhibit F, what would that be?
6  A. That was a note from myself to Karen Perrigo who
7  prepared our returns.
8  Q. And how about G, what is Exhibit G?
9  A. I wrote down the -- apparently, I broke down the
10 income for her. Because we only pay sales tax on food
11 revenues.
12 Q. And what would be Exhibit H? It looks like a
13 handwritten document.
14 A. It is handwritten. It's my handwriting. Various
15 expenses that we had for that year to aid her in preparing
16 the document for me.
17 Q. And at the top of the list of Exhibit H, it has,
18 Beer.
19 A. Right.
20 Q. And it has $7,574.73. Is that -- what would that
21 indicate?
22 A. That would indicate the expense.
23 Q. Would that be the cost of beer purchased by the
24 Beck Corporation throughout the whole year 2002?
25 A. For that year, yes, I'm assuming so.

Case 1:04-cv-00348-MBC   Document 25-7   Filed 12/06/2006   Page 9 of 19

Walter Beck Corp. vs. Safeco Corp.   DO NOT COPY   Sharyn Beck 11/11/2006

33

1    Q. Same with liquor and food?
2    A. Yes.
3    Q. Okay. Let me show you some additional tax
4  documents and just have you identify them. This group, I
5  believe, is 2001. And can you go ahead and take a look at
6  those? And I have another group for 2000. Take your time.
7  Just look through them, see if you recognize them.
8    A. These are tax returns which Karen Perrigo prepared
9  for us.
10   Q. Okay. Now, in 2001, Exhibit I, would that also be
11 the 2001 corporate tax return?
12   A. Yes.
13   Q. And Exhibit J the state tax return?
14   A. Yes.
15   Q. And Exhibit K, would that be a list that you
16 prepared for your accountant?
17   A. That's correct, yes.
18   Q. And Exhibit L, is that the equivalent of your
19 handwritten expense list that you had for 2002 but this one
20 happens to be typed up?
21   A. Yes.
22   Q. And then if you go to 2000. Okay. The financial
23 documents we have for 2000 that have been marked as exhibits
24 were Exhibits M, N, O, P, and Q. Is Exhibit M the Walter
25 Beck Corporation tax return, federal tax return?

34

1    A. Yes.
2    Q. And Exhibit N, is that a correct copy of the Walter
3  Beck state tax return?
4    A. Yes.
5    Q. And Exhibit O, can you tell us what that is? It's
6  in handwriting.
7    A. That's information Karen requested in order to
8  complete the tax return which I gave to her.
9    Q. Okay. And Exhibit P, is that, again, a handwritten
10 expense list for the year 2000 similar to the 2002 expense
11 list?
12   A. Yes.
13   Q. And then Exhibit Q, is that another breakdown of
14 that beer, food, liquor sales?
15   A. Yes.
16   Q. For 2000?
17   A. Correct.
18   Q. And are those documents that you have looked at for
19 2002, 2001 and 2000, are they correct copies to the best of
20 your knowledge of the documents that were filed or kept on
21 record?
22   A. Yes.
23   Q. Okay. And were all of the handwritten documents in
24 those set of exhibits for those three years 2002, 2001, 2000,
25 your handwritten documents?

35

1    A. They appear to be.
2    Q. And when in 2003 -- the Rainbow Inn was closed from
3  sometime in the spring, beginning of summer until November of
4  2003, correct?
5    A. Yes.
6    Q. And were any -- was there any purchases made in
7  November of 2003 with regard to liquor or beer that you can
8  recollect?
9    A. Yes, we purchased both.
10   Q. Okay. And when you would make a purchase after
11 being closed, can you give us an idea of like the dollar
12 amount that you would buy in terms of liquor, say, for
13 November, 2003?
14   A. No, I don't think I can give you a dollar amount
15 that --
16   Q. Or a range?
17   A. Obviously, we restocked items that we were out of,
18 although liquor doesn't go bad, so bottles that were there
19 were there.
20   Q. They get better, I guess, huh?
21   A. Some.
22   Q. But do you have any idea what you might have? You
23 know, like a range? I know you don't have any document in
24 front of you at this time that you could specifically
25 pinpoint $10.11, but do you have any sort of --

36

1    A. No, I don't. I don't know.
2    Q. How about with beer? Same question. Do you have
3  an idea of what purchases of beer were made in November of
4  2003?
5    A. Dollar-wise, no, I do not.
6    Q. Quantity-wise?
7    A. Well, it seemed like a lot. I don't know. Again,
8  beer, bottled beer, does not go bad in ninety days, so
9  whatever was there was able to be used. What wasn't there
10 had to be replaced.
11   Q. When you sold beer, was it by the bottle or was it
12 by the glass? Did you have draft beer or just bottled beer?
13   A. We had draft beer, yes.
14   Q. Did you have draft and bottle?
15   A. Yes.
16   Q. And to prepare the liquor lists of inventory that
17 you submitted to the insurance company and to prepare the
18 items of food and beer that were lost, did you make reference
19 to any documents or invoices or anything to try to refresh
20 your memory?
21   A. I didn't have any documents or invoices. All I had
22 was what I could remember in normal practices over time.
23   Q. But in the area of the Rainbow Inn, were there
24 certain suppliers of beer that you would use? I'm assuming
25 there's like only one or two suppliers.

Case 1:04-cv-00348-MBC    Document 25-7    Filed 12/06/2006    Page 10 of 19

Walter Beck Corp. vs. Safeco Corp.    DO NOT COPY    Sharyn Beck 11/11/2006

Page 37

1  A. Distributors.
2  Q. Distributors?
3  A. Yes. There's distributors that we used.
4  Q. Who would you have used to get your beer from in
5  2003? I assume you had an ongoing relationship with some
6  distributor.
7  A. Yes. But the -- I cannot sit here and think of the
8  correct name of the distributor that handled all of the
9  Budweiser and Michelob and that product line because it had
10 changed and that's knowledge that we could find if we had to
11 have that answer.
12 Q. Okay.
13 A. But it had changed. It used to be Bradford City
14 Beers for years. Then it became something else. But we were
15 free to walk into any distributor with a liquor license and
16 buy at a license price.
17 Q. I understand that. But before you prepared your
18 inventory that you submitted to your insurance company, did
19 you contact Bradford or any distributor? I know you don't
20 remember the name now, but did you contact any distributor
21 where you routinely purchased your beer and said, hey,
22 distributor, you know, can you pull invoices for me?
23 A. I don't recall whether I did or not.
24 Q. And how about the liquor? Does a tavern get liquor
25 from a distributing arm of the --

Page 38

1  A. No, no.
2  Q. Or you just get it from --
3  A. You may only buy it from the state store.
4  Q. And does -- for businesses for commercial
5  establishments, does the state store have a commercial arm as
6  opposed to its retail store that you would use?
7  A. Not in McKean County. I can't speak for outside of
8  that.
9  Q. And before you made up the liquor inventory list,
10 did you contact the local state store, PLCB, and ask them if
11 they had records they could access for you?
12 A. No, I don't believe I did. I went in and asked
13 them for a book, their pricing book.
14 Q. And in 2003, did the Beck Corporation maintain a
15 banking account, a check banking account, to write out checks
16 for expenses?
17 A. Yes, it did.
18 Q. And what bank would that have been?
19 A. National City.
20 Q. Was it always National City that the Beck
21 Corporation used over the years?
22 A. Yes.
23 Q. And before you made your inventories with regard to
24 the items of loss that you submitted to the insurance
25 company, did you contact the National City Bank and say, hey,

Page 39

1  can you pull records out, cancelled checks, or --
2  A. No, I did not. I kept a very small amount of money
3  in that bank account as a rule and usually paid cash for
4  purchases. So I -- there would have been no value to asking
5  them.
6  Q. You usually paid cash when you purchased an order
7  of beer from a distributor?
8  A. Lots of times I paid cash.
9  Q. Same with going to the state store?
10 A. Yes.
11 Q. Same with buying food from food suppliers?
12 A. Did both. If I was the one who was actually
13 physically going to a grocery store and buying the food, yes,
14 I paid cash, kept my receipts.
15 Q. Okay. But -- Okay. Let me ask you this. We
16 received some documents from your counsel, and I'm labelling
17 them Defendant's Exhibits R and S. Can you take a look at
18 those?
19     MR. MCDYER: And, incidentally, I have a spare
20     copy. I'll give you a whole set and you can take those
21     with you, Joshua.
22 A. Yes.
23 Q. Okay. Do you recognize exhibit -- let's say,
24 Exhibit R?
25 A. Yes.

Page 40

1  Q. What is it? Can you tell us?
2  A. It is an agreement between Harold and Sharyn Beck
3  to rent that property to the Walter Beck Corporation to
4  operate the Rainbow Inn.
5  Q. And is it -- what's the period of time of the
6  rental lease of Exhibit R?
7  A. Well, this one reads January, '99 through December,
8  '04.
9  Q. And how about Exhibit S? Is that also a rental
10 lease between Sharyn Beck --
11 A. '94 to '99. June, '94 to December, '99.
12 Q. And do those appear to be correct copies of the
13 lease agreements?
14 A. Yes. Yes.
15 Q. And in 2004, were there any -- or 2003, were there
16 any shareholders for the Walter Beck Corporation? I know you
17 were the president you said.
18 A. I was the shareholder. I owned the shares.
19 Q. A hundred percent?
20 A. Yes.
21 Q. And had you always been a hundred percent
22 shareholder of the Walter Beck Corporation from the time it
23 was established until the time of the fire in December 5,
24 2003?
25 A. As far as I recall.

41

1  Q. Is there any reason why you were the sole
2  shareholder of the business?
3  A. That's just the way I had it.
4  Q. Did you happen to put some of your personal money
5  into it more so than your husband or anything like that?
6  A. No.
7  Q. Who owned the business prior to you? Or not prior
8  to you, but prior to the Beck Corporation. Well, I guess --
9  yeah, prior to you. You owned the land and the buildings?
10 A. The Heasleys is the family name.
11 Q. When you purchased the property in 1989, '90 from
12 the Beasleys --what was it?
13 A. Heasleys.
14 Q. Easleys? Starts with an E?
15 A. No H. H-E-A.
16 Q. H-E-A. Okay. When you purchased it, what was the
17 property set up for?
18 A. It was set up for a restaurant and tavern and
19 pretty much a defunct motel.
20 Q. And then was it operated as a
21 motel/tavern/restaurant after you purchased it?
22 A. Did they operate it that way? I assume so.
23 Q. How about you?
24 A. No. I never operated as a motel.
25 Q. No. And when you bought it in 1989, '90, was there

42

1  a fire?
2  A. Yes, there sure was.
3  Q. What happened?
4  A. We lost the entire building that was closest to the
5  street, the building that housed the original restaurant and
6  tavern.
7  Q. How about the motel? Did that burn, too?
8  A. No.
9  Q. Was the motel still on the land in 2003?
10 A. Yes.
11 Q. Is the motel still there today?
12 A. No. That is the building that we lost in 2003.
13 Q. Okay. So what happened was -- and just to try to
14 speed things up, after the 1989 or '90 fire that destroyed
15 the restaurant and tavern that the Heasleys' building
16 operated out of, the motel section that was used to rent
17 rooms was remodeled into the Rainbow Inn?
18 A. That's correct.
19 Q. Okay. Have you owned any other property besides
20 this property in McKean County where a fire broke out and you
21 had a fire loss?
22 A. No.
23 Q. And who did the remodeling? Did you have a
24 contractor come in in 1990 or something to remodel the motel
25 rooms into a restaurant and tavern?

43

1  A. Yes, we did.
2  Q. Who would that have been?
3  A. I can see faces, but I can't --I can't think of the
4  names right now. But, yes, we did.
5  Q. Is it a general contractor?
6  A. Yes.
7  Q. He operated in the McKean County area?
8  A. Yes.
9  Q. Did the general contractor put the kitchen into the
10 remodeling of the buildings that became the Rainbow Inn?
11 A. Those specific questions, I would have a difficult
12 time answering because after that loss I went to work at the
13 hospital and we had no income. So I was not there everyday
14 watching that development.
15 Q. Do you know if Beck Corporation consulted with
16 anybody with regard to setting up the kitchen in 1990 after
17 the initial fire occurred? Like did you have anybody, a
18 restaurant planner, consult with the Beck Corporation and
19 say, well, look here, we'll make the dining area over here,
20 we'll put the bar area here, we'll put a kitchen here, and
21 what you ought to have is a Garland stove and a deep fryer
22 and this and that?
23 A. I don't recall a specific name, no.
24 Q. Well, you don't recall a name, but do you think
25 that there was somebody you consulted?

44

1  A. I'm sure that we must have had input and help,
2  although anyone with any common sense knows you need a stove
3  and you need a sink and you need a work table and you need a
4  refrigerator, so --
5  Q. And after the remodeling that established the
6  Rainbow Inn, what year did it become operational?
7  A. That same year. We were very fortunate in that we
8  were able to be reopened quickly.
9  Q. So about 1990 or 1991?
10 A. Whatever year you choose.
11 Q. And from 1990 or '91 until December 5, 2003, was
12 the kitchen changed, remodeled?
13 A. No.
14 Q. Were there systems changed in the kitchen -- well,
15 tell me this. In 1990 and '91, you went -- you were working
16 at the hospital. Did you also work concurrently at the
17 hospital and at the Rainbow Inn?
18 A. No. I didn't specifically work hours at the
19 Rainbow Inn. I did most of the book work. I oversaw buying,
20 picked up products, brought it back to the place. I was in
21 and out. I would be there on the weekends helping the girls.
22 Q. And in 1990 or '91, do you recall the kitchen
23 having any type of fire suppression system in it?
24 A. Yes, we had a system in place.
25 Q. Can you describe it for me?

Case 1:04-cv-00348-MBC   Document 25-7   Filed 12/06/2006   Page 12 of 19

Walter Beck Corp. vs. Safeco Corp.                DO NOT COPY                Sharyn Beck 11/11/2006

### Page 45

1  A. From my nonprofessional point of view, yes, I can
2  describe it to you. There was a hood, there were nozzels.
3  It was a Halon system. There were detectors that would
4  detect a change in the kitchen.
5  Q. Heat sensors you mean?
6  A. Right. And then that would be -- that would --
7  Halon would be released and extinguish the fire.
8  Q. And you mentioned a hood. When you say, hood, do
9  you mean like there was a hood over the Garland commercial
10 stove?
11 A. Right. There was a stainless steel --
12 Q. And I have a hood in my kitchen over a stove and it
13 has a fan in it to pull off exhaust and a light. Is that
14 what we're talking about, something like that?
15 A. Right.
16 Q. Okay. And is the hood connected to the
17 extinguishing system?
18 A. I don't -- I don't -- obviously, it all has to be
19 connected somehow. I'm sure it must be connected.
20 Q. Okay. And were there any canisters that you
21 noticed that contained anything like Halon fluid in the
22 kitchen?
23 A. In the kitchen, no, other than the handheld
24 wall-mounted fire extinguisher which we kept on hand there
25 and in the dining room and in the bar.

### Page 46

1  Q. And at the hood area over the Garland stove, were
2  there any nozzels?
3  A. Yes.
4  Q. How many?
5  A. Two. I'd say two.
6  Q. Besides the two nozzels at the hood area, were
7  there nozzels anywhere else in the kitchen? And I'm talking
8  between 1991 to 2005 -- or 2003.
9  A. I don't think so. I think that was the two.
10 Q. And from 1990 or '91 to 2003 when this fire
11 occurred that we're here about today, do you recall any
12 changes made to the system you just described for us in terms
13 of nozzels, or the hood, or the --
14 A. No. That part of it I don't believe is -- to my
15 knowledge, I don't -- I don't know. It might have been
16 updated or whatever, but the general idea was -- remained the
17 same.
18 Q. And to your knowledge did the Beck Corporation have
19 any contractor that it hired to come in to clean the hood and
20 the kitchen area?
21 A. My brother-in-law has a business in Ohio. He came
22 often and --
23 Q. Would he clean it or inspect it?
24 MR. LORENZ: He's talking about the cleaning. Just
25 cleaning.

### Page 47

1  You are just talking about the cleaning of the
2  hood, right?
3  MR. MCDYER: Right.
4  A. Of the hood?
5  Q. Yeah. Ventilating system. Was the ventilating
6  system serviced? Aside from your brother-in-law coming to
7  the restaurant occasionally and checking the system over, did
8  you have any contractor come in four times a year, on a
9  quarterly basis, to service the ventilating system, the
10 exhaust ducts, hood over cooking appliances, cleaning the
11 hood over the cooking appliances?
12 A. He always did those things when he came and cleaned
13 those things. I also had women that I hired to clean. I
14 mean, it's not -- it's not like you are cleaning a 30-inch
15 hood over your own stove. You've got to get up there and
16 clean with degreasers. And that's something you do all the
17 time, so -- and I had several cleaning ladies contracted over
18 a period of time that would have cleaned other items as far
19 as the literal cleaning of the type of equipment that you are
20 talking about. I'm not sure I'm answering you correctly.
21 Q. You also said these ladies, besides cleaning the
22 kitchen equipment that we're talking about, they also did
23 other cleaning in the restaurant. Is that what you're
24 saying?
25 A. No. Mostly I really honestly hired them to clean.

### Page 48

1  Q. The kitchen?
2  A. The kitchen.
3  Q. And do you remember a name for us in, say, 2003?
4  A. Well, I had one woman that cleaned. Her first name
5  is Katy.
6  Q. With a K?
7  A. Yes. Actually, her name was Cocaine Katy, but I
8  don't think that's going to help us too much.
9  Q. I just mentioned that because I recently saw a Katy
10 with a C?
11 A. I'm sure it was a K.
12 Q. Did she live in the area?
13 A. Yes. Yes, she did.
14 Q. And in November of 2003, this is the month
15 immediately before the fire, was your brother-in-law visiting
16 you that month?
17 A. Yes. He came up with his family.
18 Q. Did your brother-in-law go to the Rainbow Inn that
19 month?
20 A. He certainly did.
21 Q. Did you accompany him or did he go by himself?
22 A. I may have walked over with him. I don't -- I
23 don't -- I probably walked over with him, unlocked the place.
24 I wanted him to do -- I wanted him to check the burglar alarm
25 system, make sure that was all in working order.

Case 1:04-cv-00348-MBC   Document 25-7   Filed 12/06/2006   Page 13 of 19

Walter Beck Corp. vs. Safeco Corp.   DO NOT COPY   Sharyn Beck 11/11/2006

49

1  Q. In November of 2003, did you actually spend time
2  observing your brother-in-law doing whatever it was he did or
3  did you unlock it and say, here you go, Robert, thanks, I'm
4  going to go back over and take care of Harold, you know, or
5  something like that?
6  A. I don't really recall. I know that we went over, I
7  asked him specifically to do those things, clean that, check
8  that, check my burglar alarm. I may have stayed. I may not
9  have stayed. I don't really literally recall.
10  Q. In the past, other than November of 2003, did you
11  have an opportunity to observe your brother-in-law Robert
12  Beck do testing or inspection of the kitchen suppression
13  system?
14  A. Yes. I knew he would be there and I would watch
15  him do whatever he was doing, but --
16  Q. Do you recollect what you have seen him do?
17  A. I recollect that he was there, that he would walk
18  up, look at something, do whatever he was doing. I don't
19  specifically know what he did other than he cleaned it and he
20  maintained it for me and told me everything was in good
21  working order.
22  Q. Did he have any tools with him when he would do
23  this?
24  A. Oh, sure. I think he did.
25  Q. And did you ever see the system activated in any

50

1  way?
2  A. Myself, no. I assume by, activated, you mean did I
3  see all of it --
4  Q. Yeah.
5  A. -- drop out of the canisters? No.
6  Q. Even during testing, did you ever see it like
7  activated to any extent?
8  A. No.
9  Q. Did the system ever have to be activated between
10  the time you say it was installed in 1990, '91 up until --
11  A. No.
12  Q. -- the time of the fire in 2003?
13  A. No.
14  Q. Not to your knowledge?
15  A. No.
16  Q. Now, did you put the Rainbow Inn and the real
17  estate up for sale in 1993?
18  A. No. I got it into my head I wanted maybe to sell
19  the house, and I played around with that idea, but we pulled
20  it off the market.
21  Q. You put the house up for sale?
22  A. Yes.
23  Q. And when did you put it up for sale and how long
24  was the house up for sale?
25  A. Well, how long was it up for sale?

51

1  Q. Like for example, was it up for sale the entire
2  2003 year, or did you put it up for sale in January?
3  A. No. Probably from spring until the end of the
4  summer or something. I'm not even sure. I know it was only
5  shown twice, and I didn't have much -- I think if somebody
6  would have just offered me a million bucks, I would have
7  said, sure, I'll take it.
8  Q. I think I would have sold mine for that, too.
9  A. Yeah. And move into a little place that wasn't
10  nearly so big and so much work. But I can -- I wasn't very
11  serious about it, but you never know, you know, if somebody
12  would have offered me a better price.
13  Q. What were you thinking about doing if you sold it?
14  A. Well, there was a darling place right on our road
15  which eventually did sell finally that had two bedrooms and
16  was small and cute. A lot more manageable than the big house
17  that we had.
18  Q. And how about the Rainbow Inn, did you put that up
19  for sale either formally through a broker or informally?
20  A. No. We never -- of course, in that business and in
21  such a small area, everybody always thinks every bar is for
22  sale. And, no, I never put it on the market with a broker.
23  Q. Did anybody inquire in 2003 about buying the Inn?
24  A. Not that I can recall. I think three or four years
25  before that someone showed up and said so and so had sent

52

1  them over to look at the property, and, you know, we sort of
2  laughed. I mean, it wasn't unusual for somebody to say. Not
3  at all unusual. I'm sure if you would go there today, you'd
4  find the same thing.
5  Q. But you are saying there were no efforts made
6  either through a brother or yourself informally to market the
7  Rainbow Inn for sale in 2003?
8  A. Not that I can recall in any serious fashion. We
9  certainly never placed it with a broker. People come along
10  and make a lot of noises and then disappear.
11  Q. At the time of the fire, was the Rainbow Inn and
12  the real estate paid for or was it still under financing?
13  A. There was a small mortgage left on it.
14  Q. When you say, small, two, three, four, five
15  thousand?
16  A. No. It was more than that.
17  Q. Who was that with?
18  A. It was with National City.
19  Q. And was that paid off at the time of the fire or
20  after the fire?
21  A. Certainly was paid off, much to my embarrassment.
22  Safeco paid it within days of the fire. As I walked in and
23  prepared to make my monthly payment at the end of the month,
24  i handed them a check, and they clicked away and said, Mrs.
25  Beck, that has been paid in full. And I was very embarrassed

Page 53

1  by that since I had no knowledge that it had been paid.
2  Q. Well, since you bring up insurance companies, did
3  you have contact yourself or on behalf of the Walter Beck
4  Corporation as its officer with any employee or
5  representative of American Economy or any of the other
6  insurance companies that suit has been filed against,
7  American States, Safeco Insurance, from the time of the fire
8  in December 5, 2003 until today?
9  A. Not a face-to-face, no. I had no --
10 Q. Any telephone contact?
11 A. Not that I remember.
12 Q. Any communications directed to you?
13 A. No.
14 Q. By mail?
15 A. No.
16 Q. Did you direct any communications by telephone or
17 mail yourself either in your individual capacity or as an
18 officer of the Beck Corporation to one of the defendant
19 insurance companies, any of the defendant insurance
20 companies, from the time of the fire in December of 2003
21 until today?
22 A. I don't recall that I did. I may have, but I don't
23 remember.
24 Q. And as best you recall, whatever the system that
25 was in the kitchen for fire suppression was installed when

Page 54

1  the Rainbow Inn was originally remodeled and set up in 1990
2  approximately?
3  A. That's correct.
4  Q. And it was not changed from then until the time of
5  the fire except possibly for some updates?
6  A. I think that there were some updates made and other
7  expenditures, but the general idea of the whole thing, no, it
8  didn't change.
9  Q. And do you know who installed the Halon system in
10 the kitchen of the Rainbow Inn in 1990 or '91?
11 A. Yes. My husband installed it. His brother, R.J.
12 Beck, Robert Beck, would have probably been involved in
13 helping him.
14 Q. When you say, probably, is that just something you
15 are assuming?
16 A. I worked everyday. I was off that premises
17 everyday. Things that happened in those eight hours that I
18 was gone, I'm not sure.
19 Q. How about if there were any updates added to the
20 Halon system, would they have been updated by your husband?
21 A. They may have been.
22 Q. And do you recall any manufacturer's name, thinking
23 back to the kitchen, bringing the kitchen up in your mind and
24 looking around?
25 A. Like the Garland stove and --

Page 55

1  Q. Yeah. You can see Garland on the stove or Viking
2  on the stove. Can you recall any manufacturer's name on any
3  part of the system that you observed, the Halon system?
4  A. No. I -- I can see Busionics, but I think that
5  that was the --
6  Q. Burglar alarm?
7  A. That was the burglar alarm.
8  Q. And do you know whether or not there were any
9  manufacturer or owner's booklets or other information from a
10 manufacturer of the Halon system? Did you ever see such
11 documents any time during the 10 year period, or actually 13
12 year period?
13 A. Ask me the question again. I'm sorry.
14 Q. In that 13 years that you said the system was out
15 at the kitchen, did you ever recall seeing any documents from
16 a manufacturer of that particular Halon system, if there was
17 a manufacturer of that particular system, like an owner's
18 booklet or some other papers?
19 A. I don't specifically recall that booklet. We tried
20 to keep all of that kind of booklet in a place in the tavern,
21 whether it was whatever equipment. There was a box of
22 booklets, but I don't recall if that one specifically was in
23 there or not. So from a riding lawn mower to a weedeater to
24 a -- to whatever, there was a place that those were all kept.
25 It could have been in there. I myself wouldn't have had any

Page 56

1  reason to look at that, but I do recall we kept installation
2  manuals, owner's manuals, from blenders to fryers to
3  whatever.
4  Q. Specifically as to the Halon system, you don't have
5  a specific recollection of having any written documents?
6  A. No, I don't.
7  Q. Just if they did happen to exist they would have
8  been in that area?
9  A. I would assume that they would all be together in
10 one place.
11 Q. In 2003, you mentioned that you, after shutting the
12 Rainbow Inn down in the spring or beginning of summer, left
13 Pennsylvania, and I presume came to Florida for awhile.
14 A. I was here and I was back up home for awhile. I
15 was both places.
16 Q. In that year, what months did Mr. Beck spend in
17 Florida as opposed to your residence in Pennsylvania?
18 A. I knew you were going to ask me that. I don't
19 know. I mean, we were back and forth. He was back and
20 forth.
21 Q. Okay. Well, why did -- well, when the Rainbow Inn
22 was reopened in November, was Mr. Beck back in Pennsylvania
23 with you?
24 A. Yes. Yes. And I was, too.
25 Q. Why did both of you -- was there any reason you had

Case 1:04-cv-00348-MBC    Document 25-7    Filed 12/06/2006    Page 15 of 19

Walter Beck Corp. vs. Safeco Corp.          DO NOT COPY                    Sharyn Beck 11/11/2006

57

1  left the Florida area at that time, the fall, beginning of
2  winter, and went to Pennsylvania?
3      A.  Well, I wanted to be home.
4      Q.  Just the heat, or --
5      A.  I missed my family. We -- he was doing a radio
6  show. We came to Washington, D.C. with that show. That was
7  before the election. Before that was the presidential
8  election. Came there, did a -- he purchased remote equipment
9  so that we could do -- he could do -- not we. He could do
10 that show wherever he was. And he set it up so he could do
11 it out of the house on Spring Drive. So we reopened with the
12 idea that that's where we were going to stay and he would do
13 his radio show. Of course, then George Bush won, so the
14 demand for a liberal talk show radio host sort of waned.
15     Q.  In the complaint that was filed on behalf of the
16 Beck Corporation, there was an allegation, I think, at
17 paragraph 16 that said that at all material times and at the
18 time of the fire a UL listed automatic fire suppression
19 system was installed and operational at the Rainbow Inn for
20 protection of cooking and ventilating equipment. On the day
21 of the fire, do you recall -- the day before the fire, do you
22 recall being in the kitchen?
23     A.  Yes. I'm sure I was in the kitchen.
24     Q.  And on the day before the fire, do you recall
25 observing a -- the nozzles or any part of the fire

58

1  suppression system in the kitchen the day before the fire?
2      A.  Yes.
3      Q.  And in terms of whether or not the system was a UL
4  listed system, Underwriters Laboratory listed system, do you
5  have any personal knowledge or knowledge on behalf of the
6  Beck Corporation --
7      A.  That it was what?
8      Q.  Listed with Underwriters Laboratory. Would you
9  know personally whether it was or was not?
10     A.  First of all, I didn't even know you could purchase
11 any fire suppression equipment that is not UL listed. So
12 that would be my answer.
13     Q.  But do you know whether this one was specifically
14 listed or not?
15     A.  Yes, it was UL listed.
16     Q.  How do you know that?
17     A.  How do I know that? Because there's a UL symbol
18 that's on things, you know.
19     Q.  Did you see a UL symbol that you recollect on this
20 system? You told me you couldn't remember seeing any
21 manufacturer's names. Do you remember seeing --
22     A.  It's a decal.
23     Q.  -- a UL decal on any component of this system?
24     A.  On any component? Yes. The little heat detectors
25 say UL.

59

1      Q.  Do you remember seeing a UL sticker on --
2      A.  No. No. I don't remember.
3      Q.  Okay.
4      A.  But, again, I will state for the record you cannot
5  buy equipment and install it that is not UL listed.
6      Q.  Okay. That's your belief?
7      A.  That's my belief.
8      Q.  Okay. In terms of actually seeing any part of this
9  system identified with the UL sticker, you don't have a
10 current recollection of that?
11     A.  No, I don't. But you -- I will reiterate. You
12 cannot buy and install that kind of equipment without a UL
13 listing. I know that because I operated a burglar and fire
14 alarm company.
15     Q.  Now, did the Beck Corporation file a tax return for
16 2003?
17     A.  Yes, I think I filed one. I think I -- I think I
18 filed one, yes.
19     Q.  And did you use the same accountant that you used
20 for the 2002?
21     A.  I would have used Karen.
22     Q.  And is the Walter Beck Corporation still in
23 existence today?
24     A.  No.
25     Q.  What happened to it?

60

1      A.  I formally closed it and declared it no longer in
2  existence with the State of Pennsylvania.
3      Q.  When did you do that?
4      A.  Within the last year.
5      Q.  Okay. And so you filed papers with the State of
6  Pennsylvania?
7      A.  Yes.
8      Q.  In Harrisburg?
9      A.  Yes. Yes. I have no more returns to make to them.
10     Q.  And that was done -- this is 2006. It was done
11 sometime in 2005?
12     A.  No. I believe -- living here, you have no idea
13 what time of the year it is, so I believe it was done this
14 year, within 2006.
15     Q.  Okay. Sometime this year?
16     A.  I believe so.
17     Q.  Who did that for you?
18     A.  I did it myself.
19     Q.  Did it yourself. And am I correct that the tax
20 returns that you went through that were exhibits that we'll
21 have attached to your deposition for 2000, 2001, and 2002,
22 none of those years show a profit for the Beck Corporation;
23 is that right?
24     A.  That's correct.
25     Q.  And the Beck Corporation, did it use employees in

Case 1:04-cv-00348-MBC   Document 25-7   Filed 12/06/2006   Page 16 of 19

Walter Beck Corp. vs. Safeco Corp.          DO NOT COPY                    Sharyn Beck  11/11/2006

### Page 61

1  November or December of 2003, besides yourself or your
2  husband helping?
3     A. Besides myself, yes, we had several young girls
4  that bartended for me.
5     Q. What did they do?
6     A. Bartended.
7     Q. Bartenders. Do you remember their names? I'm just
8  talking about 2003, November, December.
9     A. Okay. Well, one was Amy. I don't remember her
10 last name. And if -- can I have my sheets of paper back?
11 No, I can't. Okay. I'm not good with these names. So
12 more than likely Andrea.
13    Q. Andrea?
14    A. Andrea. Adrian Brodis, but that's not her married
15 name. Adrian. Young girls.
16    Q. Brodis, B-R-O-D-I-S?
17    A. B-R-O-D-I-S. But that's her maiden name, not her
18 married name.
19    Q. Now, I have Exhibit X, which is your amended notice
20 of deposition, and it asked that some things be brought to
21 the deposition today. I'll just show this to you and ask if
22 you've seen it before.
23    A. Okay.
24    Q. Let's go through the list here. Exhibit X is your
25 deposition notice, correct?

### Page 62

1     A. Right.
2     Q. Okay. Attached to it requested that you bring any
3  lease of the Rainbow Inn for the premises covering the period
4  2005 -- or covering period December 5, 2003. And you brought
5  with you -- or at least we have two leases.
6     A. Yes.
7     Q. And one of those did cover that period; is that
8  correct?
9     A. That's correct.
10       MR. LORENZ: Dan, we'll stipulate on the record
11    that any documents that you have requested in there
12    which was in the corporation's possession, custody and
13    control have already been turned over to you prior to
14    this deposition.
15       MR. MCDYER: Okay. Well, how about 2003 income tax
16    returns or profit and loss statements? There were no
17    2003 records. Do we have access to those?
18       MR. LORENZ: Once again, anything that they have,
19    we've turned over. If you recall, they did not even
20    have the tax returns that you do have in their
21    possession. Those were actually burned in the fire
22    along with most of the other documents. Those
23    documents, if you will recall, were actually obtained
24    via subpoena through Karen Perrigo.
25       MR. MCDYER: Right.

### Page 63

1        MR. LORENZ: So to the extent that Karen Perrigo
2     prepared the return, she either does not have it or did
3     not prepare the return. But we've given you everything
4     we have.
5     Q. Okay. So the request for invoices to support the
6  existence of the fire suppression system, invoices in terms
7  of purchasing --
8     A. I don't have an invoice to support anything.
9     Q. And that system, was it purchased from somebody?
10    A. The components?
11    Q. Yes.
12    A. Yeah. That would have been purchased from R.J.
13 Beck Protective Systems.
14    Q. Your brother-in-law?
15    A. That's correct.
16    Q. Was he paid for it, or was it a --
17    A. Oh, yes, he was paid for it.
18    Q. Jeffery Beck?
19    A. Uh-huh.
20    Q. Is he a relative of yours?
21    A. Yes. He's my stepson.
22    Q. And did he work at the Rainbow Inn in 2003?
23    A. I'm sure he probably did. He's always helped us.
24    Q. But, say, specifically November, December?
25    A. Yes.

### Page 64

1     Q. What would he have done?
2     A. Done anything that we needed done, whether it was
3  mopping up or bartending or cooking.
4     Q. And Tanya Aella (ph.)?
5     A. Uh-huh.
6     Q. Does that name sound like someone that worked for
7  Rainbow Inn periodically?
8     A. Yes.
9     Q. Now, let's just limit it to November, December of
10 2003. Did she work in that few weeks period?
11    A. Yes. I would say, yes.
12    Q. What did she do?
13    A. She bartended.
14    Q. And how about Jeremy Holt?
15    A. Yes. Same.
16    Q. Is he a bartender?
17    A. Uh-huh. He would have just generally helped. He
18 would have bartended, helped cook, bartend. All of those
19 young people, the same.
20    Q. And Kimberly Holt?
21    A. The same.
22    Q. John Gates?
23    A. Yes.
24    Q. And Eilene Smith?
25    A. Yes.

Case 1:04-cv-00348-MBC   Document 25-7   Filed 12/06/2006   Page 17 of 19

Walter Beck Corp. vs. Safeco Corp.   DO NOT COPY   Sharyn Beck 11/11/2006

### Page 65

Q. And Andrea Prince, is that who you were trying to remember?
A. Yes.
Q. They were all bartenders or did odd jobs?
A. Yes.
Q. Did all of them do some type of work in that very short period of the opening of the Rainbow Inn in November of 2003 to the time of the fire?
A. They probably all were there at one time or another helping out. Nobody -- no -- not one name sticks out other than Amy that was there the -- when it happened. But they were all young people that I used. Tanya, I'm sure.
Q. I know you used them all over the course of the years of the business, but just in 2003, November and December, would they --
A. Jeffery would have been.
Q. Jeffery you would remember, and Amy. Any of the others?
A. Tanya would have been.
Q. Tanya?
A. My sister in the -- Eilene. She would have been.
Q. Eilene Smith. Okay. And the rest of them would have been --
A. They could have been there also. I'm not -- that whole thing is such a horrible blur. But I know Amy was

### Page 66

there the night that the fire happened. So I will tell you unequivocally she was there.
MR. LORENZ: Dan, by way of clarification, the affidavits by the individuals you mentioned indicate the time period during which they worked at the Rainbow Inn.
MR. MCDYER: Well, unfortunately, to my recollection, only two of them mentioned the time period. Maybe you are right. Maybe I'm wrong.
MR. LORENZ: I thought they did, but --
A. Well, I have them in that stack and you have them. So we can all look at them if we have to.
Q. You mean the affidavits?
A. If you want to.
Q. Sometime today we'll check them. I don't want to delay.
Now, the -- whatever system that was in the kitchen of the Rainbow Inn with regard to fire suppression, was it removed to your knowledge at any time between its initial installation and the date of the fire?
A. No, it was not removed. I think it was updated, but it was never removed.
Q. Would you have told anyone in 1996 that the Beck Corporation did not have a maintenance agreement for the fire suppression system?
A. Would I have told anyone that? No.

### Page 67

Q. And would you have told anyone in 2003 that the Beck Corporation's Rainbow Inn did not have a fire suppression system?
A. No, I would not have.
Q. Would you have filled out any forms for your insurance agent, Sundahl Home Company, indicating that the Rainbow Inn did not have a fire suppression system?
A. I don't believe so. I don't recall filling out any forms for Sundahl.
THE WITNESS: Can I take a break or not?
MR. MCDYER: Oh, sure.
(A short break was taken.)
Q. Mrs. Beck, have you ever in the course of your work history been a representative for a manufacturer of fire suppression systems?
A. No.
Q. Have you ever had training from a manufacturer or otherwise with regard to the maintenance or repair of a fire suppression system?
A. No. I'm not an installer.
Q. And have you ever installed or worked on a fire suppression system yourself?
A. No.
Q. And the company in Texas that you and Mr. Beck owned that did sell alarms and burglar systems, do you

### Page 68

remember the names of any of the manufacturers pertaining to fire equipment whose products you may have sold through that company, or your company, whatever agency may have sold them?
A. Firex maybe is one. No, I don't. I don't recall.
Q. Okay.
A. Silent Night. But I think that was all burglar alarm equipment.
Q. And over the course of the years of the operation of the Rainbow Inn and you being president of Beck Corporation, did you ever sit down and read the insurance policy for the Beck Corporation?
A. Word for word?
Q. Okay. You read the whole thing?
A. I mean, are you asking me if I read it word for word?
Q. Well, yes.
A. I'm not sure that I would say I read it word for word. I knew what it said. I bought it, I paid for it, I kept it current.
Q. Okay. Were you aware that the policy required in 2003 that there be a fire suppression system in the kitchen of the restaurant?
A. Yeah. I was aware the policy required that and I think -- I'm not sure if anyone else did. The Liquor Control Board wouldn't have required it, but certainly your state

Case 1:04-cv-00348-MBC     Document 25-7     Filed 12/06/2006     Page 18 of 19

Walter Beck Corp. vs. Safeco Corp.            DO NOT COPY            Sharyn Beck 11/11/2006

**Page 69**

1  health license required that things be clean and things be
2  operational, and they made their inspections.
3      Q. Okay. Are you aware of whether or not any state
4  agency pertaining to the operation of a food establishment or
5  a liquor establishment required a fire suppression system in
6  the kitchen?
7      A. I'm not aware of a state agency, no.
8      Q. Any county agency in McKean County require it?
9      A. Not that I am familiar with.
10     Q. Okay. But you are aware that the policy did
11 require a fire suppression system?
12     A. Yes, I'm aware of that.
13         MR. MCDYER: All right. Those are all the
14 questions I have. I want to thank you for taking time
15 away from your Florida weather to sit with us this
16 morning.
17         THE WITNESS: Thank you.
18         MR. LORENZ: We'll read by the way.
19     (Deposition concluded at 10:59 a.m.)

**Page 70**

1              CERTIFICATE OF OATH
2  STATE OF FLORIDA
   COUNTY OF ORANGE
4      I, the undersigned authority, certify that Sharyn Beck
   personally appeared before me and was duly sworn on the 11th
5  day of November, 2006.
6      WITNESS my hand and official seal this 20th day of
   November, 2006.

                    _____
                    Leslie Richmond, RPR and
                    Notary Public

**Page 71**

1              CERTIFICATE OF REPORTER
2  STATE OF FLORIDA
   COUNTY OF ORANGE
4      I, Leslie Richmond, Registered Professional Reporter,
   certify that I was authorized to and did stenographically
5  report the deposition of Sharyn Beck; that a review of the
   transcript was requested; and that the foregoing transcript,
6  including 69 pages, is a true and complete record of my
   stenographic notes.

       Dated this 20th day of November, 2006.

                    _____
                    Leslie Richmond, RPR and
                    Notary Public
       (This signature is valid only if signed in blue ink.)

**Page 72**

1  IN RE: WALTER BECK CORPORATION V. SAFECO CORPORATION, et al.
2  CASE NO: 04-348-Erie
3  DEPOSITION OF: SHARYN BECK
4  TAKEN ON: NOVEMBER 11, 2006

6  November 21, 2006

   Joshua R. Lorenz, Esquire
9  Meyer, Unkovic & Scott, LLP
   1300 Oliver Building
10 Pittsburgh, Pennsylvania 15223

12     The above referenced transcript has been completed and
   awaits reading and signing.

       Please notify the deponent to contact your office to
14 make arrangements to read your copy of the transcript.
   Please complete by 30 days from the date of this letter.

       The original of this deposition has been forwarded to
16 the ordering party and the errata, once received, will be
   forwarded to all ordering parties as listed below.

       Thank you,
18     Leslie Richmond

   cc: Daniel P. McDyer, Esquire, and Benjamin M. Mayer,
22     Esquire, 1300 Gulf Tower, 707 Grant Street,
       Pittsburgh, Pennsylvania 15219

Case 1:04-cv-00348-MBC   Document 25-7   Filed 12/06/2006   Page 19 of 19

Walter Beck Corp. vs. Safeco Corp.   DO NOT COPY   Sharyn Beck   11/11/2006

```
                                                                    73
 1            ERRATA SHEET
 2    Do not write on transcript - enter changes on this sheet.
 3   IN RE: WALTER BECK CORPORATION V. SAFECO CORPORATION, ET AL.
     DEPO OF: SHARYN BECK
 4   TAKEN ON: NOVEMBER 11, 2006
 5   Page #   Line #   Change/Correction   Reason
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20
     Under penalties of perjury, I declare that I have read the
21   foregoing document and that the facts stated in it are true.
22   _____
         Date            Signature of Deponent
23
                          Sharyn Beck
24   _____
     Reporter: LSR       Printed Name of Deponent
25
```

```
                                                                    74
 1
 2
 3
 ...
25
```

ZACCO & ASSOCIATES REPORTING SERVICES