**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WALTER BECK CORPORATION d/b/a THE RAINBOW INN, | ) ) ) | CIVIL DIVISION |
| | ) | Civil Action No. 04-348 - Erie |
| Plaintiff, | ) | |
| vs. | ) ) | JUDGE MAURICE B. COHILL, JR. |
| SAFECO CORPORATION, AMERICAN ECONOMY INSURANCE COMPANY, and AMERICAN STATES INSURANCE COMPANY, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.  INTRODUCTION[1]

This case arises from a dispute regarding whether an insurance policy issued by one or more of the defendants provides coverage for losses resulting from a fire that destroyed the Rainbow Inn, a restaurant owned and operated by Plaintiff Walter Beck Corporation ("Beck Corp."). The issue presented in Beck Corp.'s Motion for Summary Judgment involves a plainly worded provision of the property insurance policy issued to Beck Corp.'s for the Rainbow Inn

---

[1] Beck Corp.'s Motion for Summary Judgment and supporting filings are based upon the information and documentation known and available as of the close of business yesterday, December 5, 2006, the day before this Court's deadline for filing motions for summary judgment in this case. At some point after the close of business (5:00 p.m.), Defendants' counsel had delivered a box of documents to Beck Corp.'s counsel apparently containing documents that had never before been produced during the lengthy discovery period in this case. In view of the fact that Beck Corp.'s counsel had already prepared its Motion for Summary Judgment and supporting filings, these untimely and inappropriate disclosures by opposing counsel could not and should not be considered. Because it is expected that these documents were documents that should have been produced with the Defendants' original Rule 26 disclosures and in response to two (2) separate document requests and in response to a notice of deposition of the Defendants' designated representative and immediately after the November 7, 2006 deposition of said representative, Beck Corp. expects to file with the Court an appropriate motion(s) with respect to the aforementioned matter in the near future once it is had the opportunity to review the documents produced. Beck Corp. should not be punished, nor should the Defendants be rewarded, for the Defendants' lack of diligence.

and the question of whether the Rainbow Inn included a proper fire suppression system that was properly maintained. Based upon the extensive evidence set forth below and in Plaintiff's Concise Statement of Material Facts, and upon well-settled principles of Pennsylvania insurance law, Beck Corp. respectfully submits that there is no genuine issue of material fact relating to the issues presented and that summary judgment must be entered in favor of Beck Corp. on the issue of liability for the defendant's(s') breach of the insurance contract.[2]

## II.    **STATEMENT OF FACTS**

Beck Corp. operated under the Pennsylvania registered fictitious name of "The Rainbow Inn" and owns and operated a restaurant known as the Rainbow Inn located at Route 59, Marshburg, McKean County, Pennsylvania 16735 ("the Rainbow Inn"). (Ex.[3] 1, Complaint, ¶2, Ex. 31, Ex. 31, Affidavit of Harold Beck, ¶2). For and in consideration of a valuable premium paid by Beck Corp., an "Ultra Series Package Policy" to Beck Corp. numbered 02CC771900 and providing coverage for the period of April 23, 2003 to April 23, 2004 ("Policy") was issued to Beck Corp. as a renewal of a prior policy issued by the defendants. (Ex. 1, Complaint, ¶8; Ex. 2, Amended Answer, ¶5). A true and correct copy of the Policy is included in the Appendix as Exhibit 3 and incorporated herein by reference as if set forth in its entirety.

Each of Safeco Corporation ("Safeco Corp."), American Economy Insurance Companies ("AEIC"), and/or American States Insurance Company ("ASIC") (hereinafter collectively referred to as "Safeco") is named or identified in the Policy. (Ex. 3, Policy; Ex. 4, Deposition of

---

[2] Beck Corp. only seeks summary judgment on the issue of liability for breach of the insurance contract. It is not, at this time, seeking summary judgment regarding any waiver or estoppel claim, the amount of the loss or damages to be paid, or the other claims, such as bad faith pursuant to 42 Pa.C.S.A §8371, set forth in the Complaint. As liability for breach of contract may be a threshold issue in this case, to the extent this motion for summary judgment is granted, Beck Corp. respectfully suggests that additional summary judgment motions may be appropriate and reserves the right to seek leave to file such additional motions as appropriate.

[3] All references to Exhibits herein refer to the Exhibits included in the Appendix filed herewith.

Paul Smith ("Smith Depo."), 12-14). Safeco has represented that, at a minimum, the Policy was issued by AEIC and AEIC is the entity providing coverage under the Policy. (Ex. 2, Amended Answer, ¶5; Ex. 4, Smith Depo., 14-16). The Policy includes Building and Personal Property Coverage as well as a Restaurant Property Plus endorsement that increases the scope and amount of coverage provided under the Policy. (Ex. 3, Policy).

Prior to Beck Corp.'s involvement with the Rainbow Inn and before moving to Pennsylvania, Sharyn Beck ("Mrs. Beck"), the sole officer and shareholder of Beck Corp., and Harold Beck ("Mr. Beck"), her husband, owned and operated a company in Texas that installed and serviced fire suppression systems and burglar/fire alarms. Mr. Beck was licensed in Texas to install such systems and was a certified U.L. installer. (Ex. 5, Deposition of Harold Beck ("Mr. Beck Depo."), 13-17; 23-25; Ex. 6, Deposition of Sharyn Beck ("Mrs. Beck Depo."), 15-16; Ex. 31, Affidavit of Harold Beck, ¶6). As such, Mr. Beck was particularly familiar with specific types and names of systems and used such terminology precisely. (Ex. 5, Mr. Beck Depo. 25-26; Affidavit of Harold Beck, ¶6).

On December 5, 2003, while the Policy was in effect and during the policy period, the Rainbow Inn and its contents were destroyed by fire (the "Fire"). (Ex. 31, Affidavit of Harold Beck, ¶9). The Fire completely destroyed the Rainbow Inn and its contents such that it could not be repaired and its contents could not be salvaged. (Ex. 31, Affidavit of Harold Beck, ¶11). At the time of the Fire, the kitchen area was the last portion of the building to burn. (Ex. 31, Affidavit of Harold Beck, ¶15).

Safeco received notice of the loss promptly after the Fire. (Ex. 5, Mr. Beck Depo., 80-81). Indeed, Beck Corp. promptly and repeatedly demanded that Safeco comply with its contractual obligations to pay Beck Corp. for its losses suffered as a result of the Fire in

accordance with the terms of the Policy. (Ex. 5, Mr. Beck Depo., 80-81, 84-91; Ex. 9, 2/21/2004 Letter from Harold Beck to Paul Smith; Ex. 10, 3/24/2004 Letter from Harold Beck to Paul Smith; Ex. 11, 4/28/2004 Letter from Harold Beck to Paul Smith; Ex. 12, 6/2/2004 Letter from Harold Beck to Paul Smith; Ex. 13, 6/10/2004 Letter from Harold Beck to Paul Smith; Ex. 15, 7/5/2004 Letter from Harold Beck to Paul Smith; Ex. 29, 12/2/2004 Letter from Richard T. Victoria to Mike McGavick and Paul Smith of Safeco; Ex. 30, 11/8/2006 Letter from Richard T. Victoria to Daniel McDyer; Ex. 31, Affidavit of Harold Beck, ¶18, 23)

Shortly after the Fire, Safeco claims adjuster Paul Smith visited the site of the Fire and spoke with Mr. Beck regarding the Fire and the Rainbow Inn. (Ex. 5, Mr. Beck Depo., 80-81; Ex. 31, Affidavit of Harold Beck, ¶16-18). Mr. Beck was not an officer or employee of Beck at the time of the Fire. (Ex. 5, Mr. Beck Depo., 34-35; Affidavit of Harold Beck, ¶3). In fact, he had not been formally affiliated with the corporation since approximately 1994. (Ex. 5, Mr. Beck Depo., 34). However, because Mrs. Beck suffered from a heart attack on the day of the Fire, he assisted in communicating with Safeco. (Ex. 31, Affidavit of Harold Beck, ¶16-18). Nevertheless, Safeco never met with or interviewed Mrs. Beck, who was the only officer or shareholder of the corporation. (Ex. 5, Mr. Beck Depo., 34-35; Ex. 6, Mrs. Beck Depo., 53).

One of the things requested by Safeco shortly after the Fire was an inventory of items and property included in the Rainbow Inn. (Ex. 31, Affidavit of Harold Beck, ¶18). Though attempts to transmit the requested information earlier by e-mail were allegedly unsuccessful, on no later than January 3, 2004, Mr. Beck sent a letter to Safeco setting forth an inventory of the contents of the Rainbow Inn lost in the fire, which letter was received by Safeco. (Ex. 4, Smith Depo., 49-54; Ex. 5, Mr. Beck Depo., 84-85; Ex. 6, Deposition of Sharon Beck ("Mrs. Beck Depo.), 25-31; Ex. 7, 1/3/2004 Letter from Harold Beck to Paul Smith with "Inventory," "Liquor

Inventory," and "Food and Beer Inventory"; Ex. 31, Affidavit of Harold Beck, ¶18).

Importantly, the Inventory in Ex. 7 includes references to "Burglar and fire alarm system,

Visonic" and to "**Halon fire suppression system**" on page 5, lines 9 and 10. (Ex. 7, 1/3/2004

Letter; Ex. 4, Smith Depo., 50-51).

More than one month after receipt of the Inventory letter and by letter dated February 11,

2004, Safeco denied coverage for the losses associated with the Fire. (Ex. 8, 2/11/2004 Letter

from Paul Smith to Beck Corp. ("Denial Letter"); Ex. 31, Affidavit of Harold Beck, ¶19-20).

The Denial Letter sets forth the sole basis for Safeco's denial of Beck's claim. (Ex. 8, Denial

Letter; Ex. 4, Smith Depo., 51-52, 58-61, 69-70; Ex. 16, 7/23/2004 Letter from Paul Smith to

Harold Beck).[4]. More specifically, the Denial Letter states:

> Based upon the fact that your restaurant facility did not have the required fire
> suppression system we will be unable to cover your fire loss of December 5th
> 2003. You are required to not only have but maintain a fire suppressions [sic]
> system. The cp-7586 6/93 form requires you have and maintain this system on a
> Quarterly basis. You indicated to me this was removed in 1996 or 1997 and
> never replaced. Please refer to the policy language below:
>
>> "P-8" Commercial Cooking Protection – A U.L. listed automatic fire
>> suppression system installed for the protection of cooking appliances.
>> The suppression system must be serviced by an independent contractor
>> on a **Quarterly** basis. The ventilating system, including plenums,
>> exhaust ducts, roof vent and hood over cooking appliances must be
>> cleaned by an independent contractor on a Quarterly basis.

(Ex. 8, Denial Letter (emphasis added)). Importantly, the Denial Letter misinterprets and

misquotes the relevant language from the Policy as the Policy plainly states, "The suppression

system must be serviced by an independent contractor on a **SEMI-ANNUALLY** [sic] basis."

---

[4] Safeco does not contend that either that Beck Corp. or the Becks started or caused the Fire or that the
Fire was caused or contributed to by the alleged absence of or alleged failure to maintain or inspect a fire
suppression system. (Ex. 4, Smith Depo., 59-60, 73; Affidavit of Harold Beck, ¶10)

(Ex. 3, Policy, Protective Safeguards Endorsement, Form CP 75 86 06 93, Page 2 of 2). Clearly, the Policy does not require quarterly servicing of the fire suppression system.

Contrary to the Denial Letter, at all times material to the Policy, the claim for coverage at issue in this case, and the Fire, a U.L. listed automatic fire suppression system was installed and operational at the Rainbow Inn for the protection of cooking and ventilating equipment. (Ex. 5, Mr. Beck Depo., p46-59, 61-63, 96-98, 102-106; Ex. 6, Mrs. Beck Depo., 45-50, 53-59; 63, 66-69; 76-77; Ex 7; Ex. 9, 2/21/2004 Letter from Harold Beck to Paul Smith; Ex. 10, 3/24/2004 Letter from Harold Beck to Paul Smith; Ex. 11, 4/28/2004 Letter from Harold Beck to Paul Smith; Ex. 12, 6/2/2004 Letter from Harold Beck to Paul Smith; Ex. 13, 6/10/2004 Letter from Harold Beck to Paul Smith; Ex. 15, 7/5/2004 Letter from Harold Beck to Paul Smith; Ex. 31, Affidavit of Harold Beck, ¶21-23 (all letters written by Mr. Beck and cited herein are attested to and authenticated in his Affidavit)).

In addition to Mr. and Mrs. Beck's testimony on the subject, eight (8) third-party witnesses have executed Affidavits attesting to the fact that they observed the fire suppression system in place at the Rainbow Inn. (Ex. 17, Affidavit of John Gates; Ex. 18, Affidavit of Jeremy Holt; Ex. 19, Affidavit of Kimberly Holt; Ex. 20, Affidavit of Andrea Prince; Ex. 21, Affidavit of Eileen Smith; Ex. 22, Affidavit of Tanya Aiello; Ex. 23, Affidavit of Geoffrey Beck; Ex. 24, Affidavit of Robert J. Beck.)

Though Paul Smith, Safeco's designated representative, claim adjuster, and the person primarily responsible for investigating and denying the claim at issue in this case, has testified (and stated in the Denial Letter) that he believed that Mr. Beck advised him that there was no fire suppression system in place at the Rainbow Inn (Ex. 4, Smith Depo., 85-86; Ex. 8, Denial Letter), Mr. Beck clarified this issue in several letters to Smith and Safeco (Ex. 8-12 and 14), as

well as in his deposition (Ex. 5, Mr. Beck Depo, 89-91; 98-99; 102-103) and Affidavit (Ex. 31,

¶8, 21-23), explaining the precise meaning of his statements to Smith and the fact that a proper

fire suppression system was always in place.  Mr. Beck, who was neither an officer nor an

employee of Beck Corp. at the time of the loss, is certain that he did not advise Smith that the

fire suppression system was removed such that no fire suppression system was in place at the

time of the Fire.  (Ex. 31, Affidavit of Harold Beck, ¶21).[5]

Both Mr. Beck and Smith have characterized this miscommunication as a "serious

misunderstanding" (Ex. 14 and 15) and have acknowledged that the misunderstanding may have

arisen from the fact that the fire suppression system in place at the Rainbow Inn was not an

"Ansul" brand system, but instead a Halon based fire suppression system.  (Ex. 4, Smith Depo.,

85-87; Ex. 15, p.1, third sentence; Ex. 5, Mr. Beck Depo., 25-26 (explaining the difference

between Halon and Ansul systems).  Mr. Beck has attested to the fact that he may have stated

that the Rainbow Inn did not have an "Ansul" brand system when asked about such a system by

Smith, which is an accurate statement.  (Ex. 31, Affidavit of Harold Beck, ¶6, 22).  Smith, in

turn, has admitted that he may have used "Ansul" system as a generic term meaning fire

suppression system.  More specifically, Smith testified as follows:

> **Ex. 4, Smith Depo., page 85**
>
> 15   Q.   If you flip to the next letter, the
> 16   July [ ]5 [sic], 2004 letter, did you receive this
> 17   letter from Mr. Beck?
> 18     A.   Yes, sir.
> 19     Q.   Around the date of the letter?
> 20     A.   Yes.
> 21     Q.   In response to your June 23 letter
> 22   that we just looked at?

---

[5] Notably, though Safeco took Mr. Beck's deposition in this case, Mr. Beck was not questioned regarding this alleged conversation with Smith at any time during his deposition.  (*See generally,* Ex. 5, Mr. Beck Depo.)

23    A.   I believe so.
24    Q.   Did you have some discussion with
25  Mr. Beck over the distinction between an Ansul

*Page 86*
1         P. Smith - by Mr. Victoria
2  and a Halon system?
3    A.   That may well have been my error,
4  using the generic Ansul system in place of fire
5  suppression system.
6    Q.   A lot of these documents relate back
7  to your initial conversation with Mr. Beck in
8  which you understood him to say that he took
9  the system out in '96 or '97, correct?
10    A.   Yes.
11    Q.   Do you believe that you
12  misunderstood something he said to you then?
13    A.   I don't know.  I been around life a
14  long time.  Can there be misunderstanding,
15  we'll all walk away from this table there can
16  be misunderstanding.  I believe I heard him say
17  he had the system removed.
18    Q.   Was there a discussion at that time
19  about Halon versus Ansul system?
20    A.   I don't recall.
21    Q.   I'm just trying to get at whether
22  the use of those terms may have caused a
23  misunderstanding at that conversation.
24    A.   I can't say yes or no.  But that
25  February 11 denial letter was very clear what

*Page 87*
1         P. Smith - by Mr. Victoria
2  we needed.
3    Q.   Other than asking Mr. Beck for the
4  vendor information, did Safeco do anything
5  independently to determine whether or not a
6  fire suppression system was in place and
7  whether it was maintained properly?
8    A.   I can't speak for all of Safeco.
9  But from my -- that I initiated, no.  Whether
10  something was done further in underwriting, I
11  can't say.  But, no.  From my standpoint, no.

Additionally, Smith, as Safeco's designated representative, claim adjuster, and the person primarily responsible for investigating and denying the claim at issue in this case, testified regarding the presence of a fire suppression system as follows:

> ***Ex. 4, Smith Depo., p. 51***
> 14  Q.    Did you think that it was actually
> 15  in the inventory, in the restaurant?
> 16      A.    I don't know.  I mean, what I am
> 17  saying is I thought -- I don't know whether it
> 18  was or not.
>
>     *   *   *
>
> ***Page 60***
> 15  Let's just talk about the
> 16  existence of a system in place or not.  Is it
> 17  Safeco's position that there was no system in
> 18  place?
> 19      A.    No.  I don't know if there was a
> 20  system in place.
> 21  Q.    So Safeco's sole basis for denying
> 22  the claim is that Safeco wasn't provided with
> 23  an agreement showing that a system had been
> 24  serviced in accordance with the agreement?  In
> 25  accordance with the policy?
>
> ***Page 61***
>  1        P. Smith - by Mr. Victoria
>  2      A.    In accordance with the policy, yes.
>  3  That there was a system, that it was in place,
>  4  it was UL approved, that it was serviced
>  5  semi-annually and cleaned quarterly by an
>  6  independent contractor.  And that was the basis
>  7  of my denial.
>  8      Q.    Well, but Safeco has to -- I'm
>  9  getting back to the question again.  Is it
> 10  Safeco's contention that no system was there?
> 11      A.    Not necessarily.
> 12      Q.    What was the results of your
> 13  investigation?  Was there a system or wasn't
> 14  there?
> 15      A.    I don't know.  I don't know whether
> 16  there was or wasn't.

*Page 62*

5   Q.   And I understand that there's two
6   separate things at play.  What I am getting at
7   is, we need to know what Safeco's telling us is
8   the flaw in the system on our end and the error
9   on our end that resulted in the denial of the
10  claim.  So is it both the absence of a system
11  and the failure to maintain a system, or is it
12  what you're saying is it is at least the
13  failure to maintain a system, and we don't know
14  on the other thing?
15      A.   It's an either/or.  It's not really
16  either/or.  That's not correct.  But it is a
17  package, and I have a pile of debris.  So I
18  can't walk in the restaurant and say there is a
19  system.  So I have to rely on evidence that all
20  of that has been complied with.  There is a
21  system and that it's been serviced.
22      Q.   Do you know if in any of that debris
23  there is a burned up service agreement?
24      A.   I don't know.
25      Q.   Do you know if in any of that debris

*Page 63*

1          P. Smith - by Mr. Victoria
2   there are mangled or melted parts of a fire
3   suppression system?
4       A.   I don't know.
5       Q.   Did anybody look for it?
6       A.   Not to my knowledge.
7       Q.   So Safeco isn't taking a position
8   one way or the other whether or not a system
9   was in place?
10      A.   No.

(*See also*, Ex. 25, Notice of Deposition of Safeco; Ex. 26, Notice of Deposition of ASIC; Ex. 27,

Notice of Deposition of AEIC; Ex. 4, Smith Depo. 9, 11-12.)[6]  Thus, despite the fact that

Safeco's counsel later in the Smith deposition attempted to "repair" this testimony and state

Safeco's formal position for the record (Ex.4, Smith Depo., 100-101), and despite voluminous

---

[6] Though Smith testified that he kept notes and records regarding his conversations with Mr. Beck and his alleged investigation of the claim, no such notes or records of Smith were produced by Safeco in this case as of the close of business on December 5, 2006.  (Ex. 4, Smith Depo., 43-46, 52-53, 105-106).

evidence demonstrating the existence of the fire suppression system and the fact that Safeco did no investigation of this issue other than allegedly asking Mr. Beck, Safeco's designated representative, addressing facts, not legal arguments, plainly testified that Safeco does not know and/or cannot take a position as to whether the fire suppression system was in place.

Additionally, at all times material to the Policy, the claim for coverage at issue in this case and the Fire, the fire suppression system was properly maintained and serviced by an independent contractor. (Ex. 5, Mr. Beck Depo., 54-56, 61-64, 76-77, 102-106; Ex. 6, Mrs. Beck Depo., 55-56; Ex. 24, Affidavit of Robert J. Beck; Ex. 31, Affidavit of Harold Beck, ¶13-14). More specifically, the Affidavit of Robert J. Beck of R.J. Beck Protective Systems, Inc. indicates that:

a.   a UL listed fire suppression system was installed and in operation during the Policy period and at the time of the Fire;

b.   from about 1996 through the date of the Fire, R.J. Beck Protective Systems, Inc., was directly involved with the system as an advisor and inspection certifier of the systems;

c.   R.J. Beck Protective Systems, Inc. inspected the system no less than twice each year, both around Mr. Beck's birthday (June 14) and Thanksgiving;

d.   R.J. Beck Protective Systems, Inc. inspected the system shortly before the fire during a visit from November 24, 2003 through November 26, 2003 and made certain that the fire suppression system was operational. He determined that the two detector heads in the kitchen were clean and that the system was operational; and

e.    R.J. Beck Protective Systems, Inc. provided a written certification to Beck Corp. that both the fire suppression and burglar alarm systems were operational.

(Ex. 24, Affidavit of Robert J. Beck and February 20, 2005 letter attached to and incorporated into the Affidavit.)[7]    Though Beck Corp. kept records of the service to the fire suppression system, the great majority of Beck Corp.'s business records were destroyed in the Fire, including those records relating to the fire suppression system and its maintenance.  (Ex. 5, Mr. Beck Depo., 24-25, 50, 63-64, 86; Ex. 15).[8]  Indeed, the only and best available evidence regarding the maintenance of the system is and necessarily must be the statement of the person who performed the service and there is no evidence of record to contradict such statement.

Also, the ventilating system and hood over the cooking appliances were cleaned by an independent contractor on at least a monthly basis.  (Ex. 6, Mrs. Beck Depo., 46-48; Ex. 5, Mr. Beck Depo., 55-56; 106-109).  It is not clear if Safeco is contending that Beck Corp. failed to comply with this aspect of the Policy, but in the event that Safeco is, the record demonstrates that such contention is untrue.

Additionally, prior to the Fire, the Rainbow Inn's U.L. listed automatic fire suppression system was viewed and inspected by Safeco and/or its authorized agents and/or representatives. (Ex. 5, Mr. Beck Depo., 68; 91-96, 109-110; Ex. 9, 13, 15).  Safeco never made any objection,

---

[7] The February 20, 2005 letter from Robert J. Beck included in the Appendix as part of Ex. 24 was produced to Safeco on or about June 25, 2005 with Beck's Rule 26 disclosures attached hereto as Exhibit 28.  Upon information and belief, as of the close of discovery, no representative of Safeco has ever contacted Beck Protective Systems, Inc. or Robert J. Beck regarding the Fire, Beck's claim, the Rainbow Inn, or the fire suppression system. (Ex. 4, Smith Depo., 96; Ex. 31, Affidavit of Harold Beck, ¶14)

[8] Many of these documents were kept at the insured premises in accordance with various Pennsylvania statutes and regulations, including but not limited to 47 P.S. 2-207(h); 47 P.S. 2-211; 47 P.S. § 4-467; 47 P.S. § 4-493(12); 47 P.S. § 5-509; 47 P.S. § 5-513; 40 Pa. Code § 5.41; and 40 Pa. Code § 11.35.  (Ex. 28, §II.b.)

-12-

complaint, warning, threat, or suggestion to Beck Corp. regarding the Rainbow Inn's U.L. listed automatic fire suppression systems. (Ex. 5, Mr. Beck Depo., 68; 91-96, 109-110; Ex. 9, 13, 15).

In summary, while a wealth of evidence in the form of affidavits, documents and deposition testimony support Beck Corp.'s position that a proper fire suppression system was in place and that it was maintained as required under the Policy, the only "evidence" of record allegedly supporting the denial of coverage is Smith's belief that Mr. Beck told him that the system had been removed in 1996 or 1997. Such a flimsy scintilla of evidence does not create a genuine issue of material fact sufficient to defeat plaintiff's motion for summary judgment.

## III.   STANDARD OF REVIEW

The recent Western District case of *Tyco Valves & Control v. Tipping, Inc.*, 2006 U.S. Dist. LEXIS 77180 (W.D. Pa. 2006) plainly and accurately sets forth the standard of review applicable in this case:

> Fed.R.Civ.P. 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).
>
> The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. A dispute over those facts that might affect the outcome of the suit under the governing substantive law, i.e., the material facts, however, will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. *Id.* In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *Id. at 248-49.* Under these standards, the non-moving party must do more than show there is "some metaphysical doubt" as to the material facts.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).*

Although inferences must be drawn in favor of the non-moving party, "an inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).* Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)); see also Lujan v. National Wildlife Fed., 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)* ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit").

The non-moving party has the burden of producing evidence to establish each element of her claim. *Celotex, 477 U.S. at 322-23.* The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which she bears the burden of production. *Anderson, 477 U.S. at 252.* Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec., 475 U.S. at 587* (citations omitted).

In summary, the inquiry under a Rule 56 motion is whether the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute or whether the evidence is so one-sided that the movant must prevail as a matter of law because no reasonable jury could return a verdict in her favor.

Id. at *10-13; *see also, Williams v. Borough of West Chester*, 891 F.2d 458, 459-61 (3rd Cir. 1989).


## IV.    ARGUMENT

Beck Corp.'s Motion for Summary Judgment must be granted because Safeco has not satisfied and cannot satisfy its burden to prove the applicability of the Policy provision upon which its coverage denial is based. In fact, there is no evidence of record to support Safeco's denial of coverage. Further, even if Mr. Beck's alleged statement to Smith could be viewed as "evidence" supporting the denial, such limited evidence is not sufficient to permit a reasonable

jury to return a verdict in Safeco's favor. Thus, Beck Corp. respectfully requests that this Court enter summary judgment in its favor.

Preliminarily, there has been no dispute that, absent the fire suppression system issues, Beck Corp.'s claim would fall within the coverage provided by the Policy. As such, Beck Corp. will not belabor the point with a detailed analysis and lengthy discussion of the general coverage grant of the Policy. Certainly, should such an analysis become necessary, Beck Corp. is willing and able to supplement its submissions to the Court accordingly and/or provide additional analysis in a reply memorandum.

A.   **SAFECO BEARS THE BURDEN OF PROVING THE APPLICABILITY OF THE CONDITION/EXCLUSION RELIED UPON TO DENY COVERAGE.**

As set forth above, Safeco has denied coverage on what appear to be two grounds arising from a single provision of the Protective Safeguards Endorsement of the Policy:  the "P-8" Commercial Cooking Protection provision (hereinafter "Section P-8"). This Endorsement states in pertinent part:

1.   The following is added to the:

Commercial Property Conditions

*   *   *

a.   As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above [which lists only "P-8"].

b.   The protective safeguards to which this endorsement applies are identified by the following symbols:

*   *   *

**"P-8" Commercial Cooking Protection –** A U.L. listed automatic fire suppression system installed for the protection of cooking appliances.   The suppression system must be serviced by an

-15-

independent contractor on a SEMI ANNUALLY [sic] basis. The ventilating system, including plenums, exhaust ducts, roof vent and hood over cooking appliances must be cleaned by an independent contractor on a QUARTERLY basis.

\* \* \*

**2.**    The following is added to the EXCLUSIONS section of:

CAUSES OF LOSS – BASIC FORM
CAUSES OF LOSS – BROAD FORM
CAUSES OF LOSS – SPECIAL FORM
STANDARD PROPERTY POLICY
MORTGAGE HOLDERS E&O COVERAGE FORM

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

**a.**    Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

**b.**    Failed to maintain any protective safeguard listed in the Schedule above, over which you had control, in complete working order.

(Ex. 3, Policy, Protective Safeguards Endorsement, Form CP 75 86 06 93). Thus, while it appears that a requirement to install and maintain a fire suppression system is added to the Policy's Conditions in section 1, the Endorsement clearly contemplates that the additional "Condition" will operate as an "Exclusion" in section 2. In any event, at most, it appears that Safeco is arguing that: (1) a fire suppression system was not in place; and/or (2) that such system, if in place, was not properly maintained as required under the Policy.

Regardless of whether Section P-8 is construed as a condition or an exclusion, the insurer bears the burden of proving its applicability. Under well settled principles of Pennsylvania insurance coverage law, "where the insurer relies upon an exclusion provision in the policy, or upon the breach of a condition of the policy as its defense, the insurer bears the burden of proving that defense." *A.G. Allebach, Inc. v. Hurley*, 373 Pa. Super. 41, 540 A.2d 289 (Pa.Super. 1988); *Bianco v. Concepts "100" Inc.*, 291 Pa.Super. 458, 465, 436 A.2d 206, 209-210 (1981).

Thus, Safeco, not Beck Corp., bears the burden of supplying evidence in support of the coverage denial.

**B.    SAFECO HAS NOT MET AND CANNOT MEET ITS BURDEN OF PROVING THE APPLICABILITY OF THE CONDITION/EXCLUSION RELIED UPON TO DENY COVERAGE.**

Even disregarding the wealth of evidence mandating a conclusion that a proper fire suppression was in place and properly maintained at the Rainbow Inn, Safeco has not and cannot meet its burden of proving the applicability of Section P-8. As explained in the Standard of Review above, in responding to a summary judgment motion, the non-moving party has the burden of producing evidence to establish each element of its claim. *Celotex*, 477 U.S. at 322-23. The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which it bears the burden of production. *Anderson*, 477 U.S. at 252.

Here, Safeco can offer no more than the unsatisfactory "scintilla of evidence" in support of either element of its defense. Looking first to Safeco's burden of proving the absence of a fire suppression system, the only "evidence" of record allegedly supporting the denial of coverage cited by Safeco at any point in this case is that Smith believes that Mr. Beck, who was not an officer or employee of Beck Corp., may have told him that the fire suppression system had been removed. However, when questioned regarding his recollection of this statement, Smith acknowledged the possibility that there was a misunderstanding of Mr. Beck's statement to him. Indeed, both Smith and Mr. Beck have referred to the "serious misunderstanding" that arose as a result of this conversation (Ex. 14 and 15) and have acknowledged that the misunderstanding may have arisen from the fact that the fire suppression system in place at the Rainbow Inn was not an "Ansul" brand system, but instead Halon based fire suppression system. (Ex. 4, Smith

Depo., 85-87; Ex. 15, p.1, third sentence; Ex. 5, Mr. Beck Depo., 25-26 (explaining the difference between Halon and Ansul systems).

To add insult to injury, when questioned directly as Safeco's designated representative on the subject, Smith stated that he and Safeco did not know whether a fire suppression system was in place at the Rainbow Inn. Certainly, had Safeco had more than a scintilla of evidence in support of this defense, Smith would have at least been able to testify that Safeco believed that no system was in place. His failure to do so plainly indicates that Safeco has not and cannot meet its burden as required by both applicable insurance law and the standard required under Rule 56 of the Federal Rules of Civil Procedure.

With respect to the question of whether the system was properly maintained in accordance with Section P-8, Safeco's "evidence" is equally flimsy. In fact, absent conclusory allegations and speculation regarding the failure to produce documentation of the inspections and service dates (which was, in fact, destroyed in the Fire), Safeco can offer no evidence in support of this element of its defense. When addressing a summary judgment motion, though inferences must be drawn in favor of the non-moving party, "an inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990). Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

Given Safeco's failure and inability to meet its burden of proof as required under Pennsylvania insurance law and the Federal Rules of Civil Procedure, summary judgment should be entered in Beck Corp.'s favor.

**C.    EVEN IF SAFECO HAS PRODUCED "EVIDENCE" IN SUPPORT OF ITS BURDEN OF PROOF, SUCH EVIDENCE DOES NOT CREATE A GENUINE ISSUE OF MATERIAL FACT AND, VIEWING THE RECORD AS A WHOLE, NO REASONABLE FACT FINDER COULD RENDER A VERDICT IN SAFECO'S FAVOR.**

Given the burden placed upon Safeco to prove the applicability of Section P-8, this Court need not examine the record further to enter judgment in Beck Corp.'s favor. Nevertheless, an examination of the record as a whole and the addition of the evidence of record supporting Beck Corp.'s position to the analysis bolsters Beck Corp.'s arguments and mandates a conclusion that no reasonable finder of fact could enter a verdict in Safeco's favor. *See Williams v. Borough of West Chester*, 891 F.2d at 459-61; *Tyco Valves & Control v. Tipping, Inc.*, 2006 U.S. Dist. LEXIS 77180 at *11-13. As such, viewing the record as a whole, there is no genuine issue of material fact precluding the entry of summary judgment in Beck Corp.'s favor.

The evidence of record supporting the conclusion that there was a U.L. listed fire suppression system installed at the Rainbow Inn prior to and during the Fire, and that such system was properly serviced and maintained by an independent contractor, is overwhelming. Given that this evidence is set forth in detail in the Statement of Facts, such evidence is summarized below to avoid unnecessary duplication.

Prior to the Fire, representatives of Safeco visited and inspected the Rainbow Inn and its fire suppression system on several occasions. While Beck Corp. was asked/required to make certain other repairs and improvements to the Rainbow Inn, no complaints were ever raised regarding the fire suppression system. (Ex. 5, Mr. Beck Depo., 68; 91-96, 109-110; Ex. 9, 13, 15).

At the time of the Fire, the kitchen area, in which the fire suppression system was installed, was the last portion of the building to burn. (Ex. 31, Affidavit of Harold Beck, ¶15).

-19-

This fact provides evidence that the system was in place and operational in the kitchen of the Rainbow Inn at the time of the Fire.

After the Fire, but more than a month before the Denial Letter was issued by Safeco and long before Beck Corp. became aware of the basis for such denial, Beck Corp. advised Safeco, in writing, that a Halon fire suppression system was installed at the Rainbow Inn. Further, immediately after the issuance of the Denial Letter and in monthly letters thereafter, Beck Corp. attempted to correct Safeco's erroneous conclusion that no fire suppression system was in place. (Ex. 4, Smith Depo., 49-54; Ex. 5, Mr. Beck Depo., 46-59, 61-63, 84-85, 96-98, 102-106; Ex. 6, Mrs. Beck Depo., 25-31, 45-50, 53-59; 63, 66-69; 76-77; Ex. 7, Inventory, p. 5, lines 9 and 10; Ex. 8; Affidavit of Harold Beck, ¶19-23; Exs. 9-13, 15).

Additionally, both Mr. and Mrs. Beck's deposition testimony included detailed discussions regarding the installation, parts, maintenance and operation of the system. For example, Mr. and Mrs. Beck testified as follows:

**MR. BECK**

*Page 45*

| | | |
|---|---|---|
| 7 | Q. | Let's talk about the installation of the Halon |
| 8 | | system. When would -- when was that system installed? |
| 9 | A. | May of 1989. |
| 10 | Q. | So when the original remodeling of the motel into a |
| 11 | | restaurant occurred? |
| 12 | A. | That's right. |
| 13 | Q. | And in May of 1989, was that when the entire |
| 14 | | kitchen was installed -- |
| 15 | A. | Yes. |
| 16 | Q. | -- as well? Okay. Can you describe the stove that |
| 17 | | was in that kitchen? |
| 18 | A. | It was a five-foot long Garland cast iron stove. |
| 19 | | It was -- it worked off of propane gas. It had a griddle |
| 20 | | top, four burners, and two ovens underneath it. |
| 21 | Q. | Did you say four burners? |
| 22 | A. | Yes. Actually, it had a place for six. We had |
| 23 | | another griddle in the middle. There were two more burners. |

24　　　　It could have been a six burner if I wanted.
25　Q.　And there was a double stove underneath?

**Page 46**

1　A.　Yeah.
2　Q.　Where did you purchase the stove for the
3　　　　establishment?
4　A.　Some restaurant supply place in Erie.
5　Q.　In Erie? You don't remember the name?
6　A.　No.
7　Q.　Was it purchased new or used?
8　A.　New.
9　Q.　And what kind of hood was over this stove?
10　A.　That was a -- the hood was 12 feet long and I
11　　　　believe three or four feet wide. It was enormous. It was
12　　　　overkill for our kitchen. In fact, when you would work on
13　　　　it, you would actually have to duck under totally. It would
14　　　　come down on almost eye level and I would work inside it.
15　Q.　Your head was actually under the hood?
16　A.　Yeah.
17　Q.　Who installed the hood and the duct work?
18　A.　Doug DuPont's people did the manual installation of
19　　　　the hood and the duct work. My brother came and I assisted
20　　　　him in the actual hook up of the system that went with it.
21　Q.　When you say, the system, you mean the fire
22　　　　suppression system?
23　A.　Yes. Because they're one and the same. They work
24　　　　hand and glove.
25　Q.　So as soon as the hood was installed, your brother

**Page 47**

1　　　　and you began to work on the --
2　A.　Yes.
3　Q.　-- fire suppression?
4　A.　And, again, like I said, that is a no brainer.
5　　　　That is something that can be done in a matter of five, six
6　　　　hours.
7　Q.　What year are we talking about?
8　A.　1989 initially.
9　Q.　May of '89?
10　A.　Yeah.
11　Q.　So the decision as to what type of fire suppression
12　　　　system would be originally installed under the hood --
13　A.　Was mine.
14　Q.　That was your personal decision?
15　A.　Yeah.

-21-

16    Q.    Did you consult with your brother about it at all?
17    A.    Yeah. Well, he said, why do you want to spend so
18          much money? I said, because it's the best one.
19    Q.    So it was your decision to put the original Halon
20          system in?
21    A.    Yeah. I liked it.
22    Q.    Was it the same type of system that you were
23          selling in Texas?
24    A.    Sure was.
25    Q.    Was it the same manufacturer?

*Page 48*
1     A.    The parts vary. You know, you've got different
2           people that make the control panels that activate it. Over
3           the course of the history of that system, I replaced the
4           control panel several times. You would have things like
5           lightning strikes that would take out the burglar alarm
6           system and that -- and that would kill the system, and you
7           would have to replace that immediately.
8     Q.    Okay.
9     A.    Actually, it got to the point where lightning was
10          so bad there for awhile, I had extra equipment there that I
11          could replace at any time.
12    Q.    Let me ask you this. I will warn you right away I
13          am completely unfamiliar with these kind of systems, so the
14          questions that I ask you may seem very simple and no brainer.
15    A.    No problem.
16    Q.    But I know nothing about these. When you purchase
17          a Halon fire suppression system, what do you purchase? What
18          is it?
19    A.    You are basically purchasing two big tanks of Halon
20          gas. You are purchasing a control panel that reads the
21          sensors and throws a switch when the sensors are activated to
22          dispense the gas.
23    Q.    Okay. When you purchase one of these systems, do
24          you purchase the components separately or together?
25    A.    You purchase -- whoever gives you the best price.

*Page 49*
1           I mean, if you're going to buy a control panel and you got a
2           good price on the control panel one place, you buy it there.
3           If you're -- if you go to buy the tanks -- and the tanks come
4           in all different sizes and all. different pressures, so you
5           can you go where the best price is.
6     Q.    When you purchased the original system that was
7           installed in May of 1989, do you remember any of the

| 8 | | suppliers who sold you the components? |
|---|---|---|
| 9 | A. | No. |
| 10 | Q. | Would these have been suppliers that you may have |
| 11 | | worked with in Texas? |
| 12 | A. | Possibly. |
| 13 | Q. | Could they also have been suppliers that supplied |
| 14 | | for your brother's business? |
| 15 | A. | Yes. And he changes them like he changes his |
| 16 | | shirt, so |
| 17 | Q. | Okay. So when you purchased this system in May of |
| 18 | | 1989 after consulting with your brother and deciding on the |
| 19 | | best system, all you purchased were two tanks of Halon gas, a |
| 20 | | control panel, the sensors, and the pipes? |
| 21 | A. | The rotating nozzels. |
| 22 | Q. | And the nozzels. |
| 23 | A. | Plumbing and all that. |
| 24 | Q. | And these would have all been purchased from |
| 25 | | different suppliers or maybe the same supplier? |

*Page 50*

| 1 | A. | A lot of this -- like the pipe, I could buy |
|---|---|---|
| 2 | | locally. Okay. The nozzels, we may have had them laying |
| 3 | | around. You know, these things, you use. Buying a |
| 4 | | restaurant, if I had equipment -- you know, my first burglar |
| 5 | | alarm system in there was equipment that I brought with me |
| 6 | | from Texas. So for me to say I bought it brand new or |
| 7 | | whatever, I can't say initially. But a lot of the stuff I |
| 8 | | had. Wiring, I had. Conduit, I had. Things like that. |
| 9 | Q. | And anything that would have recorded any of these |
| 10 | | purchases would probably have been lost in the fire? |
| 11 | A. | We kept all our records underneath the Rainbow Inn. |
| 12 | | I had fixed it up there. I had a vault type thing there. |
| 13 | Q. | Would you have paid cash for all of these |
| 14 | | components? |
| 15 | A. | Cash, check, whatever. |
| 16 | Q. | Did you ever attempt to retrieve any records, |
| 17 | | banking records, that may have reflected these purchases? |
| 18 | A. | You know how many times these banks in Pennsylvania |
| 19 | | have changed names? |
| 20 | Q. | Yes, I do. |
| 21 | A. | Okay. |
| 22 | Q. | So it would be impossible to -- |
| 23 | A. | Yes. |
| 24 | Q. | Okay. Take me through the process of the actual |
| 25 | | installation of the original Halon system. What did you |

*Page 51*

1        actually have to do to install this thing? Take me through
2        step one through the final step.
3    A.   First thing you do is find a place where you are
4        going to put your tanks. And our place was on the ground
5        floor underneath the pantry. The pantry was immediately to
6        the right-hand side of the Garland stove. It was separated
7        by a wall, and there was a pantry there. We kept dry goods
8        in this area. And directly beneath it was a storage space,
9        and that was a nice clean dry place to store the tanks. So
10       we located the tanks there. We ran two sets of pipes. We
11       ran the copper tubing for the Halon gas to run in up the
12       wall, and then in above the hood, and then connected it to
13       where the nozzles would have to be. We had it come out in a
14       -- off as a T and then go down into the two nozzels. There
15       was also a third one in the actual plem. When -- the concept
16       being that, if the fire is underneath, the chances are it can
17       get up into the duct work. And the idea was to kill any fire
18       that would be in the escape hatch. You know, the air going
19       outside. So we had -- there were actually three in there.
20       And just sitting here listening, it refreshed my memory that
21       there was an active -- a device inside the plem itself. Then
22       we connected the -- we'd have to place the heat detectors in
23       place, put them in place inside the hood, and then run the
24       wiring back to the panel. Okay. Then you'd make your
25       connection at the panel. In this particular installation, we

*Page 52*

1        had two more heat detectors that I put in out away from the
2        hood in the kitchen itself. I was afraid of fire. After
3        that first fire, I was afraid of fire. And so I wanted the
4        entire kitchen protected. Because grease could have fallen
5        on the floor, set something on fire, whatever; anything. And
6        I just wanted-- if we had a fire, it could be activated.
7        We had a manual pull station on that wall separating the
8        panel and the Garland stove. It was right there on the wall.
9        It was pretty much like that one there.
10   Q.   And you're referring to a pull alarm system that's
11       installed in this room.
12   A.   Yes. But that thing, that alarm -- by pulling
13       that, though, that would activate the Halon gas. The heat
14       detector didn't have to go off. That was a fail safe. If we
15       had a fire on the stove and the heat detectors didn't
16       activate, the employee could still pull that thing and put
17       the fire out.
18   Q.   Okay. And

| 19 | A. | All you do is make the connections. |
| 20 | Q. | The electrical connections and the -- |
| 21 | A. | Yeah. |
| 22 | Q. | gas connections? |
| 23 | A. | We had backup batteries on it to make sure if the |
| 24 | | power went out, it would operate on a 24 hour basis. We had |
| 25 | | to have a backup power supply that would keep the system |

**Page 53**

| 1 | | alive for 48 hours. |
| 2 | Q. | And why is that? |
| 3 | A. | That's an Underwriter Laboratory requirement, as I |
| 4 | | understood it. |
| 5 | Q. | Okay. Prior to your installing this system in |
| 6 | | 1989, did you do any research into Underwriters Laboratories' |
| 7 | | requirements regarding these systems and their components? |
| 8 | A. | Of course. I was -- I had the book. |
| 9 | Q. | I know you were licensed in Texas. |
| 10 | A. | Yes. |
| 11 | Q. | Do you know of any changes which may have occurred |
| 12 | | since you got that original book and the time that you |
| 13 | | installed it in 1989? |
| 14 | A. | No. No. It's pretty cut and dry. There aren't |
| 15 | | any improvements to wiring and conduit and things like that. |
| 16 | Q. | So you were under the impression that the book that |
| 17 | | you studied to get your original license, or your original |
| 18 | | certification from Underwriters Laboratories hadn't changed |
| 19 | | in any significant way at the time that you installed this |
| 20 | | system? |
| 21 | A. | There were improvements to Underwriters Laboratory |
| 22 | | or additions, but there weren't any changes from the basic |
| 23 | | system I installed, because Underwriter Laboratories would |
| 24 | | never approve, for example, a wireless burglar alarm system. |
| 25 | | But now Underwriter Laboratories certifies wireless burglar |

**Page 54**

| 1 | | alarm systems. |
| 2 | Q. | But you were comfortable that the system that you |
| 3 | | installed and its components would have been certified by |
| 4 | | Underwriters Laboratories? |
| 5 | A. | Yes, I was. |
| 6 | Q. | And specifically certified for being a fire |
| 7 | | suppression system for a restaurant |
| 8 | A. | Without a doubt. |
| 9 | Q. | -- hood? Okay. When this system was being |
| 10 | | installed, and we went through the whole process, was your |

| | | |
|---|---|---|
| 11 | | brother there for the entire process? |
| 12 | A. | Yes. He came over for the day. He liked to get |
| 13 | | away. |
| 14 | Q. | Sure. And do you have any recollection whatsoever |
| 15 | | of the cost of any of the original components that you |
| 16 | | installed? |
| 17 | A. | I think the whole system was somewhere around 6- or |
| 18 | | $7,000. And I 'musing that as a rule of thumb. I knew what |
| 19 | | they cost, and I was getting it wholesale, and that's about |
| 20 | | what it cost me. |
| 21 | Q. | After the system was installed in May of 1989, how |
| 22 | | was it maintained? Meaning, who did the maintenance work on |
| 23 | | it and how often was that maintenance work done? |
| 24 | A. | My brother was always there. His son he had a |
| 25 | | son living in Erie, Pennsylvania, which is just 60, 70 miles |

**Page 55**

| | | |
|---|---|---|
| 1 | | away from us. And he wouldn't stay in Erie, Pennsylvania. |
| 2 | | When he would come to see his son, he'd come and stay with |
| 3 | | me. I had a big house right there. And so he was under foot |
| 4 | | all the time. He was over the -- he liked to go over to the |
| 5 | | bar recreationally, and every time he was there held walk |
| 6 | | through and check everything. Keep in mind, I was doing |
| 7 | | day-to-day checks on everything there, too, when I was there. |
| 8 | Q. | How often would you say -- from May of 1989 until |
| 9 | | any changes to this fire suppression system occurred, how |
| 10 | | often would it be checked? |
| 11 | A. | By my brother, a minimum of four, a maximum of |
| 12 | | seven or eight times a year. |
| 13 | Q. | And do you recall the actual process that he used |
| 14 | | to check the system? What the step by step process was? |
| 15 | A. | There's not a whole lot to check on this system. |
| 16 | | Okay. You've got heat detectors that are there. And they |
| 17 | | don't there's no way to check a heat detector. You don't |
| 18 | | test the heat detector. Once it activates, you have to |
| 19 | | replace it. So it either works or it doesn't work. And the |
| 20 | | nozzles, you can spin them with your finger. If they spin |
| 21 | | with your finger, they're not clogged up. As far as cleaning |
| 22 | | the hood and plem, that was something that was done on a |
| 23 | | regular basis because Sharyn was very meticulous about |
| 24 | | she'd look in that hood and see a spec of grease and she |
| 25 | | wanted that cleaned. And the fans, they need-~ you needed |

**Page 56**

| | |
|---|---|
| 1 | to clean the fans on a regular basis because the grease |
| 2 | would get up there and clog them up and they wouldn't work. |

| 3 | | So that was something that was done all the time, the |
|---|---|---|
| 4 | | degreaser, liquid degreaser, the whole works. |
| 5 | Q. | Okay. There wasn't a specific schedule for |
| 6 | | maintenance of this fire suppression system at that time, |
| 7 | | from 1989 until the time it was changed? It wasn't, I'm |
| 8 | | going to check it the first of every month, or -- |
| 9 | A. | No. |
| 10 | Q. | It was just when your brother happened to be in |
| 11 | | town – |
| 12 | A. | Yes. |
| 13 | Q. | -- visiting, he checked it? |
| 14 | A. | Yes. It wasn't anything like it was being ignored, |
| 15 | | though |
| 16 | Q. | No. I didn't mean to suggest that. |
| 17 | A. | And the interesting thing about this system is you |
| 18 | | you ·can physically eyeball it. It has a green ready light on |
| 19 | | it. It has a yellow trouble light. It has a red light |
| 20 | | indicating that you've got a problem. |
| 21 | Q. | This was on the control panel? |
| 22 | A. | Right on the control panel. |
| 23 | Q. | Okay. |
| 24 | A. | And that's something that you can physically |
| 25 | | eyeball. |

**Page 57**

| 1 | Q. | Was there any way to turn off the system -- |
|---|---|---|
| 2 | A. | No. |
| 3 | Q. | -- electrically? |
| 4 | A. | If you unplugged it, it still was on -- |
| 5. | Q. | Battery? |
| 6 | A. | -- battery backup. Then you'd be putting up with |
| 7 | | this irritating wine. It would beep every so often. |
| 8 | Q. | I see. I meant to ask you and I forgot to ask you, |
| 9 | | the fan that is in the hood that leads up into the -- |
| 10 | A. | There were two fans. |
| 11 | Q. | There were two fans. Okay. Where were the fans |
| 12 | | located in relation to the hood? |
| 13 | A. | They were in the hood on either end. Maybe a foot |
| 14 | | or two in, I guess. I remember. |
| 15 | Q. | Where were they in relation to the nozzles of the |
| 16 | | fire suppression system? |
| 17 | A. | They were outside of them. |
| 18 | Q. | Meaning – |
| 19 | A. | There were two nozzles.  The fans were out |
| 20 | | here. |
| 21 | Q. | Okay. The fans that were in the hood, were they |

22          always on?
23      A.  No.
24      Q.  When were the fans on?
25.     A.  They would turn the fans on when they needed them.

*Page 58*

1           If it got too hot in the kitchen, they'd turn the fans on.
2           And you could turn one on, one off. You could use one or the
3           other.
4       Q.  This was a manual switch to operate the fans?
5       A.  Yes.
6       Q.  And were the fans always on when the stove was in
7           use.
8       A.  Not necessarily.
9       Q   How was the decision made? Was it just based on
10          the heat of the kitchen?
11      A.  Yeah. If you couldn't stand the heat of the
12          kitchen, you turned on the fan.
13      Q.  Got you. . Was it also used in the event of maybe
14          smoke in the kitchen, or
15      A.  Yes
16      Q.  But there was no particular procedure in place for
17          when these fans were supposed to be on or off?
18      A.  No.
19      Q.  It was just the decision of whoever was using the
20          stove?
21      A.  Sure. I had fans in the barroom, too, to get smoke
22          out, and we turned them off and on, too.
23      Q.  Do you have any knowledge of the power of the fans?
24      A.  They were pretty powerful. I remember when I
25          bought them I used to say they did so many cubic feet per

*Page 59*

1           minute. But I couldn't tell you. I would -- when I turned
2           them on, I could suck all the heat out of the kitchen in the
3           wintertime in no time at all and make the barroom cold. So
4           I'd be careful.
5       Q.  So they were --
6       A.  Powerful fans.
7       Q.  Were they unusually powerful for the job that they
8           were doing?
9       A.  It was a big hood.
10      Q.  So they had to be powerful fans just to make the
11          hood useful?
12      A.  Uh-huh.
13      Q.  Okay. Do you recall at any time that it was

14          necessary to put on both fans at once?
15    A.    Oh, yeah.


**MRS. BECK**

*Page 44*
22    Q.    And in 1990 or '91, do you recall the kitchen
23          having any type of fire suppression system in it?
24    A.    Yes, we had a system in place.
25    Q.    Can you describe it for me?

*Page 45*
1     A.    From my nonprofessional point of view, yes, I can
2           describe it to you. There was a hood, there were nozzles.
3           It was a Halon system. There were detectors that would
4           detect a change in the kitchen.
5     Q.    Heat sensors you mean?
6     A.    Right. And then that would be -- that would --
7           Halon would be released and extinguish the fire.
8     Q.    And you mentioned a hood. When you say, hood, do
9           you mean like there was a hood over the Garland commercial
10          stove?
11    A.    Right. There was a stainless steel --
12    Q.    And I have a hood in my kitchen over a stove and it
13          has a fan in it to pull off exhaust and a light. Is that
14          what we're talking about, something like that?
15    A.    Right.
16    Q     Okay. And is the hood connected to the
17          extinguishing system?
18    A.    I don't -- I don't -- obviously, .it all has to be
19          connected somehow. I'm sure it must be connected.
20    Q.    Okay. And were there any canisters that you
21          noticed that contained anything like Halon fluid in the
22          kitchen?
23    A.    In the kitchen, no, other than the handheld
24          wall-mounted fire extinguisher which we kept on hand there
25          and in the dining room and in the bar.

*Page 46*
1     Q.    And at the hood area over the Garland stove, were
2           there any nozzles?
3     A.    Yes.
4     Q.    How many?
5     A.    Two. I'd say two.

6   Q.   Besides the two nozzels at the hood area, were
7        there nozzels anywhere else in the kitchen? And I'm talking
8        between 1991 to 2005 -- or 2003.
9   A.   I don't think so. I think that was the two.
10  Q.   And from 1990 or '91 to 2003 when this fire
11       occurred that we're here about today, do you recall any
12       changes made to the system you just described for us in terms
13       of nozzels, or the hood, or the --
14  A.   No. That part of it I don't believe is -- to my
15       knowledge, I don't -- I don't know. It might have been
16       updated or whatever, but the general idea was -- remained the
17       same.
18  Q.   And to your knowledge did the Beck Corporation have
19       any contractor that it hired to come in to clean the hood and
20       the kitchen area?
21  A.   My brother-in-law has a business in Ohio. He came
22       often and
23  Q.   Would he clean it or inspect it?
24  MR. LORENZ:  He's talking about the cleaning. Just
25       cleaning.

*Page 47*

1        You are just talking about the cleaning of the
2        hood, right?
3   MR. MCDYER: Right.
4   A.   Of the hood?
5   Q.   Yeah. Ventilating system. Was the ventilating
6        system serviced? Aside from your brother-in-law coming to
7        the restaurant occasionally and checking the system over, did
8        you have any contractor come in four times a year, on a
9        quarterly basis, to service the ventilating system, the
10       exhaust ducts, hood over cooking appliances, cleaning the
11       hood over the cooking appliances?
12  A.   He always did those things when he came and cleaned
13       those things. I also had women that I hired to clean. I
14       mean, it's not -- it's not like you are cleaning a 30-inch
15       hood over your own stove. You've got to get up there and
16       clean with degreasers. And that's something you do all the
17       time, so -- and I had several cleaning ladies contracted over
18       a period of. time that would have cleaned other items as far
19       as the literal cleaning of the type of equipment that you are
20       talking about. I'm not sure I'm answering you correctly.
21  Q.   You also said these ladies, besides cleaning the
22       kitchen equipment that we're talking about, they also did
23       other cleaning in the restaurant. Is that what you're
24       saying?

25   A.    No. Mostly I really honestly hired them to clean.

*Page 48*

1    Q.    The kitchen?
2    A.    The kitchen.
3.   Q.    And do you remember a name for us in, say, 2003?
4.   A.    Well, I had one woman that cleaned. Her first name
5          is Katy.
6    Q.    With a K?
7    A.    Yes. Actually, her name was Cocaine Katy, but I
8          don't think that's going to help us too much.
9    Q.    I just mentioned that because I recently saw a Katy
10         with a C?
11   A.    I'm sure it was a K.
12   Q.    Did she live in the area?
13   A.    Yes. Yes, she did.
14.  Q.    And in November of 2003, this is the month
15         immediately before the fire, was your brother-in-law visiting
16         you that month?
17   A.    Yes. He came up with his family.
18   Q.    Did your brother-in-law go to the Rainbow Inn that
19         month?
20   A.    He certainly did.
21   Q.    Did you accompany him or did he go by himself?
22   A.    I may have walked over with him. I don't -~ I
23         don't -- I probably walked over with him, unlocked the place.
24         I wanted him to do -- I wanted him to check the burglar alarm
25         system, make sure that was all in working order.

*Page 49*

1    Q.    In November of 2003, did you actually spend time
2          observing your brother-in-law doing whatever it was he did or
3          did you unlock it and say, here you go, Robert, thanks, I'm
4          going to go back over and take care of Harold, you know, or
5          something like that?
6    A.    I don't really recall. I know that we went over, I
7          asked him specifically to do those things, clean that, check
8          that, check my burglar alarm. I may have stayed. I may not
9          have stayed. I don't really ·literally recall.
10   Q.    In the past, other than November of 2003, did you
11         have an opportunity to observe your brother-in-law Robert
12         Beck do testing or inspection of the kitchen suppression
13         system?
14   A.    Yes. I knew he would be there and I would watch
15         him do whatever he was doing, but --
16   Q.    Do you recollect what you have seen him do?

| 17 | A. | I recollect that he was there, that he would walk |
| 18 | | up, look at something, do whatever he was doing. I don't |
| 19 | | specifically know what he did other than he cleaned it and he |
| 20 | | maintained it for me and told me everything was in good |
| 21 | | working order. |
| 22 | Q. | Did he have any tools with him when he would do |
| 23 | | this? |
| 24 | A. | Oh sure. I think he did. |

Importantly, the Beck Corp. did not testify in a conclusory or summary manner, but instead carefully identified the existence, appearance, location and operation of the Halon fire suppression system in great detail. When considered in light of the dearth of evidence to the contrary, this testimony is even more compelling.

Further, while not direct evidence of the existence of the system, the fact that Mr. Beck was previously licensed to install fire suppression systems and owned a company, at which Mrs. Beck was employed, that installed and maintained such systems, provides circumstantial support for Beck Corp.'s position. Certainly, logic dictates that individuals knowledgeable about such systems and their importance in a restaurant kitchen are especially inclined to ensure that a fire suppression system was in place and operational at all times. (Ex. 5, Mr. Beck Depo., 13-17; 23-26; Ex. 6, Mrs. Beck Depo., 15-16; Ex. 31, Affidavit of Harold Beck, ¶6).

Looking next to the evidence adduced from third parties, no less than eight (8) witnesses have provided affidavits attesting to personally observing the fire suppression system or parts thereof. Safeco has offered no evidence to the contrary, despite the fact that it has been in possession of each such affidavit since on or about July 11, 2006. (Exs. 17-24). Indeed, upon information and belief, Safeco had not contacted a single affiant as of the close of discovery. (Ex. 31, Affidavit of Harold Beck, ¶14).

One such affiant, Robert J. Beck, of R.J. Beck Protective Systems (and the brother of Mr. Beck), carefully detailed not only the nature of the system, but his, at least, semi-annual

servicing of such system. (Ex. 24). Again, Safeco cannot and has not attempted to investigate or refute this testimony. Robert J. Beck's letter attached to his affidavit has been in Safeco's possession since it was produced at the outset of this case as part of Beck Corp.'s Rule 26 disclosures on or about June 25, 2005. (Ex. 28). Nevertheless, upon information and belief, Safeco had not contacted Robert J. Beck as of the close of discovery. (Ex. 31, Affidavit of Harold Beck, ¶14).

Not only did Safeco not attempt to follow up on or refute the third-party evidence adduced by Beck Corp., it has failed to produce any such evidence in support of its denial of coverage. This is, most likely, because Safeco has admittedly performed little, if any, investigation regarding these issues, apparently opting to attempt to improperly shift that burden and impose it upon its insured. When asked what investigation Safeco undertook (other than talking to Mr. Beck, who was neither an officer, a shareholder, nor an employee of Beck Corp.) to determine whether a fire suppression system was in place and/or properly serviced, Smith testified that he, as the claims adjustor and the person responsible for denying the claim, did nothing. (Ex. 4, Smith Depo., 86-86). In fact, though prior to sending the Denial Letter Smith retained a fire investigation company to inspect the site and attempt to determine the cause of the Fire, he did not even ask the investigator to attempt to determine whether a fire suppression system was in place or operational. (Ex. 4, Smith Depo., 71-74). Further, Safeco admits that it has no idea whether parts of the fire suppression system are (or were ever) in the debris on the site of the Rainbow Inn. (Ex. 4, Smith Depo., 51, 60-62).

Given the facts set forth above, it is not surprising that Safeco testified that it does not know if a fire suppression was in place at the Rainbow Inn. Indeed, this was the best and most honest answer that it could provide under the circumstances and in light of its almost complete

lack of investigation of Beck Corp.'s claim. No reasonable person, not even Safeco, can conclude that the fire suppression system was not in place at the Rainbow Inn under the facts and evidence of record in this case. Further, the only evidence of record regarding the maintenance of the system is that offered in the testimony of Mr. and Mrs. Beck and in the affidavit of Robert J. Beck. This evidence precisely and explicitly refutes the Safeco's bare contention that the system was not properly serviced.

Considering the record as a whole, particularly in light of the fact that Safeco bears the burden of proving the applicability of Section P-8, no reasonable jury could conclude that Section P-8 applies to defeat Beck Corp.'s claim for coverage or that Safeco properly denied coverage under Section P-8. Thus, the entry of summary judgment in Beck Corp.'s favor is mandated by Rule 56 of the Federal Rules of Civil Procedure.

## V.    <u>CONCLUSION</u>

From the time of the Fire, Safeco has ignored the duties owed to its insured. Rather than properly investigate Beck Corp.'s claim, Safeco stood idly by while Beck Corp. was forced, by Safeco and by necessity, to bear Safeco's burden and to investigate and provide a factual basis to refute Safeco's unfounded denial of coverage. Beck Corp. has more than satisfied this misplaced burden through a costly and time consuming investigation of its own claim. Nevertheless, regardless of Beck Corp.'s efforts, Pennsylvania law and the Federal Rules of Civil Procedure unquestionably place the burden upon Safeco to prove, with facts and evidence of record, the applicability of Policy Section P-8 and its defenses in this case. Given Safeco's extraordinarily limited investigation of Beck Corp.'s claim and the overwhelming evidence in Beck Corp.'s favor, Safeco simply cannot satisfy these burdens. Thus, Beck Corp. respectfully requests that

this Court enter summary judgment in its favor determining that Safeco breached the Policy with

Beck Corp. and that Safeco is liable for damages resulting from such breach.

Respectfully submitted,

/s/ Richard T. Victoria
Richard T. Victoria
Pa. I.D. #76681 - rtv@muslaw.com
Joshua R. Lorenz
Pa. I.D. #84397 - jrl@muslaw.com

MEYER, UNKOVIC & SCOTT LLP
1300 Oliver Building
Pittsburgh, PA 15217
(412) 456-2800
Fax: (412) 456-2864

Counsel for Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WALTER BECK CORPORATION d/b/a THE RAINBOW INN,   ) | CIVIL DIVISION |
| ) | |
| ) | Civil Action No. 04-348 - Erie |
|      Plaintiff,   ) | |
|   vs.   ) | JUDGE MAURICE B. COHILL, JR. |
| ) | |
| SAFECO CORPORATION, AMERICAN   ) | |
| ECONOMY INSURANCE COMPANY, and   ) | |
| AMERICAN STATES INSURANCE   ) | |
| COMPANY,   ) | |
| ) | |
|      Defendants.   ) | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing BRIEF IN

SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT was served

upon counsel for the Defendant by electronic service this 6th of December, 2006 at the following

address:

> Daniel P. McDyer, Esquire
> ANSTANDIG, McDYER & YURCON, P.C.
> 1300 Gulf Tower
> 707 Grant Street
> Pittsburgh, PA 15219


>     /s/ Richard T. Victoria
>        Richard T. Victoria