```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
    WALTER BECK CORPORATION d/b/a   Civil Action No. 04-348-Erie
 3  THE RAINBOW INN,

 4       Plaintiff,                 Judge Maurice B. Cohill, Jr.

 5  vs.

 6  SAFECO CORPORATION, AMERICAN
    ECONOMY INSURANCE COMPANY, and
 7  AMERICAN STATES INSURANCE COMPANY,

 8       Defendants.
                                        /
 9

10

11
         Deposition of:      Harold Beck
12
         Taken by:           Defendants
13
         Date:               November 11, 2006
14
         Time:               11:00 a.m. - 1:21 p.m.
15
         Location:           Holiday Inn Express,
16                           The Villages
                             1205 Avenida Central
17                           Lady Lake, Florida

18       Reported by:        Leslie Richmond, RPR

19

20

21

22

23
                ZACCO & ASSOCIATES REPORTING SERVICES
24              605 East Robinson Street, Suite 430
                     Orlando, Florida  32801
25                       (407) 425-6789
```

ORIGINAL

ZACCO & ASSOCIATES REPORTING SERVICE
(407) 425-6789

DEFENDANT'S EXHIBIT

1  Q. I didn't mean to imply that you weren't smart.
2  A. No, I -- no. You learn as you do.
3  Q. And so -- but your original training came from your
4  brother?
5  A. Yes.
6  Q. And how did he receive his training in that field?
7  A. He was in law enforcement originally. And he did
8  inspections, he investigated fires, investigated burglaries,
9  things like that. And from law enforcement, he went into
10 this particular type of business, work.
11 Q. Does he have a license in that area?
12 A. Yes, he does.
13 Q. Is that in the state of Ohio?
14 A. He's licensed in many states. He does work across
15 the nation. He works for the federal government.
16 Q. Okay. Do you still have a license in Texas for --
17 A. No.
18 Q. -- installation, inspection of burglar and fire?
19 A. No.
20 Q. When did you let that license lapse?
21 A. When I sold the company to Network Security, there
22 was no reason for me to be licensed anymore.
23 Q. Okay. Did the state of Texas require any
24 additional training to keep your license?
25 A. All I had to do -- well, for the fire -- there were

1  Colorado. And it was a small plant, only 100,000 square
2  feet. And we did that, then they said, how about our Las
3  Vegas facility. And we did that. And then they had this
4  enormous one on the west coast out in California. All in
5  all, I think we did about 10 of them.
6     Q.   When you started this business -- correct me if I'm
7  wrong -- it was only -- you were only installing fire
8  detection systems?
9     A.   Fire. Not fire alarms. Smoke detectors. That's
10 all I -- my wife and I started it on our dining room table
11 selling smoke detectors.
12    Q.   And it just built from there?
13    A.   Yes.
14    Q.   When did you become involved in selling fire
15 suppression systems?
16    A.   Almost immediately. Once we were doing the smoke
17 detectors -- my wife doesn't remember these things, but I do.
18 A place by the name of Scopes Slide Service in Austin, Texas
19 was a company that stored valuable records, Lyndon Johnson's
20 personal diaries, things like that, and they needed a special
21 fire suppression system so if there was a fire -- if there
22 was a fire or if the thing was inadvertently activated, it
23 wouldn't damage the records. And that was my first exposure
24 to Halon fire suppression systems.
25    Q.   What year would that have been?

1  coming out of it going to an end, and it's activated by a
2  detector or a pull -- manual pull station.  It's a very
3  simple system.
4      Q.  So it wasn't --
5      A.  It's a no brainer.
6      Q.  I understand.  After you installed this first
7  system for Scopes Slide Service, did you have occasion to
8  sell other Halon fire suppression systems?
9      A.  This became my showpiece.
10     Q.  It was your main business?
11     A.  It was -- it became my showpiece, because back then
12 the little laptops we use for our computer, they used to be
13 in a room larger than this, and they had to be protected.
14 And Halon was a perfect agent for protecting a computer room.
15 And as big companies computerized and they got their computer
16 room, this was a natural.
17     Q.  How long did you stay involved in that kind of
18 business, installing and maintaining?
19     A.  Until we sold to Network Security.  And we sold to
20 Network Security in 1987.
21     Q.  Did your company also have contracts with these
22 companies that you installed the systems in to maintain the
23 systems?
24     A.  Yes, we did.
25     Q.  And so you maintained every system that you

1  I mean, if you're going to buy a control panel and you got a
2  good price on the control panel one place, you buy it there.
3  If you're -- if you go to buy the tanks -- and the tanks come
4  in all different sizes and all different pressures, so you
5  can -- you go where the best price is.
6      Q.  When you purchased the original system that was
7  installed in May of 1989, do you remember any of the
8  suppliers who sold you the components?
9      A.  No.
10     Q.  Would these have been suppliers that you may have
11 worked with in Texas?
12     A.  Possibly.
13     Q.  Could they also have been suppliers that supplied
14 for your brother's business?
15     A.  Yes.  And he changes them like he changes his
16 shirt, so --
17     Q.  Okay.  So when you purchased this system in May of
18 1989 after consulting with your brother and deciding on the
19 best system, all you purchased were two tanks of Halon gas, a
20 control panel, the sensors, and the pipes?
21     A.  The rotating nozzels.
22     Q.  And the nozzels.
23     A.  Plumbing and all that.
24     Q.  And these would have all been purchased from
25 different suppliers or maybe the same supplier?

```
 1    A.   A lot of this -- like the pipe, I could buy
 2 locally.  Okay.  The nozzels, we may have had them laying
 3 around.  You know, these things, you use.  Buying a
 4 restaurant, if I had equipment -- you know, my first burglar
 5 alarm system in there was equipment that I brought with me
 6 from Texas.  So for me to say I bought it brand new or
 7 whatever, I can't say initially.  But a lot of the stuff I
 8 had.  Wiring, I had.  Conduit, I had.  Things like that.
 9    Q.   And anything that would have recorded any of these
10 purchases would probably have been lost in the fire?
11    A.   We kept all our records underneath the Rainbow Inn.
12 I had fixed it up there.  I had a vault type thing there.
13    Q.   Would you have paid cash for all of these
14 components?
15    A.   Cash, check, whatever.
16    Q.   Did you ever attempt to retrieve any records,
17 banking records, that may have reflected these purchases?
18    A.   You know how many times these banks in Pennsylvania
19 have changed names?
20    Q.   Yes, I do.
21    A.   Okay.
22    Q.   So it would be impossible to --
23    A.   Yes.
24    Q.   Okay.  Take me through the process of the actual
25 installation of the original Halon system.  What did you
```

1  June.

2  Q. Of 2004?

3  A. Yeah.

4  Q. And did you ever provide any information to Mr.
5  Smith in response to that request?

6  A. No.

7  Q. And your reason for that was?

8  A. Any records I had were burned up in the fire to
9  begin with and I wasn't about to go reconstructing something
10 for him when he wasn't dealing in good faith with me. He was
11 ignoring -- I sent him probably four or five different
12 letters. I attempted to call him probably 40 or 50 times and
13 he wouldn't respond to me at all. So at that point I had had
14 enough.

15 Q. Understood. Did Mr. Smith ever ask you to simply
16 give him the name of the people who maintained your fire
17 suppression system?

18 A. Never.

19 Q. Do you recall any letters that he may have sent
20 that asked you to give him the name?

21 A. In July, June or July, he sent me a registered
22 letter asking me for this stuff, but by that time I was
23 looking for a lawyer.

24 Q. Okay. So you were in no way interested in dealing
25 with Mr. Smith anymore by June or July when he was requesting

1  that information?

2  A. That's right.

3  Q. And you made the decision not to provide him that
4  information because you were looking for counsel to file a
5  lawsuit?

6  MR. LANE: Objection. What information are you
7  talking about, because I believe actually if you look in
8  the letter it asks for the records which Mr. Beck has
9  already testified were burned in the fire to the extent
10  they existed.

11  Q. Did Mr. Smith ever ask you to simply provide him
12  the name of the people who did the maintenance? Do you
13  recall that?

14  A. No. No.

15  Q. So there was never any request from Mr. Smith or
16  from the insurance company?

17  A. Not that I recall.

18  Q. If they had asked you for that information, would
19  you have provided it at that time?

20  A. If they had asked me for the information in January
21  or February or March or April, I would have cooperated. You
22  know, if he would have said, hey, it appears there's a
23  misunderstanding here. I'm talking about an Ancil system,
24  you're talking about a Halon system. I think we're both
25  talking about a fire suppression system. I'm sorry that I

1    A.    It would have been shortly after the policy was
2  written.  Probably in '94 or '95.
3    Q.    '94 or '95.  And this was a representative of
4  American Economy Insurance?
5    A.    Safeco, whoever.  I don't know.
6    Q.    How did they approach you to do the inspection?
7    A.    They'd just show up at the bar one day, and the
8  bartender would be there.  And I'd be over at the house doing
9  whatever I was doing.  I'd get a phone call, there's somebody
10 from the insurance company here.  And I would go over.
11   Q.    Now, when they said, there's somebody from the
12 insurance company, did they specifically say which insurance
13 company?
14   A.    They would give me a card.  It was the people that
15 were doing the property insurance.  And they'd say they were
16 from the loss prevention department and that they were here
17 to do an inspection.  Sure.  I'll go with you.  I'll show you
18 whatever you want to see.
19   Q.    At the time of that first inspection that you
20 recall, do you recall where they said they came from?
21   A.    No.
22   Q.    Do you recall a name of the person?
23   A.    No.
24   Q.    The only thing that you obtained from them was a
25 business card?

```
 1   we had upgraded with the exchange.
 2        Q.   Okay.  As far as you knew, you were purchasing the
 3   most up to date Halon at any time you purchased a tank?
 4        A.   Sure.  Yeah.
 5        Q.   What size pipe is installed with the Halon system?
 6        A.   I think it's three-quarter inch copper pipe.
 7        Q.   And that's standard for any fire suppression system
 8   using Halon?
 9        A.   Now, I'm talking -- I haven't been in the industry
10   for a long time.
11        Q.   Absolutely.  But at the time that you installed
12   this --
13        A.   You know, we installed it in 1989.  If my memory
14   serves me properly, we were using three-inch copper tubing
15   for the plumbing.
16        Q.   Okay.  Let me ask a couple questions about your
17   brother and his business.
18        A.   Sure.
19        Q.   Does your brother sell or install fire suppression
20   systems for any specific manufacturer?
21        A.   No.  Not for any specific manufacturer.
22        Q.   Does he then design the systems himself with --
23   through component work, or --
24        A.   I always designed it myself.  I would suppose he
25   did, too.  Again, it's not rocket science.  It's -- you've
```